**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **ADRIENNE HOOD, Individually and as Administrator of the Estate of Henry Green V. c/o Walton + Brown, LLP.** **395 E. Broad St., Suite 200** **Columbus, OH 43215** | **Case No.:** |
| **Plaintiff,** | |
| **vs.** | |
| **CITY OF COLUMBUS, OHIO; and DOES 1-100, UNKNOWN, City of Columbus 911 Operators and Other Employees** **c/o City Attorney** **77 N. Front St.** **4th Floor** **Columbus, Ohio 43215** | **Complaint** **JURY DEMAND ENDORSED** |

**ADRIENNE HOOD, Individually and as Administrator of the Estate of Henry Green V. c/o Walton + Brown, LLP.**
**395 E. Broad St., Suite 200**
**Columbus, OH 43215**

           **Plaintiff,**

**vs.**

**CITY OF COLUMBUS, OHIO; and DOES 1-100, UNKNOWN, City of Columbus 911 Operators and Other Employees**
**c/o City Attorney**
**77 N. Front St.**
**4th Floor**
**Columbus, Ohio 43215**

**And**

**JASON S. BARE, Officer**
**Columbus Division of Police**
**c/o Columbus Division of Police**
**120 Marconi Blvd.**
**Columbus, Ohio 43215**

**Individually and in His Official Capacity as Employee of the City of Columbus, Ohio**

**And**

**ZACHARY B. ROSEN, Officer**
**Columbus Division of Police**
**c/o Columbus Division of Police**
**120 Marconi Blvd.**
**Columbus, Ohio 43215**

**Individually and in His Official Capacity as Employee of the City of Columbus, Ohio**

**Case No.:**

**Judge:**

**Complaint**

**JURY DEMAND ENDORSED**

PAGE **1** OF **36**

**And**

**ERIC J. PILYA, Sergeant**
**Columbus Division of Police**
**c/o Columbus Division of Police**
**120 Marconi Blvd.**
**Columbus, Ohio 43215**

**Individually and in His Official Capacity as**
**Employee of the City of Columbus, Ohio**

**And**

**GARY CAMERON, Commander**
**Columbus Division of Police**
**c/o Columbus Division of Police**
**120 Marconi Blvd.**
**Columbus, Ohio 43215**

**Individually and in His Official Capacity as**
**Employee of the City of Columbus, Ohio**

**And**

**KIM JACOBS, Chief**
**Columbus Division of Police**
**c/o Columbus Division of Police**
**120 Marconi Blvd.**
**Columbus, Ohio 43215**

**Individually and in her official capacity as**
**Employee of the City of Columbus, Ohio**

**Defendants.**

## I.    PRELIMINARY STATEMENT

1. This civil rights and wrongful death case challenges the fatal shooting of Henry Green, V (hereinafter, "Decedent", "Plaintiff" or "Henry") by Columbus Division of Police Officers Jason Bare and Zachary Rosen on June 6, 2016.

2. Henry Green was a 23-year-old African-American male who graduated from Brookhaven High School as a member of the class of 2011. He was a bright young man who made everyone

laugh. He could always be counted on to crack a joke or lighten a tense situation. He loved cooking and had plans to attend culinary school as well as pursuing a degree in business administration in an effort to one day open a family-owned restaurant. He loved the outdoors, sports, and most importantly his family. He was relied on to care for his young nephew and other family members. Henry was a son, a brother, an uncle, and a loved one to many.

3. Henry was killed on June 6, 2016 after encountering plain-clothed Officers Bare and Rosen in an unmarked vehicle. Henry was shot eight times by Officers Bare and Rosen, who fired a combined 23 shots at Henry, and subsequently died as a result of the gunshot wounds suffered.

4. Officers Bare and Rosen confronted Henry in a fashion that unnecessarily created a dangerous situation, failing to follow well-established constitutional policing practices including failing to identify themselves as police officers and using deadly force inappropriately, excessively and unreasonably, amongst numerous other violations of policy and law.

5. Officers Bare and Rosen were working as a part of the City of Columbus' Community Safety Initiative (CSI), previously known as the "Summer Strike Force."

6. Upon its creation, the initiative called for the utilization of aggressive uniformed tactics and the initiative was referred to as "a plan designed by officers for officers."

7. Throughout the years, many community members have referred to the officers working this program as "The Jumpout Boys," due to their practice of jumping out of unmarked vehicles and confronting citizens.

8. Many say that in fact, "The Jumpout Boys" target citizens for unreasonable encounters in order to seek out criminal activity.

9. The tactics and strategy of the CSI/Summer Strike Force authorized Columbus Division of Police Officers to act recklessly, aggressively and unreasonably in carrying out their ordinary duties.

10. Typically, Officers are trained early in their careers on the constitutional and community expectations regarding their powers of arrest and use of force and that their use of police powers are to be used with the utmost of care and restraint.

11. The Columbus Division of Police's chain of command endorsed the dangerous and unconstitutional policing tactics that are connected to this incident and that placed Henry and continue to place the public at unnecessary risk of death and/or injury from not only Officers Bare and Rosen, but from others in the department who have a similar proclivity to use force unreasonably and inappropriately.

12. During his application process with the Columbus Division of Police, Officer Bare admitted to drinking and driving 8 times in the previous twelve months before he applied to be a Columbus Division of Police Officer. He stated that the most he had to drink prior to driving was ten to twelve beers in a 5-hour period. In fact, he had last driven under the influence two weeks prior to giving his statement to Columbus Division of Police.

13. The hiring of Officer Bare is an example of a troubling pattern by the Columbus Division of Police of hiring officers with questionable decision-making skills, and in this case criminal behavior, that is reflective of the Officers employed by the City of Columbus. The negligent hiring of Officer Bare and others is a pattern and practice directly related to the death of Henry Green V.

14. Officers Bare and Rosen have been subject to many investigations due to their actions as officers, including complaints of unnecessary and excessive force, retaliation, and rude and discourteous conduct.

15. Most recently, Officer Rosen was filmed stomping on the head of a handcuffed citizen, raising concerns throughout the community.

16. The failure to properly train, supervise and discipline Officers Bare and Rosen is an authorization of their behavior and reflective of a pattern and practice of behavior within the Columbus Division of Police.

17. The City of Columbus and Columbus Division of Police failed to properly investigate the circumstances surrounding Henry's death, demonstrating a deliberate indifference to their right to be free from constitutional violations such as those committed by Officers Bare and Rosen, and demonstrating a pattern and practice of failing to investigate and discipline officers for the use of force against citizens.

18. Plaintiff brings this civil rights and state law action to ensure constitutional policing practices are respected, to secure fair compensation in order to hold the City of Columbus and its liable employees accountable for their actions and to help end the civil rights violations carried out by Columbus Division of Police Officers against members of the community.

## II.    JURISDICTION AND VENUE

19. This action is brought pursuant to Ohio statutes, and United States Constitution Amendments IV and XIV, § 1983 and § 1988, respectively.

## III.    THE PARTIES

20. Plaintiff Adrienne Hood is the Administrator of the Estate of Henry Green V and was a resident of Franklin County, Ohio, at all times material to the subject incident.

21. Defendant City of Columbus, Ohio, is a political subdivision of the state of Ohio, organized and existing under the laws of the state of Ohio, and operating and conducting business in Franklin County, Ohio. Columbus Division of Police is a subdivision of Defendant City of Columbus, Ohio.

22. Upon information and belief, Defendant City of Columbus, Ohio Division of Police Officer Jason Bare is being sued in his individual capacity; to wit, Officer Bare was a resident of Franklin County at the time of the incident. Officer Bare was at all times relevant to this action a law enforcement officer employed by the Columbus Division of Police. Officer Bare is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. He is sued individually and in his official capacity as an employee of the City of Columbus.

23. Upon information and belief, Defendant City of Columbus, Ohio Division of Police Officer Zachary Rosen is being sued in his individual capacity; to wit, Officer Rosen was a resident of Franklin County at the time of the incident. Officer Rosen was at all times relevant to this action a law enforcement officer employed by the Columbus Division of Police. Officer Rosen is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. He is sued individually and in his official capacity as an employee of the City of Columbus.

24. Upon information and belief, Defendant City of Columbus, Ohio Division of Police Sergeant Eric Pilya is being sued in his individual capacity; to wit, Sergeant Pilya was a resident of Franklin County at the time of the incident. Officer Pilya was at all times relevant to this action a law enforcement officer employed by the Columbus Division of Police. Sergeant Pilya is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. He is sued individually and in his official capacity as an employee of the City of Columbus.

25. Upon information and belief, Defendant City of Columbus, Ohio Division of Police Commander Gary Cameron is being sued in his individual capacity; to wit, Commander Cameron was a resident of Franklin County at the time of the incident. Commander Cameron was at all times relevant to this action a law enforcement officer employed by the Columbus Division of Police. Commander Cameron is a "person" under 42 U.S.C. § 1983 and at all times relevant to this

case acted under color of law. He is sued individually and in his official capacity as an employee of the City of Columbus.

26. Upon information and belief, Defendant City of Columbus, Ohio Division of Police Chief Kim Jacobs is being sued in her individual capacity; to wit, Chief Jacobs was a resident of Franklin County at the time of the incident. Chief Jacobs is the current holder of the office of Chief of the Columbus Division of Police, and the Chief Law Enforcement Officer for Columbus, Ohio. Chief Jacobs is the final policymaker with respect to the policies of the Columbus Division of Police. Chief Jacobs is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. She is sued individually and in her official capacity as an employee of the City of Columbus.

27. All of the events or omissions giving rise to this action occurred in Franklin County, Ohio.

28. The actions of the Defendants, as well as their agents and employees, which were within the scope of their employment, were at all relevant times undertaken with malice and knowing disregard for the Plaintiff's rights.

29. This is an action seeking damages in excess of seventy-five thousand dollars ($75,000.00), exclusive of costs, interest, and attorney's fees.

## IV. FACTUAL ALLEGATIONS

*Summer Strike Force/Community Safety Initiative*

30. In February 2006, the City of Columbus and Columbus Division of Police created a "Strike Force" committee that was comprised of multiple patrol officers and command personnel throughout the division.

31. The committee developed an "improved Strike Force initiative" that was designated "a plan designed by officers for officers."

32. The plan called for the "utilization of aggressive uniformed tactics" to improve the effectiveness of the Columbus Division of Police.

33. Throughout the following years, the name of the initiative alternated between the "Summer Strike Force," the "Summer Safety Initiative," the "Police Strike Force," and the "Summer Anti-Gang Initiative" before final becoming the "Community Safety Initiative" in 2011.

34. The City of Columbus and Columbus Division of Police measured success by tracking the number of felony arrests, misdemeanor arrests, drugs seized, warrants served and firearms confiscated. There were no specific numeric goals that the program set out to reach, yet the numbers of arrests, drugs seized, warrants served and firearms confiscated were touted as accomplishments.

35. The City of Columbus and Columbus Division of Police continued to tout the program as a success, even as crime increased.

36. In 2006, although the goal was to reduce violent crime in the areas targeted, violent crime actually increased during the time that the Summer Strike Force was in operation.

37. Despite this fact, the officers that worked the Strike Force that year were recommended for "Medal of Merit" awards.

38. Each year the City of Columbus and Columbus Division of Police reported on the numbers of arrests, guns seized and in some years the amounts of drugs seized.

39. These goals encouraged officers to proactively find crimes being committed in order to boost their goals.

40. Number-based policing has been found to send the wrong message to the public and encourage officers to create unnecessary confrontations.

41. Laurie Robinson, former Chair of President Obama's Task Force on 21st Century Policing, has previously stated "If citizens believe that tickets are being issued or arrests are being made for reasons other than the goal of law enforcement, which is about public safety, then their

trust in the legitimacy of the system is eroded."[1] In the same NPR article that quoted Ms. Robinson, Tim Dees, a retired Reno, Nevada police officer stated "the satisfaction of the citizen, very difficult to put a value on that. And it's much easier for, frankly, lazy administrators to make it into a numbers game." [2]

42. Many members of the Columbus, Ohio community have complained about the tactics of Columbus Division of Police officers, including those working in the Summer Strike Force.

43. Columbus, Ohio community members have complained that some Columbus Division of Police officers have taken on the practice of being in plainclothes and unmarked cars prior to "jumping out" on citizens, looking for crimes where no crimes are being committed and making citizens feels less safe.

44. The officers who gunned down Henry Green V, Officer Jason Bare and Officer Zachary Rosen, were working the Summer Strike Force when they killed him on June 6, 2016.

*Officer Hiring*

45. Officer Jason Bare was hired by the Columbus Division of Police on December 17, 2006.

46. Prior to being hired by the Columbus Division of Police, Officer Bare was convicted of Disorderly Conduct while a student at Ohio University, as a result of being found to be publicly intoxicated and walking in the street. Officer Bare also failed to appear in court for a year before being found guilty.

47. Prior to being hired by the Columbus Division of Police, Officer Bare had been reprimanded while employed as a Juvenile Detention Center Officer for leaving a juvenile who was on suicide watch unattended.

48. Officer Bare also admitted to stealing a yard sign as an adult.

---

[1] http://www.npr.org/2015/04/04/395061810/despite-laws-and-lawsuits-quota-based-policing-lingers
[2] http://www.npr.org/2015/04/04/395061810/despite-laws-and-lawsuits-quota-based-policing-lingers

49. During his interview process with the Columbus Division of Police, Officer Bare admitted to driving under the influence of alcohol eight times in the twelve months leading up to his application with the Columbus Division of Police.

50. Officer Bare's admission of drinking and driving under the influence of alcohol eight times in those previous twelve months was listed in his background packet as an "area of concern" by his background investigator.

51. Officer Bare stated that the most he had to drink during this time prior to driving was "ten to twelve beers over a five-hour period."

52. Officer Bare admitted to last driving a vehicle under the influence two weeks prior to his interview, having had four beers after dinner.

53. Despite the clear concerns with drinking alcohol in excess, driving under the influence of alcohol and public intoxication as well as leaving a juvenile under suicide watch unattended, Officer Bare was hired by the Columbus Division of Police.

54. Officer Zachary Rosen was hired by the Columbus Division of Police on December 5, 2010.

55. Officer Rosen's background file notes that he had a criminal history as a juvenile, was fired from a job for not showing up, and admitted to a two-year period of drug use, including cocaine and marijuana use. He was also convicted of being in possession of alcohol while underage.

56. Officer Rosen admitted to committing a felony for which he was never arrested, citing his cocaine usage.

*Officer Pattern of Conduct*

57. Since his hiring by the Columbus Division of Police, Officer Bare has been involved in at least thirty Internal Affairs investigations.

58. Despite this large number of internal investigations, Officer Bare has rarely if ever been disciplined for his behavior, often failing to have allegations against him sustained or receiving a reprieve from his chain of command.

59. On November 16, 2011, the Columbus Division of Police's Employee Action Review System (EARS) Committee found that Officer Bare exhibited a pattern of behavior that warranted review.

60. Specifically, the committee determined that a pattern of conduct may have existed regarding Officer Bare's tactics used and type of force used, identifying a pattern regarding poor officer safety, poor prisoner control techniques and utilizing a taser when suspects could be armed without having lethal force back-up.

61. However, despite the EARS committee identifying this pattern of behavior, Officer Bare's chain of command disagreed with the committee's findings.

62. Officer Bare's sergeant stated that there was not a pattern but rather poor documentation by Officer Bare of his actions.

63. Instead of additional training, Officer Bare's chain of command required copies of any action response forms he completed for the next six months.

64. On January 2, 2013, Officer Bare was conducting a traffic stop when he was heard in the background while his partner was airing information over the radio. He was heard yelling to a driver, "Get back in the car, dumbass." He admitted to making the statement, stating that it was "accidental."

65. He was given counseling by his supervisor related to his actions on January 2, 2013.

66. On March 24, 2014, Officer Bare was accused of throwing a citizen to the ground, calling him a "Dread head fucker," accusing the citizen of selling drugs and stating that he would break out the windows in the citizen's home.

67. Another officer with Officer Bare, Officer Joseph Ritch, was accused of threatening to remove his badge and "whip" the individual's "ass", and was alleged to have stated to him, "that is the most use you have gotten from a pencil and paper in a long time."

68. Despite multiple witness accounts, Officer Bare was cleared of wrongdoing, though Officer Ritch admitted to making his statement regarding the pen and paper.

69. Since his hiring by the Columbus Division of Police, Officer Rosen has been involved in at least thirty-one Internal Affairs investigations.

70. On February 23, 2014, Officer Rosen was accused of approaching a vehicle with his gun out during a traffic stop, pulling a 15-year-old from a vehicle, placing a gun to his head, throwing him to the ground and putting a boot on his head.

71. He was cleared of any wrongdoing in this incident by the Columbus Division of Police.

72. On June 7, 2015, Officer Rosen was alleged to have followed and initiated a traffic stop on a citizen out of retaliation.

73. This complaint was investigated and sustained by Internal Affairs.

74. In issuing his finding, the investigator, Sergeant Raymond Meister, noted many issues regarding Officer Rosen's actions and the explanations for his actions.

75. Sergeant Meister stated, "there is an argument to be made that officers created a situation which resulted in *[name redacted]* committing a traffic infraction he would not have otherwise committed."

76. Sergeant Meister noted that "Officers offer only vague and very general concerns regarding *[name redacted]* behavior, providing a tenuous link to their 'officer safety concerns.' Officer Rosen even indicates that driving in the area of their police cruiser served to 'escalate the situation' in the eyes of the officers."

77. He continued, "[t]here is no substantive evidence *[name redacted]* exhibited even a modicum of threatening behavior which warranted the response by the officers of the immediate need to stop *[name redacted]* and identify him."

78. Sergeant Meister concluded, "[i]t is the finding of this investigator that Officer Rosen and Officer Hardwick did not use good discretion, did not exhibit proper conduct and self-control,

and did not maintain impartiality when addressing the verbal affront created by *[name redacted]*."

79. Despite these findings, Officer Rosen's chain of command initially recommended he be disciplined with non-documented verbal counseling before settling on documented counseling.

80. No further training or discipline occurred related to this incident.

81. On April 8, 2017, Officer Rosen was filmed by a citizen stomping on the head of a handcuffed suspect, prone and no longer a threat.

82. That incident is currently under investigation by the Columbus Division of Police, but Officer Rosen has suffered no adverse employment action to this date.

*The Death of Henry Green V*

83. On June 6, 2016, around 6:00 pm, Henry Green, V was in in his Linden neighborhood, located in Columbus, Ohio. He was walking down the street with a friend, headed to dinner at his aunt's house, located on Duxberry Ave.

84. As he and his friend walked down East 26th Ave and approached the intersection of Ontario St., they encountered a white SUV that swerved as if trying to hit them.

85. As they jumped back, they noticed two white males in the SUV, and they watched the SUV as it turned right on to Gerbert Rd., which was parallel to the street they had then began walking down, Ontario St.

86. On heightened alert and unaware of the intentions of the individuals in the white SUV, Henry and his friend watched the vehicle continue down Gerbert Rd., and as they approached the intersection of Ontario St. and Duxberry Ave., they saw the white SUV speeding down Duxberry Ave. towards them.

87. According to interviews conducted by the Critical Incident Response Team of the Columbus Division of Police on June 22, 2016, Officers Bare and Rosen were in the white SUV and in plainclothes, working the Community Safety Initiative.

88. Officer Bare stated that he was wearing camouflage shorts, a gray t-shirt, and a ball cap.

89. Officer Bare stated his badge was displayed on his chest and hanging from a lanyard outside his shirt.

90. Officer Rosen stated that he was wearing blue jeans, a blue t-shirt and his badge was "hanging from a metal (chain) lanyard."

91. Officer Bare stated that upon driving through the intersection at 26th Ave. and Ontario St., Henry walked into the street towards them and lifted his shirt up at the waist to display a pistol in his front waistband.

92. Officer Bare stated that they aired Henry's description over the radio, turned down Duxberry and drove toward Ontario St., where they again encountered Henry.

93. Officer Bare stated that when they stopped in front of him, Henry lifted his shirt to grab the black pistol, pulled it from his waistband.

94. Officer Bare stated that both he and Officer Rosen yelled "Police," "put your gun down", or "words to that effect," while he used his right hand to lift and flash his badge towards Henry.

95. Officer Bare stated that Henry refused to comply with their commands and instead raised his weapon and pointed it at Officer Rosen.

96. Officer Bare stated that Henry advanced toward Officer Rosen and he heard several gunshots, which he believed were from Henry.

97. Officer Bare stated that he fired a total of seven shots at Henry.

98. Officer Rosen stated that as he and Officer Bare were driving they encountered Henry, who continued walking into the street as if he wanted to force them to stop or strike him.

99. Officer Rosen stated that Henry lifted his shirt and flashed his gun, as if he was trying to get him to slow down so that he could car jack him.

100. Officer Rosen stated that as they drove by, he saw Henry in his left side view mirror aiming the pistol at their vehicle.

101.    Officer Rosen stated that as they approached Henry at the next intersection, Officer Rosen upholstered his pistol.

102.    Officer Rosen stated at this point Henry reached into his waistband and pulled his pistol.

103.    Officer Rosen stated that he raised and pointed his pistol at Henry through the front windshield and put the car in park.

104.    Officer Rosen stated that he pointed his pistol between the gap between the "A" pillar on the driver's side of the vehicle and the open driver's side door and shouted "police" and "don't move" or "words to that effect."

105.    Officer Rosen stated that Henry did not comply and instead raised his weapon towards Officer Rosen.

106.    Officer Rosen stated that because he believed Henry was "firing or about to fire his weapon" he then made the decision to begin firing at Henry.

107.    Officer Rosen stated that he fired his weapon a total of fifteen times.

108.    Officer Rosen stated that Henry did not comply with his commands and he "fired/returned fire" at him.

109.    In his interview with the Columbus Division of Police, Officer Rosen stated people were coming off their porches yelling, "Why did you shoot him?"

110.    Although Henry Green V is not alive to tell his account of the events of June 6, 2016, numerous witnesses have given their accounts of the day in question.

111.    Witness #1 stated that Henry did not pull a weapon on the white SUV while on E. 26th Ave. He stated that there was no indication by Officers Bare or Rosen that they were police officers, neither officer identified themselves as police officers, neither officer had their badge visible, the officers reacted extremely quickly and aggressively, and the officers fired prior to Henry ever raising a weapon at the officers or firing at them. He stated that they continued to walk

towards Henry and fire at him, even as he lay on the ground. He stated that he did not know they were officers until they placed Henry in handcuffs on the ground.

112.    Witness #2 stated that Henry did not have a gun out when he encountered him that day. He stated that the white SUV sped down Duxberry Ave. before coming to an abrupt stop in front of Henry. He stated that he noticed the driver had a gun pointed at the window as he drove down the street. He stated that the officers fired so quickly that he believed the shots were fired almost as soon as they exited the vehicle. He stated that they did not identify themselves as officers and did not have any badge visible. He stated that Officers Bare and Rosen began firing at Henry first, and eventually Henry was able to pull and raise his gun to defend himself. He stated that the officers continued to fire on Henry, even as Henry lay on the ground. He did not know that they were officers until they handcuffed Henry on the ground. He also stated that his fiancée and young children were outside in the backdrop and he feared for their safety.

113.    Witness #3 stated that she was standing outside when she saw the encounter unfold. She had seen Henry walking that day "minding his own business," although she did not know him personally. She stated that the SUV was driving down the street and Henry hopped out of the way of the vehicle, and Officers Bare and Rosen jumped out of the SUV. She stated that she thought a street fight was about to unfold because she did not know they were officers and did not see any badges. She did not hear them identify themselves in any way. She stated that she did not know if Henry may have flashed a gun, but he did not pull one out before the officers began firing on Henry. She stated Henry made it to the sidewalk, and she believes he may have been trying to make it home, but he fell and his body went stiff. She stated they "let off a whole bunch of rounds." She stated that when they began cuffing him, she yelled "why are y'all putting a dead man in cuffs?" She expressed to her best friend that she had just

"watched an innocent man die," and that she had watched him walking up and down the street all day and he did not do anything wrong in the encounter.

114.    Witness #4 stated that Henry walked past him on Duxberry moments prior to the encounter in question. He stated that he saw the entire incident unfold, turning around as he heard the individuals in the white SUV jump out with their guns drawn. He never heard them identify themselves as officers, did not see any badges visible, and did not know they were officers until they began to handcuff Henry and a uniformed officer shows up seconds afterward to perform CPR. He stated that Mr. Green was clearly dead at this point, and that the actions of the officers were reckless, because there were surrounding houses and children present.

115.    Witness #5 stated that she was in her house feeding her children when she heard shots and went to the window. She saw the officers exchanging fire with Henry. She stated one officer was using the car as a shield. She stated that once Henry fell to the ground and his gun had fallen on the ground, they continued shooting him as they walked up on him. She noted the officers' badges were not displayed until after the shooting, when people began yelling at them and they pulled their badges from under their shirts to identify themselves.

116.    Witness #6 stated that he heard gunshots, and once the gunshots stopped he ran outside to make sure his godchildren were ok. He stated that within a minute police cruisers were pulling up. He noted that he witnessed the officers pull their badges from under their shirts after the shooting.

117.    Witness #7 stated that she did not see the incident from the beginning, but she heard gunshots while she was in her car and turned to look. She stated that she saw two white males shooting at the ground. She stated that she initially thought they may have been "shooting an animal or something." She later discovered they were officers, but she stated that she saw no indication that they were other than the way they were holding their guns.

118.    Witness #8 stated that she did not see the incident from the beginning, but when she heard gunshots she looked out of her window and saw the officers shooting Henry on the ground. She stated she did not hear any announcements of "police" prior to the gunshots. She stated, "if you ask me it was overkill." She stated that she believes she heard cop guns shooting first. She believes that Henry fired back at the officers. She stated the ones that shot him didn't attempt to give him CPR, they just tried to roll him over and cuff him.

119.    Witness #9 stated that she was outside her car getting ready to get in when the she witnessed the encounter. She stated that she saw the white SUV pull up in front of Henry and the two individuals get out and just start shooting. She did not see Henry with a gun. She stated that she never heard anyone yell "freeze" or anything like that, and she wasn't that far away from the shooting.

120.    Witness #10 stated that he normally would not talk to police, but if he was murdered he would want someone to talk on his behalf. He gave that reasoning for why he gave a statement regarding what he witnessed. He stated that while he was sitting in his vehicle he heard gunshots and glass breaking. He stated that he then made sure his family was safe, and witnessed the shooting unfold. He stated that he saw Officers Bare and Rosen shooting Henry two to four times while he was standing up, and continue to shoot him once he fell to the ground. He believed they shot twenty to twenty-five times total during the incident. He stated that he never heard the "two white males" say anything, never saw any police badges and did not know it was the police until the shooting stopped and one of the males pulled out a police radio.

121.    Witness #11 stated that from what she witnessed, Officers Bare and Rosen just started shooting and did not say anything to Henry. She stated that the officers kept shooting once Henry was on the ground, describing their actions as "overkill".

122.    On June 6, 2016, the Columbus Division of Police issued a news release stating in part, "On June 6, 2016 at approximately 6:10pm, officers were working plain-clothes directed patrol in the area of Ontario Street and Duxberry Avenue and observed two men standing on the street corner. One man was holding a gun. According to a witness, officers exited their vehicle, with their badges displayed, and ordered the man to drop the gun. The man ignored the commands and opened fire on the officers. The officers returned fire and struck the suspect multiple times." The release stated that the incident will be investigated by the Critical Incident Response Team.

123.    Along with the aforementioned news release, Columbus Division of Police Spokesman Rich Weiner informed the media that police had "spoken to an independent witness who corroborated the general scenario outlined by police."[3]

124.    It is now known that the release of this information runs counter to what is clear from the results of the Columbus Division of Police's own CIRT investigation.

125.    Not only was there no witness who corroborated the officers' version of events, there were numerous witnesses who directly countered the officers' version of events, many of which were interviewed immediately following the shooting.

126.    There is no evidence of any witness who corroborated the officers' version of events.

127.    No witness gave any statement that they heard the officers identify themselves.

128.    No witness gave any statement that they witnessed Henry pull a weapon on the officers.

129.    No witness gave any statement that they witnessed Henry fire at the officers first.

_The Critical Incident Response Team Investigation_

———————————————

[3] http://www.dispatch.com/content/stories/local/2016/06/07/officer-involved-shooting.html

130.    The Critical Incident Response Team (CIRT) investigates all shootings involving Columbus Division of Police Officers and other cases at the direction of the commander of the Crimes Against Persons Bureau, and all facets of those investigations.

131.    Sergeant Eric Pilya was appointed as the CIRT Team Leader in 2011 and has held the position since.

132.    The CIRT consists of 12 homicide detectives that come from various shifts of homicide investigators, as well as the shift supervisors and the lieutenant over the homicide section.

133.    The CIRT conducts the investigation into all police-involved shootings, forwarding the results of that investigation to the Franklin County Prosecutor's Office to be presented to a grand jury.

134.    After the grand jury proceeds with a no-bill, the investigative packet is forwarded to the Columbus Division of Police Firearms Review Board to determine if the shooting shall be considering within policy.

135.    The Columbus Division of Police Chief makes the final decision on whether a shooting is within policy or not.

136.    The Columbus Division of Police has an Officer Support Team, made up of officers who have been involved in a "critical incident" in the past.

137.    These officers respond to the scene of a police-involved shooting and provide support and advice to the officers involved.

138.    Sergeant Pilya has stated that the Officer Support Team is trained to "steer them away from talking about the incident."

139.    Sergeant Pilya, the CIRT Team Leader, provides an initial training for Officer Support Team members.

140.    In that training, he instructs Officer Support Team members to tell the officer involved in a shooting to not make a statement.

141.    In addition to training the Officer Support Team, Sergeant Pilya teaches a class on CIRT Team "best practices" at the academy that any officer can sign up to take.

142.    In this class, he instructs officers on CIRT Team best practices.

143.    In this class, he also informs officers that they do not have to give a statement to the CIRT Team following a police-involved shooting.

144.    The CIRT Team does not attempt to question an officer involved in a shooting immediately, instead establishing a policy of giving an officer at least seven to fourteen days before attempting to question them.

145.    After a police officer is involved in a shooting, the CIRT Team allows the officer to walk back through the scene.

146.    During the walk through, the CIRT Team has a standing agreement with the Fraternal Order of Police (FOP) that the CIRT Team will be allowed to ask three pre-determined questions of the officers with their FOP attorney present.

147.    In the CIRT Team's investigative packet, they include information about a victim's criminal history, gang affiliation and known associates, amongst other information.

148.    No background information related to prior uses of force is provided in the CIRT investigative packet regarding the officers involved in a shooting.

149.    In the CIRT Team's investigative packet, they include information about a victim's drug and alcohol use.

150.    No drug or alcohol tests are performed or requested by the Columbus Division of Police on an officer involved in a shooting.

151.    Immediately following the death of Henry Green V, Sergeant Pilya assigned Detective Gregory Sheppard to lead the CIRT investigation.

152.    Detective Sheppard met with Henry's parents the next day following the shooting.

153.   In this meeting, he informed them that he could not give them many details because there was an ongoing investigation.

154.   However, Detective Sheppard informed Henry's parents that Henry "knew they [Officers Bare and Rosen] were the police."

155.   Detective Sheppard admitted that Witness #1 stated that the officers never identified themselves.

156.   Despite this information, Detective Sheppard relayed that "everybody out there knew they were the police because they are riding around as undercover cops because of the summer safety initiative that the mayor created."

157.   Despite the investigation being only a day old, Detective Sheppard informed the family that he believed the shooting started as one officer was exiting the car.

158.   Detective Sheppard informed the family that "there were no nerves that made [Henry's] gun go off. The pattern of shots was too consistent."

159.   Detective Sheppard stated to the family that "the officer was lucky he went home that day."

160.   When Henry's parents asked why the officers did not confront Henry when they initially claimed he pulled a weapon, Detective Sheppard stated that if he personally were driving down the street and someone pointed a gun at him he would not stop because he would lose, adding "I'm going to put myself in a situation where I can win."

161.   When Detective Sheppard continued to describe what he would do if someone pointed a gun at him, Henry's parents asked if that was what Henry was accused of since he kept alluding to it.

162.   Detective Sheppard stated to Henry's parents that the officers were probably trying to get to the point where they could find Henry because they didn't know if he was going to shoot somebody or what because of him pointing the gun.

163.     When the family informed Detective Sheppard that they were frustrated and would retain a lawyer to help them get answers, Detective Sheppard discouraged them.

164.     Detective Sheppard stated to Henry's parents that they could "get a lawyer, he's not going to get anything."

165.     Detective Sheppard added that they did not need a lawyer to make a public records request because it was a waste of money.

166.     Detective Sheppard informed the family that if any witnesses came forward later in the investigation, the prosecutor would polygraph them.

167.     Detective Sheppard informed the family that if they held any witnesses back it would look like the family had motive to hide these people, that they were "trying to win by cheating."

168.     In further discussing the Division of Police, Detective Sheppard informed the family that he sat on the committee when the Department of Justice investigated the department in the past.

169.     Detective Sheppard stated that they had reviewed "300 excessive force cases" and that there was one officer who he did not like because he did not feel he should be an officer.

170.     Detective Sheppard explained that every time the officer would be accused of doing something he would deny it, and that the officer would admit to doing certain things but would say it was justified.

171.     Detective Sheppard stated that "he shouldn't be an officer, but he is."

172.     Detective Sheppard went on to say "his name was in there at least ten times. There were some officers you saw five, ten, fifteen times in there. It is the same officers doing the same stuff."

173.     When the family expressed concerns about Officer Bare and Rosen's reputations in the community, Detective Sheppard informed the family that "the grand jury will know the officers' records."

174.    When the family expressed concerns over witnesses who stated that Henry was fired upon as he was lying on the ground and no longer a threat, Detective Sheppard informed the family that he had just left the autopsy and he could tell the family for a fact that Henry was not fired upon with the officers standing over him.

175.    Due to concerns about the investigation conducted by the Columbus Division of Police, Henry's family retained a forensic pathologist to perform an independent examination of his body. The forensic pathologist came to the conclusion that Henry was shot eight times, not seven as previously concluded by the Franklin County Coroner's Officer. He also found that based on the location and path of the wound that created the most anatomical damage, that Henry was either down on the ground or in the process of going down when he suffered several of the wounds. He also concluded that a wound in Henry's back that was previously labeled an exit wound was actually an entrance wound, traveling frontwards through his body.

*Policy and Practice Allegations*

176.    Plaintiff is informed and believes, and on the basis of such information and belief alleges that the governmental entity defendants and their decision makers, with deliberate indifference, gross negligence, and reckless disregard to the safety, security, and constitutional and statutory rights of the Decedent, maintained, enforced, tolerated, permitted, acquiesced in, and applied policies, practices, or customs and usages of, among other things:

(a) Training and authorizing Columbus Division of Police Officers to act recklessly and aggressively with regard to the use of force on citizens;

(b) Hiring, retaining and assigning officers with demonstrably unreasonable decision-making patterns and patterns of misconduct;

(c) Subjecting citizens to the unreasonable use of force and unreasonable seizure;

(d) Allowing officers to violate the constitutional rights of citizens and take other unlawful action against citizens;

(e) Failing to adequately train officers regarding the use of force and the use of lethal force;

(f) Failing to adequately train officers on plainclothes tactics and negligently assigning officers to plainclothes duty;

(g) Failing to adequately supervise officers, permitting unlawful conduct to occur;

(h) Failing to adequately discipline officers regarding their unlawful conduct;

(i) Failing to perform drug and alcohol tests on officers after their involvement in police shootings;

(j) Authorizing the Summer Strike Force/Community Safety Initiative to continue on for years while negligently assigning, supervising and retaining officers working in the program;

(k) Setting numbers-based goals for the Summer Strike Force/Community Safety Initiative which led to unconstitutional and unlawful conduct while pursuing those goals;

(l) Failing to adequately investigate police-involved shootings, both ratifying and authorizing future behavior;

(m) Condoning and encouraging officers in the belief that they can violate the constitutional rights of individuals, such as Henry Green V, and that such conduct will not adversely affect their opportunities for promotion and other employment benefits.

177. Plaintiff is informed and believes, and on the basis of such information and belief alleges, that the entity defendants and their decision makers ordered, authorized, acquiesced in, tolerated, permitted or maintained custom and usages permitting Columbus Division of Police Officers to engage in the unlawful and unconstitutional actions, policies, practices and customs or usages set forth in the foregoing paragraph. Defendants' conduct as alleged

herein constitutes a pattern of constitutional violations based either on a deliberate plan by defendants or on defendants' deliberate indifference, gross negligence, or reckless disregard to safety, security, and rights of plaintiff and the Decedent.

(a) Defendant City of Columbus and Columbus Division of Police have a policy, practice and custom of allowing officers to violate the constitutional rights of citizens, and failing to adequately train, supervise and discipline officers who participate in such unlawful conduct;

(b) Defendant City of Columbus and Columbus Division of Police authorized the Summer Strike Force/Community Safety Initiative, and as a matter of policy, Defendants authorized overly aggressive and unlawful conduct, and inadequately supervised, trained and disciplined officers in such a way that it reflects deliberate indifference to the Fourth and Fourteenth Amendment rights of those likely to be implicated when officers of the Columbus Division of Police come into contact with community residents and others;

(c) Sergeant Eric Pilya, as Team Leader for the Critical Incident Response Team, had both actual and constructive knowledge of the actions of both Officers Bare and Rosen, as well as actual and constructive knowledge of the actions of the actions of the detectives responsible for investigating police-involved shootings, and he along with chain of command authorized and encouraged the pattern and practice of failing to adequately investigate officer-involved shootings.

(d) Commander Gary Cameron, as 2016 Community Safety Initiative Director, and as a matter of policy and practice negligently assigned, trained, supervised and retained officers working in the program. Commander Cameron had both actual and constructive knowledge of the actions of both Officers Bare and Rosen, as well as actual and constructive knowledge of the actions of the chain

of command in failing to train, supervise and discipline Officers Bare, Rosen and other officers working the Community Safety Initiative throughout the years.

(e) Chief Kim Jacobs, as chief law enforcement officer for the City of Columbus, Ohio, serves as the ultimate policymaker for the Columbus Division of Police, and had both actual and constructive knowledge of the actions of both Officers Bare and Rosen, as well as actual and constructive knowledge of the actions of the chain of command in failing to train, supervise and discipline Officers Bare, Rosen and others like them.

*Damages*

178.    Plaintiff and family members have lost Decedent's love, comfort, society, and consortium, and have sustained emotional distress, all in amounts in accordance with proof. The estate has incurred medical, burial and other related expenses. The Decedent sustained general damages, including pre-death pain and suffering and post-death loss of enjoyment of his life, in an amount in accordance with proof.

179.    The conduct of the individual defendants was willful, malicious, oppressive and in reckless disregard for the constitutional rights of plaintiffs and the Decedent himself, thus justifying punitive damages against the defendants in an amount in accordance with proof.

## V. CLAIMS FOR RELIEF

### COUNT ONE

### 42  U.S.C. § 1983 AND ORC § 2125.01 - WRONGFUL DEATH AND SURVIVAL ACTION

180.    Plaintiff hereby incorporates paragraphs 1-178 as though fully set forth herein.

181.    This is an action brought against defendants in their individual and official capacities, pursuant to Ohio Revised Code § 2125.01 and the United States Constitution Amendments IV and XIV, in violation of 42 U.S.C. § 1983 and § 1988.

182.   At all times material hereto, Defendants were employees and/or agents of Defendant City of Columbus, and acting within the course and scope of their employment with same, and acting under color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs, and usages of Defendant City of Columbus.

183.   Defendants Officer Jason Bare, Officer Zachary Rosen, Sergeant Eric Pilya, Commander Gary Cameron and Chief Kim Jacobs have, under color of law, deprived Henry Green of rights, privileges, and immunities secured to him by the Fourth and Fourteenth Amendments to the United States Constitution, by, among other things, subjecting Decedent to a seizure without a warrant or any other legal justification or fabricating a legal justification for doing so  and Officers Bare and Rosen failing to identify themselves as police officers, subjecting Decedent to excessive force and acting with deliberate indifference to his right to life and liberty.

184.   The foregoing wrongful acts of defendants killed Decedent.

185.   The actions of defendants acting in concert and under color of law, were undertaken intentionally, willfully, maliciously, with a deliberate indifference and/or with a reckless disregard for the natural and probable cause of their acts, was done without lawful justification or reason, and was designed to and did cause specific and serious physical and emotional pain and suffering in violation of Plaintiff's civil rights.

186.   As a proximate result Plaintiff and family members lost companionship, society, comfort and consortium with the Decedent, and are entitled to damages for the pain, suffering and disfigurement of the Decedent.

187.   Plaintiff has ongoing and continuous mental and physical damages, and as such is entitled to recovery, including but not limited to the following:

        (a)      Compensation for physical and emotional harm;

        (b)      Loss of earnings and net accumulations;

        (c)      Past medical bills and expenses;

      (d)     Conscious pain and suffering;

      (e)     Punitive damages;

      (f)     Award reasonable attorneys' fees and costs to Plaintiff on Federal 1983

             Counts;

      (g)     Any and all other and further relief as this Court may deem appropriate.

WHEREFORE, Plaintiff demands damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00), together with post judgment interest and costs.

## <u>COUNT TWO</u>

**EXCESSIVE FORCE AND UNREASONABLE SEIZURE IN VIOLATION OF 42 U.S.C. § 1983 AND THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**

188.    Plaintiff hereby incorporates paragraphs 1-186 as though fully set forth herein.

189.    This is an action brought against defendants in their individual and official capacities, pursuant to the United States Constitution Amendments IV and XIV, in violation of 42 U.S.C. § 1983 and § 1988.

190.    At all times material hereto, Defendants were employees and/or agents of Defendant City of Columbus, and acting within the course and scope of their employment with same, and acting under color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs, and usages of Defendant City of Columbus.

191.    Defendants subjected Decedent to unreasonable seizure and excessive force, depriving him of bodily integrity, liberty, and due process of law.

192.    The actions of defendants, acting in concert and under color of law, were undertaken intentionally, willfully, maliciously, with a deliberate indifference and/or with a reckless disregard for the natural and probable cause of their acts, was done without lawful justification or reason, and was designed to and did cause specific and serious physical and emotional pain and suffering in violation of Plaintiff's civil rights.

193.  As a direct and proximate result of defendants' acts, omissions, and clearly unreasonable seizure and use of excessive force, Defendant deprived Plaintiff of the rights to be free from unreasonable seizure, the right to be free from excessive force and the right to due process of law guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution.

194.  Plaintiff has ongoing and continuous mental and physical damages, and as such is entitled to recovery, including but not limited to the following:

(a)  Compensation for physical and emotional harm;

(b)  Loss of earnings and net accumulations;

(c)  Past medical bills and expenses;

(d)  Conscious pain and suffering;

(e)  Punitive damages;

(f)  Award reasonable attorneys' fees and costs to Plaintiff on Federal 1983 Counts;

(g)  Any and all other and further relief as this Court may deem appropriate.

WHEREFORE, Plaintiff demands damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00), together with post judgment interest and costs.

## COUNT THREE

**RACIAL DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1983 THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT**

195.  Plaintiff hereby incorporate paragraphs 1-193 as though fully set forth herein.

196.  This is an action brought against defendants in their individual and official capacities, pursuant to the United States Constitution Amendments IV and XIV, based upon racial discrimination in law enforcement and failure to provide equal protection under the law in violation of 42 U.S.C. § 1983 and § 1988.

197. At all times material hereto, defendants were employees and/or agents of Defendant City of Columbus, acting within the course and scope of their employment with same, and in furtherance of the interest of Defendant City of Columbus, and with Defendant City of Columbus' consent.

198. Plaintiff, as an African-American is a member of a protected class, and thus also had the clearly established statutory right to be free from racially motivated arrests, detentions, searches and seizures.

199. Any reasonable officer knew or should have known that these rights at the time of the complained conduct as they were clearly established at that time.

200. Plaintiff's race was a motivating factor in the decision to detain him and use excessive force. Defendants' conduct was undertaken with the purpose of depriving Plaintiff of the equal protection and benefits of the law, equal privileges and immunities under the law, and due process in violation of the Fourteenth Amendment and 42 U.S.C. § 1983.

201. Defendant engaged in the conduct described in the complaint willfully, maliciously, in bad faith, and in reckless disregard for Plaintiff's federally protected rights.

202. The acts or omissions of the Defendant were moving forces behind Plaintiff's injuries.

203. Plaintiff has permanent and ongoing damages as a result of said incident and as such is entitled to recovery, including but not limited to the following:

    (a)    Compensation for physical and emotional harm;

    (b)    Loss of earnings and net accumulations;

    (c)    Past medical bills and expenses;

    (d)    Conscious pain and suffering;

    (e)    Punitive damages;

(f)     Award reasonable attorneys' fees and costs to Plaintiff on Federal 1983 Counts;

(g)   Any and all other and further relief as this Court may deem appropriate.

WHEREFORE, Plaintiff demands damages in an amount in excess of SEVENTY- FIVE THOUSAND DOLLARS ($75,000.00), together with post judgment interest and costs.

## COUNT FOUR

### ASSAULT AND BATTERY

204.   Plaintiff hereby incorporate paragraphs 1-202 as though fully set forth herein.

205.   This is an action brought against defendants in their individual and official capacities, pursuant to Ohio Revised Code § 2903.11, 2903.12, 2903.13, and the United States Constitution Amendments IV and XIV in violation of 42 U.S.C. § 1983 and § 1988.

206.   At all times material hereto, defendants were employees and/or agents of Defendant City of Columbus, acting within the course and scope of their employment with same, and in furtherance of the interest of Defendant City of Columbus, and with Defendant City of Columbus' consent.

207.   Defendants knowingly caused serious physical harm to Decedent.

208.   Defendant engaged in the conduct described in the complaint willfully, maliciously, in bad faith, and in reckless disregard for Plaintiff's federally protected rights.

209.   The acts or omissions of the Defendant were moving forces behind Plaintiff's injuries.

210.   Plaintiff has permanent and ongoing damages as a result of said incident and as such is entitled to recovery, including but not limited to the following:

(a)     Compensation for physical and emotional harm;

(b)     Loss of earnings and net accumulations;

(c)     Past medical bills and expenses;

(d)     Conscious pain and suffering;

(e)     Punitive damages;

(f)     Award reasonable attorneys' fees and costs to Plaintiff on Federal 1983

Counts;

(g)     Any and all other and further relief as this Court may deem appropriate.

WHEREFORE, Plaintiff demands damages in an amount in excess of SEVENTY- FIVE

THOUSAND DOLLARS ($75,000.00), together with post judgment interest and costs.

## COUNT FIVE

### *MONELL* CLAIM AGAINST THE CITY OF COLUMBUS, OHIO – 42 U.S.C. § 1983

211.  Plaintiff hereby incorporate paragraphs 1-209 as though fully set forth herein.

212.  At all times material hereto, Defendants were employees and/or agents of Defendant City of Columbus, acting within the course and scope of their employment with same, and in furtherance of the interest of Defendant City of Columbus, and with Defendant City of Columbus' consent.

213.  The City of Columbus directly caused the constitutional violations suffered by Plaintiff, and is liable for the damages suffered by Plaintiff as a result of the conduct of the defendant officers. The conduct of the defendant officers was a direct consequence of policies and practices of Defendant City of Columbus.

214.  Defendant Columbus Division of Police Chief Kim Jacobs had actual knowledge and/or had constructive knowledge and/or failed to conduct a proper investigation into the actions of Defendants Bare and Rosen. A proper investigation would have included that Defendants Bare and Rosen participated in a pattern of conduct that was racially discriminatory and/or unconstitutional.

215.  Defendant City of Columbus had actual knowledge and/or had constructive knowledge and/or failed to conduct a proper investigation into the actions of Defendants Bare

and Rosen. A proper investigation would have included that Defendants Bare and Rosen participated in a pattern of conduct that was racially discriminatory and/or unconstitutional.

216. At the time of the incidents described in this Complaint, the pattern of racially discriminatory and/or unlawful conduct was established through policy, practice and custom of the City of Columbus and the Columbus Division of Police.

217. By tacitly authorizing the behavior of Defendants, the policymakers and those responsible for hiring, training and supervision of police officers within the City of Columbus acted negligently, recklessly, intentionally, willfully, wantonly, knowingly and with deliberate indifference to the serious safety needs of the citizens of Columbus, including Henry Green.

218. Defendant City of Columbus has a policy, practice and custom of failing to adequately investigate and discipline police officers who exhibit racially motivated and/or unconstitutional conduct. This policy, practice and custom was the moving force behind the racially motivated and unconstitutional actions against Henry Green.

219. Defendant City of Columbus has a policy, practice and custom of allowing officers to exhibit racially motivated and/or unconstitutional conduct. This policy, practice and custom was the moving force behind the racially motivated and unconstitutional actions against Henry Green.

220. Defendant City of Columbus has a policy, practice and custom of exhibiting racially motivated and/or unconstitutional conduct. This policy, practice and custom was the moving force behind the racially motivated and unconstitutional actions against Henry Green.

221. Defendant City of Columbus has a policy, practice and custom of failing to investigate civilian complaints against officers consisting of racially motivated and/or unconstitutional conduct. This policy, practice and custom was the moving force behind the racially motivated and unconstitutional actions against Henry Green.

222. Defendant City of Columbus negligently retained Defendants Bare and Rosen.

223. Defendant City of Columbus has a policy, practice and custom of negligently retaining police officers who exhibit racially motivated and/or unconstitutional conduct. This policy, practice and custom was the moving force behind the racially motivated and unconstitutional actions against Henry Green.

224. Defendant City of Columbus failed to adequately train Defendants Bare and Rosen.

225. Defendant City of Columbus has a policy, practice and custom of failing to adequately train police officers who exhibit racially motivated and/or unconstitutional conduct. This policy, practice and custom was the moving force behind the racially motivated and unconstitutional actions against Henry Green.

226. Defendant City of Columbus has a policy, practice and custom of conspiring to interfere with and to deprive Plaintiffs of their causes of action by allowing suspect officers unreasonable and harmful concessions during investigations of police-involved shootings.

227. The policies, practices and customs described above have been the subject of civil rights investigations, previous lawsuits and have been well known within the Columbus community for many years. These policies, practices and customs have been perpetuated by the line officers including Defendants Bare and Rosen, Chief Kim Jacobs, policymakers and those responsible for hiring, training and supervision of police officers within the City of Columbus who have all acted negligently, recklessly, intentionally, knowingly and with deliberate indifference to the serious safety needs of the citizens of Columbus, including Henry Green.

228. The wrongful policies, practices, customs and/or usages complained of herein, demonstrated a deliberate indifference on the part of policymakers of the City of Columbus to the constitutional rights of persons within the city, and were the direct and proximate cause of the violations of Plaintiff's rights alleged herein.

### <u>VI. JURY DEMAND</u>

Plaintiffs request a jury trial on all claims triable to a jury.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court award:

A. Compensatory damages in an amount to be shown at trial;
B. Punitive damages against the individual Defendants (not the City of Columbus) in an amount to be shown at trial;
C. Loss of earnings and net accumulations;
D. Costs incurred in this action and reasonable attorney fees under 42 U.S.C. § 1988;
E. Prejudgment interest; and
F. Such other and further relief as this Court may deem just and proper.

Respectfully submitted,

*/s/ Sean L. Walton*

Sean L. Walton (0088401)
Chanda L. Brown (0081076)
WALTON + BROWN, LLP
395 E. Broad Street, Suite 200
Columbus, Ohio 43215
T: (614) 636-3476
F: (614) 636-3453
swalton@waltonbrownlaw.com
cbrown@waltonbrownlaw.com
*Attorneys for all Plaintiffs*