**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| ADRIENNE HOOD, | Case No. 2:17-cv-471 |
| Plaintiff, | Judge George C. Smith |
| v. | Magistrate Judge |
| | Elizabeth A. Preston Deavers |
| CITY OF COLUMBUS, OHIO, et al., | **MOTION FOR SUMMARY** |
| | **JUDGMENT BY DEFENDANTS** |
| Defendants. | **JASON BARE AND** |
| | **ZACHARY ROSEN** |

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, Defendants Jason Bare and

Zachary Rosen move this Court for summary judgment on all claims asserted against them in this

action by Plaintiff Adrienne Hood, Administrator of the Estate of Henry Green V. A memorandum

in support of this motion is attached, and supporting exhibits have been filed separately.

Respectfully submitted,

/s/ Westley M. Phillips
Westley M. Phillips (0077728) - LEAD
Timothy J. Mangan (0025430)
Andrew D.M. Miller (0074515)
Assistant City Attorneys
CITY OF COLUMBUS, DEPARTMENT OF LAW
ZACH KLEIN, CITY ATTORNEY
77 North Front Street, Columbus, Ohio 43215
(614) 645-7385 / (614) 645-6949 (fax)
wmphillips@columbus.gov
tjmangan@columbus.gov
admmiller@columbus.gov
Attorneys for Defendants

I.     STATEMENT OF FACTS .................................................................................. 1

    A.     INTRODUCTION.................................................................................1

    B.     OFFICERS ZACHARY ROSEN AND JASON BARE .......................................2

    C.     HENRY GREEN AND CHRISTIAN RUTLEDGE ............................................4

    D.     THE INCIDENT AT EAST 26TH AVENUE AND ONTARIO STREET ..........5

    E.     GREEN'S ALTERCATION WITH JHERRI ALFRED .....................................8

    F.     THE INCIDENT AT DUXBERRY AVENUE AND ONTARIO
         STREET ...........................................................................................9

    G.     OTHER WITNESSES' DESCRIPTIONS OF THE INCIDENT.....................13

         1.     Christian Rutledge's Deposition Testimony ......................... 14

         2.     Jherri Alfred ......................................................................... 15

         3.     Lavonna Williams ................................................................. 15

         4.     Shantel Anderson .................................................................. 16

    H.     ACTION V. REACTION ......................................................................16

    I.     FORENSIC EVIDENCE .......................................................................18

         1.     Green Was Armed ................................................................. 18

         2.     Green Fired at Least Six Times ............................................. 19

         3.     Matthew Noedel's Analysis of the Incident ......................... 19

    J.     MICHAEL LYMAN ...........................................................................20

II.    STANDARD OF DECISION ........................................................................... 26

III.   LAW & ARGUMENT ................................................................................... 27

    A.     PLAINTIFF'S FOURTH AMENDMENT CLAIMS FAIL ................................28

    B.     PLAINTIFF'S EQUAL PROTECTION CLAIMS FAIL .................................33

    C.     PLAINTIFF'S STATE-LAW CLAIMS FAIL ...........................................34

IV.   CONCLUSION ............................................................................................ 36

## MEMORANDUM IN SUPPORT

Plaintiff Adrienne Hood, Administrator of the Estate of Henry Green V., has filed suit against Columbus Police Officers Jason Bare and Zachary Rosen (collectively, "the Officers"). See COMPL. (DOC.1). Plaintiff alleges that the Officers violated the Fourth and Fourteenth Amendment rights of Henry Green V ("Green") on June 6, 2016. Plaintiff also asserts state-law claims against the Officers for wrongful death, assault, and battery.

## I. STATEMENT OF FACTS

### A. INTRODUCTION

Officers Rosen and Bare were patrolling in an unmarked GMC Acadia SUV on East 26th Avenue, approaching Ontario Street, when they first encountered Green. Green stepped into the path of their vehicle, forcing Officer Rosen to either stop the vehicle or drive around Green. While Green's objective may not have been clear initially, his intentions quickly became apparent as Officer Rosen drove around and past Green. Green lifted his shirt to display a pistol in his front waistband and then pulled the pistol from his waistband. Green pointed his gun at the GMC as Officer Rosen continued driving on East 26th Avenue.

Officer Rosen turned onto the next street and stopped the GMC when he was out of Green's sight. Officer Rosen aired over the radio what had just occurred, reporting that the suspect had just pulled a gun on them and they were "swinging around the block." After turning onto the next street, Duxberry Avenue, and driving the distance of a few houses, the Officers were again confronted by Green who was standing in the street at the intersection of Duxberry and Ontario. Green's hands were in his waistband, from where he had pulled his gun just moments earlier. Officer Rosen continued driving when Green suddenly removed any doubt as to his intentions. As

Officer Rosen was bringing the GMC to a stop, Green pulled the handgun from his waistband, raised and pointed the gun at Rosen, and started shooting.

In reaction to the sudden and very real threat to his life, Rosen fired his handgun at Green. While the exchange rapidly unfolded, Officer Bare made his way out of the vehicle and moved toward the front of the GMC. In reaction to the threat to Officer Rosen's life, and the threat to his own life if Green redirected his attention and line of fire, Bare fired his handgun at Green. Green was struck and fell to the ground while dropping his gun, but not before he had fired at least six shots at Officer Rosen.

The death of Henry Green was the direct result of Green's threat and criminal actions on East 26th Avenue, and Green's threat and criminal actions at Ontario and Duxberry, including his attempt to kill Officer Rosen. While any death is tragic, Green set everything in motion, causing the officers to fear for their lives.

### B. OFFICERS ZACHARY ROSEN AND JASON BARE

On the afternoon of Monday June 6, 2016, Officers Zachary Rosen and Jason Bare were working as partners on a plain clothes assignment for the City of Columbus' 2016 Community Safety Initiative. BARE AFF. ¶ 7 (R.153 #2673); ROSEN AFF. ¶ 7 (R.162 #2873). The intent of the Community Safety Initiative was to strengthen community relations and to combat violent crime. ROSEN AFF. ¶ 7 (R.162 #2873). The Officers were patrolling criminal "hotspots" within 5 Precinct, located in Columbus' South Linden area, looking for gang, weapons and narcotics activities. BARE AFF. ¶ 8 (R.153 #2673); ROSEN AFF. ¶ 7 (R.162 #2873). The Officers were assigned a standard unmarked white 2015 GMC Acadia sports utility vehicle ("the GMC"). BARE AFF. ¶ 9 (R.153 #2673); ROSEN AFF. ¶ 8 (R.162 #2873); ROSEN AFF. Ex.2 (R.162-2 #2883). Officer Rosen was driving the GMC and Officer Bare was riding in the second row on the passenger side. BARE AFF. ¶ 9 (R.153 #2673); ROSEN AFF. ¶ 8 (R.162 #2873). Rosen and Bare's unit call number was 6410.

BARE AFF. ¶ 9 (R.153 #2673); ROSEN AFF. ¶ 8 (R.162 #2873). Officer Rosen was wearing blue jeans, a blue shirt, and a black baseball cap, with his badge hanging from his neck on a lanyard. ROSEN AFF. ¶ 9 (R.162 #2874); ROSEN AFF. Ex.3 (R.162-3 #2884). Officer Bare was wearing camouflage shorts, a gray t-shirt, and a ball cap, with his badge hanging from his neck on a lanyard. BARE AFF. ¶ 10 (R.153 #2673); BARE AFF. Ex.1 (R.153-1 #2680). The Officers were carrying police-issued Smith & Wesson model M&P, 40 caliber semiautomatic pistols with one bullet in the chamber and a fifteen round magazine. BARE AFF. ¶ 11 (R.153 #2673); ROSEN AFF. ¶ 10 (R.162 #2874).

The Officers had knowledge of a number of violent crimes, shootings, and homicides that had recently occurred in the South Linden area within a half mile radius of the intersection of Duxberry Avenue and Ontario Street. BARE AFF. ¶ 12 (R.153 #2674); ROSEN AFF. ¶ 11 (R.162 #2874); ROSEN AFF. Ex.4 (R.162-4 #2885). On December 14, 2015, a 17-year-old male was shot and killed in front of 1136 Duxberry Avenue following a street fight. BARE AFF. ¶ 13 (R.153 #2674); ROSEN AFF. ¶¶ 11-12 (R.162 #2874); ROSEN AFF. Ex.4 (R.162-4 #2885). On May 16, 2016, between approximately 6:00 p.m. and 6:10 p.m., an unknown black male suspect carjacked a victim at the intersection of Cleveland Avenue and East Maynard Avenue. BARE AFF. ¶ 14 (R.153 #2674); ROSEN AFF. ¶¶ 11, 13 (R.162 #2874); ROSEN AFF. Ex.4 (R.162-4 #2885). On May 25, 2016, a female was shot by an unidentified assailant at 1186 East 21st Avenue. BARE AFF. ¶ 15 (R.153 #2674); ROSEN AFF. ¶¶ 11, 14 (R.162 #2874); ROSEN AFF. Ex.4 (R.162-4 #2885). On May 27, 2016, two unknown black male suspects were involved in the shooting of two teenagers in the 900 block of East 21st Avenue. BARE AFF. ¶ 16 (R.153 #2674); ROSEN AFF. ¶¶ 11, 15 (R.162 #2874, 2875); ROSEN AFF. Ex.4 (R.162-4 #2885). On May 27, 2016, suspected gang members had reportedly shot at one another near the intersection of East 22nd Avenue and Ontario Street. BARE

AFF. ¶ 17 (R.153 #2674); ROSEN AFF. ¶¶ 11, 16 (R.162 #2874, 2875); ROSEN AFF. EX.4 (R.162-4 #2885). On Sunday June 5, 2016, the day before the incident at issue, a gang member had been shot in an unsolved drive-by shooting that occurred at 1215 East 26th Avenue. BARE AFF. ¶ 18 (R.153 #2674); ROSEN AFF. ¶¶ 11, 17 (R.162 #2874, 2875); ROSEN AFF. EX.4 (R.162-4 #2885).

### C.     HENRY GREEN AND CHRISTIAN RUTLEDGE

Henry Green and Christian Rutledge were close friends. RUTLEDGE DEP. 39-40 (R.148 #1697-98). On June 6, 2016, between 3:00 and 4:00 p.m., Green told Rutledge over the telephone that he was at a house located at 2138 Ontario Street and that he had been either drinking or smoking marijuana. RUTLEDGE DEP. 55-58, 60-61 (R.148 #1713-16, 1718-19); RUTLEDGE DEP. EX.E (R.148-5 #2113); RUTLEDGE DEP. EX.F (R.148-6 #2114). Rutledge walked to 2138 Ontario Street to meet with Green. RUTLEDGE DEP. 59-60 (R.148 #1717-18). Upon arrival, Rutledge saw bottles of alcohol and observed that Green was drunk. *Id*. at 73-78, 80 (R.148 #1731-36, 1738). Rutledge's observation proved to be correct. Post-incident toxicology analyses revealed that Green was intoxicated at the time of his death, with a blood alcohol concentration of one-tenth of one percent (i.e., 0.10 g%), and with marijuana in his system. BAKER AFF. ¶¶ 8-9 (R.152 #2657).

Green and Rutledge left 2138 Ontario Street at approximately 4:30 or 4:40 p.m. and walked southbound to a house located at 1156 East 21st Avenue, arriving between 5:00 and 5:10 p.m. RUTLEDGE DEP. 82-83, 85, 87-89; 91, 95 (R.148 #1740-41, 1743, 1745-47, 1749, 1753); RUTLEDGE DEP. EX.H (R.148-8 #2116); MILLER DEP. 12-17 (R.147 #1586-91); MILLER DEP. EX.A (R.147-1 #1637); MILLER DEP. EX. B (R.147-2 #1638). The house at 1156 East 21st Avenue is owned by Robert Hankins. MILLER DEP. 12-13 (R.147 #1586-87). While at 1156 East 21st Avenue, Green engaged in an argument with a young woman whom he threateningly told, "I'll smack the fuck out of you, I ain't playing." RUTLEDGE DEP. 96-97, 103-105, 142-143 (R.148 #1754-55, 1761-63, 1800-01). Hankins then told Green to leave his house. MILLER DEP. 22-24 (R.147 #1596-98).

Green responded, "I'm just going to leave before she says anything else to make me mad and I won't be able to control myself." RUTLEDGE DEP. 105-106 (R.148 #1763-64).

Green and Rutledge left 1156 East 21st Avenue at approximately 5:45 p.m. and walked northbound on Ontario Street towards Duxberry Avenue. RUTLEDGE DEP. 95, 107-109 (R.148 #1753, 1765-67); RUTLEDGE DEP. EX.M (R.148-13 #2121). One person at the house commented that someone may kill Green based on the way he was acting. MILLER DEP. 28-30 (R.147 #1602-04). Tavares Miller described Green as being "irate" when he left the house. *Id*. Miller thought that Green was drunk and he knew that Green carried a gun. *Id*. at 28, 35 (R.147 #1602, 1609). When Miller heard the gunshots from the incident at issue, he immediately thought that Green had gotten into a shootout. *Id*. at 33, 49 (R.147 #1607, 1623).

According to Rutledge, Green was visibly angry and was stomping his feet as he walked. RUTLEDGE DEP. 109-110 (R.148 #1767-68). Rutledge was concerned about Green's behavior. RUTLEDGE DEP. 111-112 (R.148 #1769-70). According to Rutledge, if Green would have touched him as they walked northbound from East 21st Avenue to East 26th Avenue, the situation would have probably escalated into a fight. *Id*. at 114-115 (R.148 #1772-73). In the approximate location of Ontario Street and East 24th Avenue, a woman stopped Rutledge and asked what was wrong with Green, to which Rutledge responded, "I don't know. He's mad." *Id*. at 112-113 (R.148 #1770-71).

## D.    THE INCIDENT AT EAST 26TH AVENUE AND ONTARIO STREET

Between approximately 6:05 p.m. and 6:10 p.m., Rosen and Bare drove westbound on East 26th Avenue to monitor 1215 East 26th Avenue, the location of the gang-related drive-by shooting which had occurred the previous day. BARE AFF. ¶ 19 (R.153 #2674); ROSEN AFF. ¶ 18 (R.162 #2875). Immediately after the Officers passed 1215 East 26th Avenue and approached the intersection of East 26th Avenue and Ontario Street, they saw Green and Rutledge walking

northbound on Ontario Street, in the middle of the road, just south of East 26th Avenue. BARE AFF. ¶ 19 (R.153 #2674); ROSEN AFF. ¶ 18 (R.162 #2875); ROSEN AFF. Ex.5 (R.162-5 #2886). Green was wearing a red tank top and black shorts. BARE AFF. ¶ 20 (R.153 #2675); ROSEN AFF. ¶ 19 (R.162 #2876). Rutledge was wearing a black shirt. BARE AFF. ¶ 20 (R.153 #2675); ROSEN AFF. ¶ 19 (R.162 #2876). Rutledge stopped just south of East 26th Avenue, yielding the right-of-way to the GMC. ROSEN AFF. ¶ 19 (R.162 #2876); RUTLEDGE DEP. 124 (R.148 #1782). Green, on the other hand, glared at the Officers and continued walking into the middle of East 26th Avenue as if to force Officer Rosen to stop or hit him with the vehicle. ROSEN AFF. ¶ 19 (R.162 #2876).

According to Rutledge, Green walked in front of the GMC "to where they probably thought they would have hit him." RUTLEDGE DEP. 124-125 (R.148 #1782-83). Rutledge heard the GMC screech its tires as it began stopping to avoid Green. *Id*. at 125 (R.148 #1783). Based on his observations, Rutledge thought that Green "was in the wrong for walking out in front of" the GMC. *Id*. at 128 (R.148 #1786). Rutledge thought that Green walked in front of the GMC because he was mad and drunk. *Id*. at 125 (R.148 #1783). Rutledge warned Green to "slow the fuck down," to which Green responded, "I don't give a fuck." *Id*. at 129 (R.148 #1787). Green then yelled, "What the fuck? What the fuck? What the fuck?" at the GMC. *Id*. at 130-131 (R.148 #1788-89). Rutledge asked Green, "What the fuck is wrong with you?" but Green kept angrily saying "What the fuck?" to the GMC. *Id*. at 131 (R.148 #1789). Green lifted his shirt, displayed a black pistol in his front waistband, and started pulling his pistol out. BARE AFF. ¶ 20 (R.153 #2675); ROSEN AFF. ¶ 20 (R.162 #2876). When Green pulled the gun from his waistband, Officer Rosen thought that Green might have been trying to get him to slow down so he could carjack the GMC. ROSEN AFF. ¶ 20 (R.162 #2876). Officer Rosen drove past Green and saw Green in his driver side view mirror

6

aiming the pistol at the GMC.[1] *Id.* Officer Bare heard Officer Rosen yell, "He just pulled a gun on us! He just pulled a gun on us!" Bare Aff. ¶ 21 (R.153 #2675). Officer Rosen continued driving westbound on East 26th Avenue, turned north onto the next street, Gerbert Road, where he lost sight of Green and stopped the GMC. Bare Aff. ¶ 22 (R.153 #2675); Rosen Aff. ¶ 21 (R.162 #2876); Rosen Aff. Ex.6 (R.162-6 #2887).

Considering the totality of the circumstances, the Officers believed that, based on Green's actions, he posed a serious threat to anyone in the area who might encounter Green. Bare Aff. ¶ 23 (R.153 #2675); Rosen Aff. ¶ 22 (R.162 #2876). From 6:10:20 p.m. to 6:10:43 p.m., Officer Rosen aired the following over the CPD radio: "6410. Duxberry, Ontario. Two male blacks walking northbound. Red tanktop, black shorts, short hair on one. Just pulled a 33 on us. We are swinging around the block." Bare Aff. ¶ 24 (R.153 #2675); Rosen Aff. ¶ 23 (R.162 #2876); Synched Video[2] at 18:10:20 (R.168 #3053). The code "33" is a CPD radio code reference for a gun. Bare Aff. ¶ 24 (R.153 #2675); Rosen Aff. ¶ 23 (R.162 #2876); Rosen Aff. Ex.1 (R.162-1 #2882). The Officers intended to address Green's criminal threat as well as the danger he presented to other drivers or persons in the vicinity by getting eyes on Green to make sure that he was taken

---

[1] On September 29, 2017, after being interviewed for felony charges regarding his use of stolen credit cards, Rutledge told Columbus Police Detective Rick Crum that "Green pulled his shirt up and showed the men the gun in his waistband." Crum Aff. ¶ 5 (R.156 #2695). Green then "pointed the gun at the men as they drove away and was making sounds, going 'bang, bang, bang.'" *Id.* Rutledge has since denied making this unsworn and unrecorded statement to Crum. Thus, for purposes of this motion for summary judgment, Rutledge can neither confirm nor deny that Green pulled a gun on the GMC at East 26th Avenue and Ontario Street because, according to his deposition testimony, he was looking at his cell phone and text messaging his girlfriend during this portion of the altercation. Rutledge Dep. 129, 133-135 (R.148 #1787, 1791-93).

[2] The audio/visual files cited in this memorandum can be found on a flash drive that Defendants manually filed with the Court on October 23, 2018. *See* Notice of Manually Filed Exhibits (Flash Drive) (R.168 #3049-54).

The video file labeled "Synched Video" synchronizes Rosen and Bare's CPD radio transmissions with the video taken by CPD Cruiser #23's cruiser camera video system into one combined recording to provide a real-time depiction of what occurred during the incident. Connelly Aff. ¶ 6 (R.155 #2688). CPD Officers Brian Connelly and Paul Lively were originally responding to a separate incident in Cruiser #23 when Rosen and Bare's radio transmission were made. Connelly Aff. (R.155 #2687-92).

into custody as soon as possible, ideally by the uniformed personnel who would be responding to Officer Rosen's radio call. BARE AFF. ¶ 25 (R.153 #2675); ROSEN AFF. ¶ 24 (R.162 #2877). The Officers displayed their badges on the outside of their shirts on lanyards. BARE AFF. ¶ 25 (R.153 #2675); BARE AFF. EX.1 (R.153-1 #2680); ROSEN AFF. ¶ 24 (R.162 #2877); ROSEN AFF. EX.3 (R.162-3 #2884).

### E. GREEN'S ALTERCATION WITH JHERRI ALFRED

During the brief period of time that it took Officer Rosen to stop the GMC and air his radio call, Jherri Alfred narrowly avoided a deadly encounter with Green, which is precisely the threat the Officers feared that Green posed to members of the general public. It had taken Green and Rutledge approximately one minute to walk northbound on Ontario Street from East 26th Avenue to Duxberry Avenue. RUTLEDGE DEP. 145-146 (R.148 #1803-04); RUTLEDGE DEP. EX.P (R.148-16 #2124). On this short stretch of Ontario Street, Green walked past and stared at Alfred in an intimidating manner as Alfred was getting into his parked car with his fiancé and their two children. ALFRED DEP. 10-11, 37-39, 43, 56-68, 71, 206 (R.142 #429-30, 456-58, 462, 475-87, 490, 625); ALFRED DEP. EX.H (R.142-8 #677); ALFRED DEP. EX.I (R.142-9 #678); ALFRED DEP. EX.J (R.142-10 #679). Alfred responded to Green's menacing stare by reaching into his car, picking up his gun from the center console, and putting it into his gun holster in a manner meant to be visible to Green. ALFRED DEP. 69, 73-75, 78, 81-82 (R.142 #488, 492-94, 497, 500-01). Alfred states that he was attempting to send the message to Green that "I don't know what you've got under your shirt, but it's not going to kill me." *Id.* at 78 (R.142 #497). Green looked down at Alfred's gun and kept walking northbound on Ontario Street toward what turned out to be the deadly confrontation at Duxberry Avenue. *Id.* at 81-82 (R.142 #500-01).

### F.      THE INCIDENT AT DUXBERRY AVENUE AND ONTARIO STREET

After Officer Rosen aired that the gun had been pulled on them and provided a description of the suspect and the location, he drove the GMC north on Gerbert Road and turned east on Duxberry Avenue to go toward Ontario Street in order to locate Green. BARE AFF. ¶ 26 (R.153 #2676); ROSEN AFF. ¶ 25 (R.162 #2877); ROSEN AFF. EX.7 (R.162-7 #2888). The Officers drove toward the intersection of Duxberry and Ontario, and were about halfway down the street, when Green and Rutledge came into view. BARE AFF. ¶ 27 (R.153 #2676); ROSEN AFF. ¶ 26 (R.162 #2877); ROSEN AFF. EX.7 (R.162-7 #2888). The Officers saw Green in the middle of Duxberry Avenue, looking westbound at their GMC. BARE AFF. ¶ 27 (R.153 #2676); ROSEN AFF. ¶ 26 (R.162 #2877). The Officers had anticipated that Green might have fled to avoid arrest. BARE AFF. ¶ 28 (R.153 #2676); ROSEN AFF. ¶ 27 (R.162 #2877). Instead, as the GMC approached, Green stood in the middle of Duxberry Avenue with his hands in his waistband area from where he had pulled out his gun just a minute earlier on East 26th Avenue. BARE AFF. ¶ 28 (R.153 #2676); ROSEN AFF. ¶ 27 (R.162 #2877). The Officers' training and knowledge provided their understanding of the "reactionary gap" concept and they recognized that Green posed an imminent deadly threat. BARE AFF. ¶ 29 (R.153 #2676); ROSEN AFF. ¶ 28 (R.162 #2878).

Officer Rosen unholstered his pistol as he drove toward Green and Rutledge. ROSEN AFF. ¶ 29 (R.162 #2878). A number of things then happened nearly simultaneously. BARE AFF. ¶30 (R.153 #2676); ROSEN AFF. ¶ 29 (R.162 #2878). Officer Rosen stopped the GMC approximately 5-7 feet from Green. BARE AFF. ¶ 30 (R.153 #2676); BARE AFF. EX.2 (R.153-2 #2681); ROSEN AFF. ¶ 29 (R.162 #2878); ROSEN AFF. EX.8 (R.162-8 #2889). As Officer Rosen was stopping the GMC, Green was reaching into his front waistband and then quickly pulled out the pistol from under his shirt. BARE AFF. ¶ 31 (R.153 #2676); ROSEN AFF. ¶ 30 (R.162 #2878). Officer Rosen raised and aimed his gun with his right hand through the front windshield of the GMC as he reached

his left hand over his body to throw the GMC into park, and then reached his left hand back over to start opening the driver's side door to get out of the GMC, while repeatedly shouting "Police!" and "Don't move!" ROSEN AFF. ¶ 30 (R.162 #2878).

Officer Bare drew his weapon and started to exit the GMC from the rear passenger door while yelling "Police! Put your gun down!" or words to that effect, while using the fingertips of his right hand to lift and flash his badge on its lanyard toward Green. BARE AFF. ¶ 32 (R.153 #2676). Green pointed his pistol directly at Officer Rosen and approached Rosen's position. BARE AFF. ¶ 33 (R.153 #2676); ROSEN AFF. ¶ 31 (R.162 #2878). Green was either firing or was about to fire his weapon at Rosen. ROSEN AFF. ¶ 31 (R.162 #2878). In response, Officer Rosen fired several shots at Green in rapid succession through the gap between the "A" pillar on the driver's side of the GMC and the open driver-side door as he fell back into his seat in an effort to avoid Green's gunfire. *Id*. Green fired directly at Officer Rosen, riddling the GMC with bullet holes and shooting out the front and back driver-side windows. BARE AFF. ¶ 34 (R.153 #2677); ROSEN AFF. ¶ 32 (R.162 #2878); ROSEN AFF. EX.9 (R.162-9 #2890); ROSEN AFF. EX.10 (R.162-10 #2891); ROSEN AFF. EX.11 (R.162-11 #2892); ROSEN AFF. EX.12 (R.162-12 #2893); ROSEN AFF. EX.13 (R.162-13 #2894); ROSEN AFF. EX.14 (R.162-14 #2895); ROSEN AFF. EX.15 (R.162-15 #2896); ROSEN AFF. EX.16 (R.162-16 #2897).

Officer Rosen momentarily stopped firing as Green ducked out of his view on the opposite side of Rosen's now open driver-side door. ROSEN AFF. ¶ 33 (R.162 #2878). Officer Rosen didn't know if he had struck Green or if Green was seeking concealment from Rosen's opened door. *Id*. Officer Bare moved quickly to his right and circled toward the front passenger's side of the GMC as Green was circling around Officer Rosen's position. BARE AFF. ¶ 35 (R.153 #2677); BARE AFF. EX.3 (R.153-3 #2682). Officer Rosen heard additional gunshots and moved out from behind the

driver-side door to the north/northeast. ROSEN AFF. ¶ 34 (R.162 #2879). Green was moving north/northwest aiming his weapon and firing at Officer Rosen. *Id*. Officer Bare fired several shots as Green was pointing his weapon and firing at Officer Rosen. BARE AFF. ¶ 36 (R.153 #2677). Officer Rosen fired several additional shots in rapid succession. ROSEN AFF. ¶ 34 (R.162 #2879). Green fell to the ground, dropped his gun, and the Officers immediately stopped firing. BARE AFF. ¶ 36 (R.153 #2677); ROSEN AFF. ¶ 34 (R.162 #2879); ROSEN AFF. EX.17 (R.162-17 #2898).

This was a tense, uncertain, and rapidly evolving situation. BARE AFF. ¶ 37 (R.153 #2677); ROSEN AFF. ¶ 35 (R.162 #2879). Rosen fired a total of fifteen shots in approximately three to five seconds, inclusive of the momentary pause. ROSEN AFF. ¶ 35 (R.162 #2879). Officer Bare fired a total of seven shots in approximately two seconds. BARE AFF. ¶ 37 (R.153 #2677). Officer Rosen fired his weapon at Green because he was in fear for his life. ROSEN AFF. ¶ 36 (R.162 #2879). Green fired multiple bullets directly at Officer Rosen and Rosen believed he had no other means to protect his life. *Id*.

Green also posed a deadly threat to Officer Bare. SHAW AFF. ¶ 43 (R.163 #2908). An average suspect can move his hand and forearm across his body to a 90-degree angle in 12/100ths of a second. *Id*. He can move his hand from his hip to shoulder height in 18/100ths of a second. *Id*. Thus, Green could have turned his firearm from Rosen to Bare in 12/100ths of a second. *Id*. Basic reaction time is 31/100ths of a second. *Id*. Officer Bare fired his weapon at Green because he was in fear for his life and for the life of Officer Rosen. BARE AFF. ¶ 37 (R.153 #2677). Officer Bare believed he had no other means to protect their lives. *Id*.

Officer Rosen advanced and stepped on Green's pistol to secure it underfoot on the ground. BARE AFF. ¶ 38 (R.153 #2677); ROSEN AFF. ¶ 37 (R.162 #2879). Officer Bare also advanced closer to Green, who was lying face up on the ground. BARE AFF. ¶ 38 (R.153 #2677); ROSEN AFF. ¶ 37

11

(R.162 #2879). The Officers held cover over Green as they waited for help to arrive. BARE AFF. ¶ 38 (R.153 #2677); ROSEN AFF. ¶ 37 (R.162 #2879). At 6:11:18 p.m., Officer Bare aired "Shots fired! Shots fired!" BARE AFF. ¶ 39 (R.153 #2677); ROSEN AFF. ¶ 38 (R.162 #2879); SYNCHED VIDEO at 6:11:18 (R.168 #3053). At 6:11:31 p.m., Officer Rosen aired "Duxberry and Ontario, shots fired!" BARE AFF. ¶ 40 (R.153 #2677); ROSEN AFF. ¶ 39 (R.162 #2879); SYNCHED VIDEO at 18:11:31 (R.168 #3053). At 6:11:51 p.m. Officer Rosen aired "Start the medic, please!" BARE AFF. ¶ 41 (R.153 #2678); ROSEN AFF. ¶ 40 (R.162 #2879); SYNCHED VIDEO at 18:11:51 (R.168 #3053).

A crowd of people began to converge toward the Officers. BARE AFF. ¶ 42 (R.153 #2678); ROSEN AFF. ¶ 41 (R.162 #2879). At 6:12:07 p.m. Officer Rosen aired "Duxberry and Ontario. Run cars into us." BARE AFF. ¶ 42 (R.153 #2678); ROSEN AFF. ¶ 41 (R.162 #2879); SYNCHED VIDEO at 18:12:07 (R.168 #3053). At 6:12:37 p.m., less than 80 seconds after Officer Bare aired "Shots fired," CPD Officers Paul Lively and Brian Connelly arrived at the scene in Columbus Police Cruiser #23 and the remainder of the incident is captured on their cruiser video system. BARE AFF. ¶ 43 (R.153 #2678); ROSEN AFF. ¶ 42 (R.162 #2880); CONNELLY AFF. ¶ 23 (R.155 #2691); SYNCHED VIDEO (R.168 #3053). Green's gun is observed in the video next to Green where he is lying on the ground. ROSEN AFF. ¶ 43 (R.162 #2880); ROSEN AFF. EX.18 (R.162-18 #2899); SYNCHED VIDEO at 18:12:38 (R.168 #3053). The Officers' badges are observed in the video hanging around their necks on lanyards. BARE AFF. ¶ 44 (R.153 #2678); BARE AFF. EX.4 (R.153-4 #2683); SYNCHED VIDEO at 18:13:32 (R.168 #3053); ROSEN AFF. ¶ 44 (R.162 #2880); ROSEN AFF. EX.19 (R.162-19 #2900); SYNCHED VIDEO at 18:13:32 (R.168 #3053). Officer Connelly observed that Green was unconscious. CONNELLY AFF. ¶ 25 (R.155 #2692). At 6:13:04 p.m., Connelly started handcuffing Green to secure him on the ground. CONNELLY AFF. ¶ 26 (R.155 #2692); SYNCHED VIDEO at 18:13:04 (R.168 #3053). At 6:13:25 p.m., Connelly started searching

Green for weapons. CONNELLY AFF. ¶ 27 (R.155 #2692); SYNCHED VIDEO at 18:13:25 (R.168 #3053). At 6:13:43 p.m., Connelly started administering first aid to Green. CONNELLY AFF. ¶ 28 (R.155 #2692); SYNCHED VIDEO at 18:13:43 (R.168 #3053). At 6:14:13 p.m., Connelly began to perform CPR on Green. CONNELLY AFF. ¶ 29 (R.155 #2692); SYNCHED VIDEO at 18:14:13 (R.168 #3053). Other officers arrived and took control of the scene. BARE AFF. ¶ 45 (R.153 #2678); ROSEN AFF. ¶ 45 (R.162 #2880). At that point, Rosen and Bare were led away from the scene by Officer Support Team Members. BARE AFF. ¶ 45 (R.153 #2678); ROSEN AFF. ¶ 45 (R.162 #2880). This concluded Rosen and Bare's involvement in the incident. BARE AFF. ¶ 45 (R.153 #2678); ROSEN AFF. ¶ 45 (R.162 #2880).

The timing and rapidly evolving nature of events can be accurately determined from the Officers' recollections in conjunction with the cruiser video and radio transmission evidence. The entire encounter, from the time Green first confronted the Officers by stepping into the path of the GMC at East 26th Avenue and drew and pointed his gun, until the conclusion of the shooting, spanned less than two minutes. From 6:10:20 p.m. to 6:10:43 p.m., Officer Rosen aired "6410. Duxberry, Ontario. Two male blacks walking northbound. Red tanktop, black shorts, short hair on one. Just pulled a 33 on us. We are swinging around the block." Thirty-five seconds later, at 6:11:18 p.m., Officer Bare aired "Shots fired! Shots fired!" Allowing for the 30-45 seconds backward from Officer Rosen's initial airing, to account for Green's confrontation and threat on East 26th Avenue, the entire encounter lasted less than two minutes.

### G. OTHER WITNESSES' DESCRIPTIONS OF THE INCIDENT

The accounts of several individuals who claim to have seen some of the incident, but from vantage points quite distinct from the vantage points of Officers Rosen and Bare, corroborate the reasonableness of the belief that Green presented a risk of serious physical harm.

### 1.    Christian Rutledge's Deposition Testimony

Rutledge acknowledges the incident as being tense, uncertain, and rapidly evolving. RUTLEDGE DEP. 227 (R.148 #1885). Rutledge did not condone Green's behavior during the incident and believes that Green should not have pulled a gun on the GMC. *Id*. at 228-229 (R.148 #1886-87). According to Rutledge, immediately before the shots were fired, Green was angrily and loudly yelling "Bro, bro, bro, bro, bro!" at the GMC while holding out his left arm in a manner that Rutledge knows to be typical of someone holding a gun, the implication being that Rutledge was not looking at Green's hands at the crucial moments. RUTLEDGE DEP. 175-190 (R.148 #1833-48); RUTLEDGE DEP. EX.T (R.148-20 #2128); RUTLEDGE DEP. EX.U (R.148-21 #2129); RUTLEDGE DEP. EX.V (R.148-22 #2130); RUTLEDGE DEP. EX.W (R.148-23 #2131). Rutledge backed away, focusing on the GMC, and says he did not see what Green was doing at the moment shots were fired.[3] RUTLEDGE DEP. 190-191, 199-202 (R.148 #1848-49, 1857-60). When the shooting started, Rutledge stopped looking at what was happening and ran westbound on Duxberry Avenue. *Id*. at 202-203 (R.148 #1860-61). Rutledge heard approximately 17 gunshots in total and could tell that the shots came from different calibers of guns because they sounded different. *Id*. at 204 (R.148 #1862). As stated above, Rosen and Bare were both armed with Division-issued .40 caliber Smith & Wesson Model M&P semi-automatic pistols. Green, on the other hand, was armed with a Glock, Model 30, .45 caliber handgun. SHEPPARD AFF. ¶¶ 35-38 (R.164 #2946-47).  Immediately after the

---

[3] On September 29, 2017, Rutledge told Columbus Police Detective Rick Crum that the GMC came back around the corner and the two guys jumped out and yelled "Police" and Green started shooting at the men. CRUM AFF. ¶ 6 (R.156 #2696). Rutledge said that he told Green "Don't" then "they lit him up and he died right before my eyes." *Id*. at ¶ 7. Rutledge stated that the night the incident happened he told the truth about the incident. *Id*. Rutledge stated that when his friends and the neighborhood began telling him that it didn't happen that way, he then lied about what occurred. *Id*. As noted earlier, Rutledge has since denied making this unsworn and unrecorded statement to Crum. Thus, for purposes of this motion for summary judgment, Rutledge's description of the incident is limited to his deposition testimony.

shooting, Rutledge "blurted out" "This nigga shot at the fucking cops. This dumbass nigga." RUTLEDGE DEP. 225-227 (R.148 #1883-85). Rutledge looked at Green's gun laying on the sidewalk and stated, "I know this nigga didn't just do what he just did." RUTLEDGE DEP. 222 (R.148 #1880); RUTLEDGE DEP. EX.X (R.148-24 #2132).

### 2. Jherri Alfred

While Rutledge says he saw Green's arm extended in a manner known to be typical of someone holding a gun, Jherri Alfred saw Green pull and raise the gun. Alfred "saw the gun come up from [Green's] pants" and "saw [the gun] in the air." ALFRED DEP. 135-136 (R.142 #554-55). This confirmed to Alfred that Green possessed a gun moments earlier when Alfred, justifiably, had felt threatened by Green—"oh, damn, dude had a gun, walked past me." *Id*. Alfred's demonstration of Green pulling and raising his gun in response to something the officer said vividly captures the deadly risk Green presented to the Officers. ALFRED DEP. 134-141, 218 (R.142 #553-60, 637); ALFRED DEP. EX.Q (R.142-17 #686); ALFRED DEP. VIDEO PART II, 1:36:50-1:37:24 (physical demonstration) (R.168 #3049).

Alfred also states that Green pulled out his gun, raised it up, and *then* the shots started. ALFRED DEP. 134-141, 218 (R.142 #553-60, 637); ALFRED DEP. EX.Q (R.142-17 #686); (physical demonstration—ALFRED DEP. VIDEO PART II, 1:36:50-1:37:24) (R.168 #3049). Finally, Alfred is certain that he heard a number of shots coming from a Glock, which happens to be the gun Green was firing. ALFRED DEP. 144-145 (R.142 #563-64).

### 3. Lavonna Williams

Lavonna Williams' account is consistent with Officer Rosen's description of the event, although her vantage point was from her address at 2198 Ontario Street. WILLIAMS DEP. 28 (R.150 #2535). She heard gunshots and then directed her attention southward toward the intersection of Duxberry and Ontario. *Id*. at 47 (R.150 #2554). Williams saw a man standing at the front of the

vehicle and shooting his gun into the white vehicle. WILLIAMS DEP. 47, 51-53, 61-62, 123-124 (R.150 #2554, 2558-60, 2568-69, 2630-31); WILLIAMS DEP. EX.E (R.150-5 #2647), WILLIAMS DEP. EX. F (R.150-6 #2648).

### 4. Shantel Anderson

Shantel Anderson's recollection is provided from the vantage point of her house at 1210 Duxberry Avenue, which is slightly to the east of the intersection of Duxberry and Ontario. ANDERSON DEP. 11, 21 (R.143 #706, 716); ANDERSON DEP. EX.A (R.143-1 #812). Anderson says she saw the GMC drive slowly eastbound on Duxberry Avenue and come to a stop near Green at Duxberry and Ontario. ANDERSON DEP. 50, 53, 57 (R.143 #745, 748, 752). She states further that the driver of the GMC "[r]olled down the window a little bit" and "said some words" [but] "I don't know what the words was to Mr. Henry Green." *Id*. at 57 (R.143 #752). At that point, according to Anderson, "[w]hatever words they exchanged" Green lifted his shirt "to show what he had." ANDERSON DEP. 57 (R.143 #752); ANDERSON DEP. VIDEO 2:51:10-2:52:25 (R.168 #3049). "And after that, I don't know what the words was, but Mr. Henry start[ed] shooting. I guess he felt offended." ANDERSON DEP. 57-59 (R.143 #752-54). Anderson saw Green continue shooting as he walked toward the GMC. *Id*. at 71-72 (R.143 #766-67). According to Anderson, Green shot out one of the vehicle's windows while the officer tried to shield himself behind the door of the vehicle. *Id*. at 47-48, 61, 63 (R.143 #742-43, 756, 758). Anderson saw the young guy shooting at the officers and then they started shooting back. *Id*. at 45-46 (R.143 #740-41).

### H. ACTION V. REACTION

Most deadly confrontations begin and end within three seconds. SHAW AFF. ¶ 35 (R.163 #2906). Time is a life-threatening factor—time to think, to act, to react, and to do it all within the parameters of the law and departmental policy. *Id.* Research has shown that a deadly threat can unfold at a speed of one quarter of a second or less. *Id.* The physiological realities of deadly force

confrontations include the factors of action-versus-reaction. *Id.* at ¶ 36 (R.163 #2906). Force Science Institute, Ltd. ("Force Science"), an independent human dynamics research institute, defines reaction time as a measure of the time from the arrival of a suddenly presented and unanticipated signal to the beginning of the response to it. *Id.* Action and reaction sequences take quantifiable amounts of time to complete. *Id.* at ¶ 37 (R.163 #2906).

There have been many studies completed on action versus reaction. *Id.* In a series of experiments with officers from Tempe, Arizona, researchers discovered that the average reaction time for officers to shoot when cued with a light was .31 seconds. *Id.* at ¶ 37 (R.163 #2906-07). Three-quarters of that time (.23 seconds) was taken up with processing and one fourth (.08 seconds) with the actual physical motion of moving the finger from the resting position and firing.[4] *Id.* at ¶ 37 (R.163 #2907). In a more complex scenario where officers had to process information from a number of lights in different rows in the decision to shoot, the reaction almost doubled to .56 seconds.[5] *Id.*

Since the invention of a shot timer, research has been completed on the length of time to fire a shot. *Id.* at ¶ 38 (R.163 #2907). Force Science completed a study with the primary purpose being to measure the times it takes to do certain motions. *Id.* All of the motions in the study were self-initiated, and therefore were "action" motions to which an officer would presumably be reacting. *Id.* In this study it gave an average time for a person sitting in an automobile to draw a gun from across his body and fire it the opposite direction. *Id.* The average time to grab a firearm from one side of the body and point and shoot in the opposite direction was 26/100ths of a second.

---

[4] Lewinsky, W. and Hudson, B. (2003a). Time to start shooting? Time to stop shooting?: The Tempe study. *The Police Marksmen*, (September/October), 26-29.

[5] Lewinsky, W. and Hudson, B. (2003b). The impact of visual complexity, decision making and anticipation. *The Police Marksmen*, (November/December), 24-27.

*Id.* The findings of the study show that most officers cannot fire faster than a suspect with a weapon in hand, even if it was not aimed at the officer. *Id.* at ¶ 39 (R.163 #2907). The officer has to perceive and absorb the threat that a suspect is going to fire, process the information within the current context, decide on an appropriate action, and then signal the muscles to respond. *Id.* In the meantime, the suspect has already assessed the situation, decided on a course of action, and must only complete the act of firing. *Id.* That is why it is commonly stated that action is always faster than reaction. *Id.*

Force Science completed a study of the average time it takes to remove a gun from the waistband (Combat Tuck) and fire in a very quick, close combat tuck maneuver. *Id.* at ¶ 40 (R.163 #2907). The study found that the average time to remove a firearm from one's waistband and fire was 0.23 seconds. *Id.* at ¶ 40 (R.163 #2907-08). The fastest time recorded was 0.09 seconds. *Id.* at ¶ 40 (R.163 #2908). This of course is less than the average reaction time of 0.31 seconds. *Id.* The eight video files labeled Shaw Videos 01-08 illustrate the remarkable speed of gun attacks. Shaw Aff. ¶ 41 (R.163 #2908); (R.168 #3052-53). Additionally, bullets pose a deadly threat over a significant range. *Id.* at ¶ 41 (R.163 #2908).

## I.  FORENSIC EVIDENCE

The forensic evidence is consistent with the reasonableness of the Officers' conclusion that Green presented an imminent risk of serious physical harm.

### 1.  Green Was Armed

Green was armed with a Glock, Model 30, .45 caliber semiautomatic pistol with a ten round magazine.[6] Sheppard Aff. ¶¶ 30e, 35-38 (R.164 #2942-44, 2946-47); Rosen Aff. Ex.17 (R.162-

---

[6] Green typically kept this gun hidden in a dresser in his room. Stowers Dep. 48-49 (R.149 #2423-24); Stowers Dep. Ex.G (R.149-7 #2492).

17 #2898). As stated above, Green's gun is observed in the cruiser video next to where Green is lying on the ground. Green's DNA was found on both the gun and its magazine. SIMON AFF. (R.165 #3031-35); SIMON AFF. EX. A (R.165-1 #3036); SIMON AFF. EX. B (R.165-2 #3039-40); SIMON AFF. EX. C (R.165-3 #3041-42); SIMON AFF. EX. D (R.165-4 #3043-44); PARKER AFF. (R.160 #2828-30); PARKER AFF. EX. A (R.160-1 #2831-32); PARKER AFF. EX. B (R.160-2 #2833-34); PARKER AFF. EX. C (R.160-3 #2835-37); PARKER AFF. EX. D (R.160-4 #2838-39). A post-incident firearms trace revealed that the gun was stolen.[7] SHEPPARD AFF. ¶ 39 (R.164 #2947); SHEPPARD AFF. EX. F (R.164-6 #3000-01); SHEPPARD AFF. EX. G (R.164-7 #3002-06). The Franklin County Sheriff's Concealed Carry Office found no evidence of Green ever applying for or being issued a Concealed Carry Permit. WHEELER AFF (R.166 #3045).

### 2. Green Fired at Least Six Times

Six fired .45-caliber cartridge cases found at the scene were from Green's gun. SHEPPARD AFF. ¶ 52 (R.164 #2949); DUCAT AFF. ¶ 16 (R.157 #2700); DUCAT AFF. EX. C (R.157-3 #2711). Four fired .45 caliber bullets were recovered and matched to Green's gun. SHEPPARD AFF. ¶ 59 (R.164 #2950); DUCAT AFF. ¶ 16 (R.157 #2700); DUCAT AFF. EX. C (R.157-3 #2711).

### 3. Matthew Noedel's Analysis of the Incident

Forensic Scientist Matthew Noedel performed a forensic analysis of the incident and made a number of observations and findings. Green's gunshots struck the GMC between four and six times. NOEDEL AFF. ¶ 43 (R.159 #2758). The four fired .45 caliber bullets from Green's gun that were recovered were found in the GMC's driver-side exterior mirror; in the driver's door; in the headliner above the headrest of the front passenger seat; and on the ground below the rear door on the driver's side of the GMC. *Id*. at ¶ 23 (R.159 #2753). The GMC exhibited a variety of bullet

---

[7] For the sake of clarity, the Defendants will still refer to this stolen gun as "Green's firearm."

damage from Green's gunshots. *Id.* at ¶ 14 (R.159 #2750). Identifiable damage from Green's gunshots includes the following:

- The windows of the driver's door and driver side back door were shattered in the up, or mostly up, position. NOEDEL AFF. ¶ 14 (R.159 #2750); NOEDEL AFF. EX.D (R.159-4 #2807).

- A bullet struck the back of the external driver's side mirror. NOEDEL AFF. ¶ 18 (R.159 #2751); NOEDEL AFF. EX.E (R.159-5 #2808). This fired bullet path likely occurred at a time when the GMC's driver's door was closed, or mostly closed. NOEDEL AFF. ¶ 18a (R.159 #2751).

- A bullet perforated the back of the external driver's side mirror. NOEDEL AFF. ¶ 19 (R.159 #2751-52); NOEDEL AFF. EX.F (R.159-6 #2809).

- A bullet perforated the outer layer of the driver's door and deeply dented the interior layer of the door. NOEDEL AFF. ¶ 20 (R.159 #2752); NOEDEL AFF. EX.G (R.159-7 #2810).

- A bullet perforated the outer layer of the driver's door, perforated the inner door metal, and continued through the interior door panel toward the main body of the GMC. NOEDEL AFF. ¶ 21 (R.159 #2752-53); NOEDEL AFF. EX.H (R.159-8 #2811).

- A bullet clipped the interior edge of the driver's door and deflected generally toward the body of the GMC. NOEDEL AFF. ¶ 22 (R.159 #2753); NOEDEL AFF. EX.I (R.159-9 #2812).

All six of Green's fired .45 caliber cartridge cases were located in the area toward the northwest corner of the intersection of Duxberry and Ontario. NOEDEL AFF. ¶ 23 (R.159 #2753). Green's fired cartridge cases are generally toward the north/northeast of the GMC which supports that he was in that area while firing his gun. *Id.* at ¶ 44 (R.159 #2758).

### J. MICHAEL LYMAN

Michael Lyman is presented by Plaintiff as a "police procedures" expert. His conclusions do not challenge the reasonableness of the Officers' belief that Green's actions posed a risk of serious physical harm. Lyman states, with respect to the initial confrontation at 26th Avenue and Ontario Street, "[i]f it's to be believed that the gun was pointed at the back of the vehicle I think

20

that's very serious. And I think there is some police intervention that needs to take place. And at the very minimum there needs to be a field interview of Mr. Green and possibly—and probably even an arrest." LYMAN DEP. 35 (R.146 #1427). "[T]hat's certainly a threat and in my opinion it's most likely a violation of the law." *Id*.

Lyman does not find fault with the Officers responding by turning onto Gerbert Road from 26th Avenue. *Id*. at 26-27 (R.146 #1418-19). He states, "In fact I'm saying that Rosen did the right thing to air the fact that this person pointed a weapon at them, and to request marked units to come to the area for intervention. That's all very appropriate." *Id*. at 37 (R.146 #1429). Nor does Lyman find fault with the Officers then turning from Gerbert Road onto Duxberry Avenue "[p]rovided they don't make their contact as an unmarked unit." *Id*. at 44-45 (R.146 #1436-37). Lyman states that the Officers should have "turned on Duxberry for the purpose of surveilling Rutledge and Green to see where they might go. For example, if they might flee, which direction. So they could inform their responding marked units." *Id*. at 81 (R.146 #1473).

For purposes of his opinion, Lyman agrees that Green posed a risk of serious physical harm to the Officers at the moment that they used deadly force at Duxberry and Ontario. *Id*. at 78-79 (R.146 #1470-71). According to Lyman, Green posed a risk of serious physical harm if he pulled up his shirt to display a handgun; and if he pulled the gun from his waistband; and if he pointed the gun at Officer Rosen; and certainly when Green was shooting at Officer Rosen. *Id*. at 55-66 (R.146 #1447-58). Lyman accepts that the evidence shows that Green was shooting in the direction of Officer Rosen during the incident. *Id*. at 76 (R.146 #1468). Thus, Lyman is not critical of the Officers' decisions to use deadly force at the moment their shots were fired. *Id*. at 78-81 (R.146 #1470-73). Instead, Lyman opines that once the Officers turned onto Duxberry Avenue, they made tactical, practical, and procedural errors that ultimately led to their use of lethal force, and that is

what he believes made their use of lethal force "unreasonable." *Id*. Specifically, Lyman opines that Rosen and Bare should not have approached Green once they saw him on Duxberry Avenue. *Id*. Lyman states, "I would expect the officers to do what they did initially, and that is to air the event, request for uniformed officers to come in and encounter Mr. Green, or for a field interview or a possible arrest. And that should be done by the uniformed personnel. Not by Rosen and Bare who are not in uniform and not properly identified as law enforcement." *Id*. at 43 (R.146 #1435). Lyman surmises that "it is likely, if not certain, that had a marked unit been the first unit to drive up and encounter Henry Green, any use of deadly force would have been avoided because Green would have known that the encounter was an official police action." *Id*. at 46-47 (R.146 #1438-39). Lyman admits, however, "I'm speculating on what I believe the outcome would have been. And no, I don't have a crystal ball. I don't know exactly what would have happened." *Id*. at 47 (R.146 #1439).

Lyman's opinion on tactics lacks any evidentiary basis and also disregards the threat that Green posed to the Officers when Green confronted them on Duxberry Avenue. Green was armed with a Glock 30 .45 caliber handgun. SHAW AFF. ¶ 44 (R.163 #2908). The Journal of the American Medical Association (JAMA) published a study on July 27, 2018 titled *The Association of Firearm Caliber With Likelihood of Death From Gunshot Inquiry in Criminal Assaults. Id.* The objective was to determine whether the likelihood of death from gunshot wounds inflicted in criminal assaults is associated with the power of the assailant's firearm as indicated by its caliber. *Id.* The cases were divided into 3 groups with the .45 included as a large caliber. *Id.* The cross-sectional findings using five years of data extracted from investigation files kept by the Boston Police Department determined that "The case fatality rates of assaults inflicting gunshot injury increased significantly with the caliber of the firearm." *Id.*

As stated above, as the Officers drove toward the intersection of Duxberry Avenue and Ontario Street, Green and Rutledge came into view about halfway down the street. That distance measured is estimated to be 139.5 feet. *Id.* at ¶ 45 (R.163 #2909). The FBI Uniform Crime Report "Law Enforcement Officers Killed & Assaulted 2008" was a study conducted detailing the distance that officers were killed by firearms in the ten year period of 1999 to 2008. *Id.* at ¶ 46 (R.163 #2909). The study found that 33 (6.7%) of law enforcement officers were killed at a distance greater than 50 feet. *Id.* It is without question that at the distance that Officer Rosen first saw Green on Duxberry Avenue, he and Officer Bare were within a distance capable of being shot by Green. *Id.* at ¶ 47 (R.163 #2909). Handguns are lethal at distances of 50 yards and human targets are easily hit from distances of 150 feet. *Id.* The Columbus Division of Police utilizes the Police Practical Combat Course in their firearms training which requires recruits to hit a human-like target from 150 feet. *Id.* at ¶ 48 (R.163 #2909). When Officer Rosen travelled eastbound on Duxberry Avenue and first observed Green, he was well within 50 yards. *Id.* Understanding the close proximity of Green to the Officers' vehicle and the high caliber of firearm carried by Green, not only were Rosen and Bare in an immediate threat of serious physical harm posed by Green, but there was also a likelihood of death from the high caliber of round. *Id.* at ¶ 49 (R.163 #2909). Furthermore, if the Officers would have failed to approach Green once they saw him on Duxberry Avenue, they would have limited their ability to protect the public from the serious threat posed by Green to anyone else he might encounter. *Id.* at ¶ 50 (R.163 #2909). Closing the distance increased their accuracy rate probability should Green threaten the life of a citizen in that area. *Id.* (R.163 #2909-10).

Lyman concedes that Green posed a risk to the Officers after they turned onto Duxberry Avenue, but implies that the Officers should have just stopped and/or stayed in Green's firing

range despite the risk Green presented. Lyman Dep. 57-60 (R.146 #1449-52). However, Lyman states, "the extent the target is closer to the person who is firing has a lot to do with the level of threat. Because it's more likely that the person who is firing the firearm will hit the target if the individual is closer, as opposed to being several houses away…" *Id*. at 59 (R.146 #1451). "[I]t's a danger either way." *Id*. at 60 (R.146 #1452). By implication, therefore, Lyman suggests the Officers should have relied solely on the possibility of Green's inaccuracy with a firearm.

Even if Lyman's suggested course of action and hypothetical peaceful outcome are determined to be relevant, the evidence in the record suggests that Green would also have confronted uniformed officers responding in a marked cruiser. First, Green had a strong motivation to avoid arrest as he had committed a number of crimes during the incident, including Aggravated menacing, see O.R.C. § 2903.21(A); Carrying concealed weapons, O.R.C. § 2923.12(A)(2); Using weapons while intoxicated, see O.R.C. § 2923.l5(A); and Receiving stolen property, O.R.C. § 2913.51(A), (C).[8]

Second, Green made an ominous threat approximately three weeks before the incident when he told Devonte Lewis that "he's going out dumping at the boys," which means that he was going to die while shooting a gun at police officers.[9] Lewis Dep. 50-52, 192 (R.145 #992-94, 1134); Lewis Dep. Ex.D-32 (R.145-4 #1203).

---

[8] Prior to the conclusion of the incident, Green had committed the additional crimes of Attempted murder, O.R.C. §§ 2903.02(A), 2923.02; Felonious assault, O.R.C. § 2903.11(A)(2), (D)(1)(a); Discharge of a firearm on or near prohibited premises, O.R.C. § 2923.162(A)(3), (C)(1); Discharge of a firearm on or near prohibited premises, O.R.C. § 2923.162(A)(3), (C)(2); Discharge of a firearm on or near prohibited premises, O.R.C. § 2923.162(A)(3), (C)(3).

[9] Defendants note that Green initially pulled his gun on the Officers in the area of 1215 East 26th Avenue, the location of the June 5, 2016 gang-related drive-by shooting. Both Green and Lewis were members of a gang-affiliated rap group called "FTF," or "Fuck the Fame." Stowers Dep. 55-57 (R.149 #2430-32).; Stowers Dep. Ex.H-009-014 (R.149-8 #2501-06); Lewis Dep. 28, 39, 45-46, 57, 123 (R.145 #970, 981, 987-88, 999, 1065). One of Green's many nicknames was "Bub Black." Stowers Dep. 8-9 (R.149 #2383-84).. FTF extensively promotes gang activity, drug dealing, gun violence, and threatens rivals. Lewis Dep. (in its entirety) (R.145 #943-1142).; 60 Baby music video "Wave," Lewis Dep. 125-136 (R.145 #1067-78).; Lewis Dep. Ex.J Video 3 (R.168 #3050) https://www.youtube.com/watch?v=WrpCPx4h-7o (reference to "Bub Black" at 2:50 to 2:54), Lewis Dep. 129 (R.145 #1071); FTF Lewis music video "Charlie," Lewis Dep. 136-149 (R.145 #1078-1091); Lewis Dep. Ex.J Video 2

Third, Green was intoxicated during the incident. "Drunk persons are generally unpredictable" and "heavy intoxication create[s] a more volatile situation," *Marvin v. City of Taylor*, 509 F.3d 234, 246 (6th Cir. 2007). This was especially true with Green who "had a very bad drinking problem," and would become violent and "physically abusive" when he consumed alcohol. GALUSHA-SMITH DEP. 28, 40 (R.144 #843, 855). Green threatened to kill his previous girlfriend Alliyah Galusha-Smith between five to ten times while he was under the influence of alcohol. *Id*. at 17, 38 (R.144 #832, 853). Green physically assaulted Galusha-Smith on multiple occasions while drunk, including incidents where he smacked, punched, and choked her. *Id*. at 40 42-43 (R.144 #855, 857-58). Galusha-Smith testified that during one particularly disturbing alcohol-fueled incident, Green "beat me down about a flight of steps. He spit on me, choked me, stomped on me." *Id*. at 23, 27 (R.144 #838, 842). Green punched and stomped on her face until she "blacked out." *Id*. at 26 (R.144 #841). "I know it went from me getting pushed down the stairs to getting drug back up the stairs and ended with him just choking me and then he spit on me again and dropped me and then just left." *Id*. at 26-27 (R.144 #841-42). According to Galusha-Smith, "I was released from the hospital the same day. Two severely bruised black eyes. My face just looked distorted." *Id*. at 23 (R.144 #838). During another alcohol-fueled incident, Green threatened to kill both Galusha-Smith and her mother by stating, "All right, bitch. I'm going over to kill you. You

---

(R.168 #3050) https://www.youtube.com/watch?v=JKeyFQJEnAE (reference to "Bub Black" at 2:22 to 2:36), LEWIS DEP. 141-142 (R.145 #1083-84).

Evidence in the record suggests that Green was affiliated with the Bloods street gang whose territory stretches from East 21st Avenue to Duxberry Avenue and thus includes all locations at issue in this case. The territory of the DBlock Bloods stretches from 21st Avenue to Duxberry Avenue in the Linden area. RUTLEDGE DEP. 266-267 (R.148 #1924-1925). Green also referred to himself as "Bubby Blood" STOWERS DEP. 75-76 (R.149 #2450-51); STOWERS DEP. EX.E (R.149-5 #2490), and "Bubby Red." STOWERS DEP. 8-9 (R.149 #2383-84). Green is shown on a video displaying the Bloods gang sign while referring to himself as "Bubby Fucking Red." RUTLEDGE DEP. 413-414 (R.148 #2071-2072); RUTLEDGE DEP. EX.AA-007 (R.148-27 #2350), RUTLEDGE DEP. EX.CC, Video 4 (R.168 #3052); STOWERS DEP. 42-46; 75-76 (R.149 #2417-21, 2450-51); STOWERS DEP. EX I (R.168 #3053).

will be missed and so will your mother." *Id*. at 31, 38-39 (R.144 #846, 853-54). "You will be wearing your mother on a shirt." *Id*. at 22 (R.144 #837).

Finally, just two minutes earlier, Green had stepped in front of the GMC, forcing it to stop or change direction, and then displayed, pulled and pointed a gun at the vehicle and the Officers.

While none of these factors lend credence to Lyman's speculation of the likelihood, or even possibility, of Green peacefully responding to a law enforcement effort to confront him, all of Green's actions established the threat he posed to people in the area, to Bare and Rosen, and to any other police officers Green encountered.

## II.    STANDARD OF DECISION

Summary judgment is appropriate "if [Defendants show] that there is no genuine dispute as to any material fact and [they are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Even though the Court must view all of the evidence and draw all reasonable inferences in Plaintiff's favor, Plaintiff must still identify specific facts within the record showing there is a genuine issue of material fact. *See Muncie Power Prods. v. United Techs. Auto.*, 328 F.3d 870, 873 (6th Cir. 2003). Not just any dispute of fact will do. The "dispute must present a *genuine* dispute of *material* fact." *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013) (emphasis in original). A fact is "material" only if its resolution "might affect the outcome of the suit under the governing law," and a dispute is "genuine" only if the "evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 251-52 (1986). The evidence with respect to a particular factual dispute cannot be "so one-sided that [Defendants] must prevail as a matter of law," and [Plaintiff] cannot rely upon a "mere existence of a scintilla of evidence in support of [her] position." *Id.* at 251-52.

### III.    LAW & ARGUMENT

Plaintiff has asserted Fourth and Fourteenth Amendment claims against Officers Bare and Rosen under 42 U.S.C. § 1983. For the following reasons, Bare and Rosen are entitled to qualified immunity and summary judgment for these claims. Qualified immunity shields government officials from liability for civil damages under § 1983 insofar as their actions do not violate any clearly established statutory or constitutional rights of which a reasonable person would have known at the time of the incident. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity "ordinarily applies unless it is obvious that [a] reasonably competent official would have concluded that the actions taken were unlawful," *Chappell v. Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009), and it affords "'ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341, (1986)). "In a civil suit arising from the use of deadly force, immunity should be recognized 'if officers of reasonable competence could disagree on the issue.'" *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (quoting *Malley*, 475 U.S. at 341). Because of the factually particularized nature of the qualified immunity analysis, "'[e]ach defendant's liability must be assessed individually based on his own actions.'" *Pollard v. City of Columbus*, 780 F.3d 395, 402 (6th Cir. 2015) (quoting *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010)).

Plaintiff must demonstrate that the Officers are not entitled to qualified immunity. *See Chappell*, 585 F.3d at 907. Consequently, Plaintiff bears the burden of showing that, when the evidence is viewed in her favor: (1) a constitutional right was violated; and (2) that right was clearly established at the time of the violation. *See id.* Because Plaintiff fails to demonstrate either prong of this test, she fails to carry her burden. *See id.* Courts have discretion to decide which of

27

the "two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

### A.     PLAINTIFF'S FOURTH AMENDMENT CLAIMS FAIL

Plaintiff argues that the Officers used excessive force against Green in violation of the Fourth Amendment.[10] However, the Officers are entitled to judgment because their use of force was reasonable under the Fourth Amendment and are also entitled to qualified immunity because they did not violate any clearly established constitutional right.

The Fourth Amendment guarantees the right to be free from unreasonable seizures, and includes the right to be free from excessive force. *See Graham v. Connor*, 490 U.S. 386, 388 (1989). An "objective reasonableness" standard governs whether an officer's particular use of force was excessive, *see id.*, and deadly force is objectively reasonable when an officer "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others..." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). The objective reasonableness test "requires careful attention to the facts and circumstances of each particular case, including … whether the suspect poses an immediate threat to the safety of the officers or others." *Graham,* 490 U.S. at 396. The officer's conduct is to be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* Because "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation," *id.* at 396–97, courts "must avoid substituting [their] personal notions of proper police procedure for the

---

[10] See COMPL. ¶¶ 188-194 (DOC.1, PAGE ID #: 29-30). Plaintiff also references the Fourteenth Amendment in her excessive force claim. The Fourteenth Amendment protects pretrial detainees from the use of excessive force, but it does not apply to claims arising from an arrest. *Aldini v. Johnson*, 609 F.3d 858, 865 (6th Cir. 2010). Rather, the Fourth Amendment governs claims of excessive force occurring "in the course of an arrest or other seizure of the plaintiff," as well as claims arising from a stop. *Id.*

instantaneous decision of the officer at the scene." *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992). That is, courts "must never allow the theoretical, sanitized world of [their] imagination to replace the dangerous and complex world that policemen face every day." *Id.* "After all, 'what constitutes reasonable action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.'" *Mullins*, 805 F.3d at 766 (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1163 (6th Cir. 1996)).

To determine whether a suspect presents an imminent danger to officers or the public at the time the officers use deadly force requires an analysis of both the moments before the shots were fired and the prior interactions between the suspect and the Officers. See *Latits v. Phillips*, 878 F.3d 541, 548. (6th Cir. 2017). The Court may consider only the facts that were knowable to the Officers at the time of the incident. *White v. Pauly*, 137 S. Ct. 548, 550 (2017) (per curiam).

Given the facts of this case, a reasonable officer would have probable cause to believe that Green posed a threat of death or serious physical injury to Rosen and Bare. Green stood in the middle of the street and confronted the Officers as they drove on East 26th. When Officer Rosen drove around and past him, Green displayed, pulled, and pointed a gun at the Officers. Less than two minutes later, Green stood in the middle of the street and again confronted the Officers as they drove on Duxberry. Green's hands were in his waistband, from where he had displayed and pulled the gun in the earlier encounter. Green then pulled and pointed his gun and opened fire at Officer Rosen. Green fired multiple bullets directly at Officer Rosen. Officer Bare fired his shots as Green was pointing his weapon and firing at Officer Rosen. Green could have turned his firearm from Rosen to Bare in 12/100ths of a second. It was reasonable for the Officers to use deadly force to stop Green from shooting and killing them during this tense, uncertain, and rapidly evolving incident.

Of course, "[w]hen a person aims a weapon in a police officer's direction, that officer has an objectively reasonable basis for believing that the person poses a significant risk of serious injury or death." *Greathouse v. Couch*, 433 F. App'x 370, 373 (6th Cir. 2011). "Time and time again, [the Sixth Circuit has] rejected Fourth Amendment claims…when the officers used deadly force only after the suspects had aimed their guns at the officers or others." *Presnall v. Huey*, 657 Fed. Appx. 508, 512 (6th Cir. 2016) citing *Boyd v. Baeppler*, 215 F.3d 594, 598, 604 (6th Cir. 2000); *Estate of Sowards v. City of Trenton*, 125 F. App'x 31, 34, 38-39 (6th Cir. 2005); *Whitlow v. City of Louisville*, 39 F. App'x 297, 300, 306 (6th Cir. 2002). Moreover, a "police officer need not wait for a suspect to open fire on him, much less wait for the suspect to actually hit him, before the officer may fire back." *Greathouse*, 433 Fed. App'x at 373 (citing *Sowards*, 125 Fed App'x at 38–39; *Boyd*, 215 F.3d at 599–600). "Whether [a suspect] shot first or did not fire the gun at all is immaterial to whether the officers' actions were reasonable under the circumstances. The issue is whether [the suspect] threatened the officers with the gun at close range such that they were justified in using deadly force in self-defense." *Sowards*, 125 Fed App'x at 38 citing *Boyd*, 215 F.3d at 600 ("That the defendants did not see or hear Boyd fire the weapon does not affect whether the police officers, acting reasonably under the circumstances known to them, acted in defense of their own safety and the safety of [others] through the use of deadly force.").

The Officers also did not have to wait for Green to raise his weapon before employing deadly force. *See Thornton v. City of Columbus*, 727 Fed. App'x. 829, 838, (6th Cir. 2018) citing *Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001) ("[A]n officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action."). Relatedly, the Sixth Circuit has recently rejected a "categorical rule that force can only be reasonable if a suspect raises his gun." *Thomas v. City of Columbus*, 854 F.3d 361, 366 (6th Cir. 2017).

30

As stated above, Michael Lyman, presented by Plaintiff as a "police procedures" expert, accepts, for purposes of his opinion, that Green posed a risk of serious physical harm to the Officers at the moment that they used deadly force at Duxberry and Ontario. LYMAN DEP. 78-79 (R.146 #1470-71). Lyman is not critical of the Officers' decisions to use deadly force at the moment their shots were fired. Instead, Lyman opines that once the Officers turned onto Duxberry Avenue, they made tactical, practical, and procedural errors that ultimately led to their use of lethal force, and that is what made their use of lethal force "unreasonable." Specifically, Lyman opines that Rosen and Bare should not have approached Green once they saw him on Duxberry Avenue. According to Lyman, "it is likely, if not certain, that had a marked unit been the first unit to drive up and encounter Henry Green, any use of deadly force would have been avoided because Green would have known that the encounter was an official police action." LYMAN DEP. 46-47 (R.146 #1438-39).

The substance of Lyman's opinion regarding tactical decisions, and thus Plaintiff's argument, has been specifically rejected by both the United States Supreme Court and the Sixth Circuit.[11] Plaintiff "cannot establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided." *Rucinski v. Cnty. of Oakland*, 655 Fed. Appx. 338, 343 6th Cir. 2016) (quoting *San Francisco v. Sheehan*, 135 S. Ct. 1765, 1777 (2015)). Rather, courts must consider the officers' reasonableness under the circumstances they faced at the time they decided to use force. *See Livermore v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007) (describing the so-called "segmented analysis" this circuit uses to analyze use-of-force claims). Courts may not scrutinize whether it was reasonable for officers "to create the

---

[11] Lyman's avoidable-equals-unreasonable standard has no support from any legal authority and directly contradicts the long-held standard against judging an officer's conduct with safe and leisurely hindsight. *See Graham*, 490 U.S. at 396; *Mullins*, 805 F.3d at 766; *Dickerson*, 101 F.3d 1151, 1163; *Smith*, 954 F.2d 343, 347.

circumstances." *Id.* Even a reckless approach to the scene will not necessarily render a later use-of-force decision unreasonable. *See Chappell*, 585 F.3d at 915–16; *Thomas*, 854 F.3d 365. According to the Sixth Circuit:

> …we cannot, as [the plaintiff] urges, find a constitutional violation based on how [the officer] approached the crime scene. Arguably, [the officer's] decisions to rush toward the apartment without backup violated Columbus Police Department procedures. Arguably, his violations increased the likelihood that [the officer] might have to use force. But those decisions were not seizures. Their reasonableness is not at issue.

*Thomas*, 854 F.3d at 365.

To be clear, the Officers deny making any tactical misjudgments, errors, or mistakes. This incident was caused solely by Green's criminal and violent behavior. Green displayed, pulled, and pointed a gun at the Officers on East 26th Avenue. The Officers intended to address Green's criminal threat as well as the danger he presented to other drivers or persons in the vicinity by getting eyes on Green to make sure that he was taken into custody as soon as possible, ideally by the uniformed personnel who would be responding to Officer Rosen's radio call.[12] As the GMC approached on Duxberry, it was Green who escalated the incident by standing in the middle of Duxberry Avenue with his hands in his waistband area from where he had pulled out his gun a minute earlier on East 26th Avenue, posing a serious deadly threat. But even if Lyman's opinion regarding the Officers' approach were taken as true for purposes of this motion, there is still no dispute that the Officers acted reasonably under the circumstances at the moment they fired their weapons.

---

[12] As noted by the Ohio Supreme Court, "no other public employee faces the potential danger, violence or unique statutory responsibilities a law-enforcement officer faces. Not only does Ohio law require an officer to arrest and detain a person who is violating the law, O.R.C. 2935.03(A)(1), it also subjects that officer to potential criminal liability for negligently failing to do so, R.C. 2921.44(A)(2)." *Argabrite v. Neer*, 149 Ohio St. 3d 349, 353 (2016).

Based on the foregoing, the Officers' reaction was objectively reasonable, and they did not violate any clearly established constitutional right. They are entitled to qualified immunity and summary judgment on Plaintiff's federal excessive force claims.

### B.    PLAINTIFF'S EQUAL PROTECTION CLAIMS FAIL

Plaintiff also alleges that the Officers racially discriminated against Green in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.[13] "The Equal Protection Clause of the Fourteenth Amendment provides citizens a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures." *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997). An officer's discriminatory motivations for pursuing a course of action can give rise to an Equal Protection claim, even where there are sufficient objective indicia of suspicion to justify the officer's actions under the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 813 (1996). A plaintiff can demonstrate a violation of the Equal Protection Clause by showing that he was subjected to unequal treatment based upon his race or ethnicity during the course of an otherwise lawful stop. *See Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 533 (6th Cir. 2002).

Green's race played no role whatsoever in any of the Officers' actions. BARE AFF. ¶ 46 (R.153 #2678); ROSEN AFF. ¶ 46 (R.162 #2880). The bare assertion of the race of Green does not establish an Equal Protection claim. The Officers attempted to take Green into custody to address his criminal threat as well as the danger he presented to other drivers or persons in the vicinity.[14] They used deadly force to stop Green from shooting and killing them. No evidence in this case

---

[13] See COMPL. ¶¶ 195-203 (DOC.1, PAGE ID #: 30-31).

[14] Both Rutledge and Green are African-American males and approximately the same age. RUTLEDGE DEP. 186 (R.148 #1844). Even Rutledge thought that the officers were focused on Green and not on Rutledge because Green had a gun. *Id*. at 185-187 (R.148 #1843-45).

supports Plaintiff's Equal Protection claims. The Officers are entitled to qualified immunity and to summary judgment on Plaintiff's Equal Protection claims.

### C.     PLAINTIFF'S STATE-LAW CLAIMS FAIL

Plaintiff has also asserted Ohio state-law claims against the Officers for wrongful death,[15] assault, and battery.[16] O.R.C. 2125.02(A)(1) permits the recovery by a personal representative for the wrongful death of a decedent when the death of a person is caused by wrongful act, neglect, or default which would have entitled the party injured to maintain an action and recover damages under O.R.C. 2125.01. *Jacobson v. Kaforey*, 149 Ohio St. 3d 398, 417 (2016). The tort of assault is defined as the willful threat or attempt to harm or touch another offensively, which threat or attempt reasonably places the other in fear of such contact. *Smith v. John Deere Co.*, 83 Ohio App. 3d 398, 406 (Ohio App. 10th Dist, 1993). The tort of battery exists when a person acts with the intent to cause a harmful or offensive contact and such a harmful contact actually results. *Love v. City of Port Clinton*, 37 Ohio St. 3d 98, 99 (1988). "Officers are privileged to commit battery when making a lawful arrest, but the privilege is negated by the use of excessive force." *Alley v. Bettencourt*, 134 Ohio App.3d 303, 313 (Ohio App. 4th Dist.1999).

Plaintiff's wrongful death, assault, and battery claims fail because the Officers acted lawfully and reasonably during the incident. Furthermore, because Officers Rosen and Bare behaved reasonably under the circumstances, statutory immunity shields them from Plaintiff's state-law claims for the same reasons qualified immunity shields them from the undue-force claim. *See Wilkerson v. City of Akron,* 2018 U.S. App. LEXIS 28934, *15, 2018 FED App. 0232p (6th Cir.), 9; *Chappell*, 585 F.3d at 916 n.3. Pursuant to O.R.C. § 2744.03(A)(6), City employees are

---

[15] See COMPL. ¶¶ 180-187 (DOC.1, PAGE ID #: 27-29).

[16] See COMPL. ¶¶ 204-210 (DOC.1, PAGE ID #: 32-33).

statutorily immune from tort liability unless: (a) their acts or omissions were manifestly outside the scope of their employment or official responsibilities; (b) their acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or (c) civil liability is expressly imposed upon them by some other section of the Ohio Revised Code. The statute creates a presumption of immunity, and Plaintiff must provide sufficient evidence to rebut it with one of those three statutory immunity exceptions. *See Cook v. Cincinnati*, 103 Ohio App. 3d 80, 90 (Ohio App. 1st Dist., 1995).

Because the Officers were acting within the course and scope of their employment and official responsibilities at all relevant times, O.R.C. § 2744.03(A)(6)(a) does not apply. O.R.C. § 2744.03(A)(6)(c) does not apply because there is no provision of the Ohio Revised Code that would otherwise impose liability upon the Officers for the conduct about which Plaintiff complains. Finally, the same facts that support the Officers' reasonableness of their conduct also support the absence of malice, bad faith, wantonness, or recklessness under O.R.C. § 2744.03(A)(6)(b). *See Pollard,* 780 F.3d at 404. Because none of these three immunity exceptions applies to Plaintiff's state-law claims, the Officers are statutorily immune from tort liability. For all of the foregoing reasons, Officers Bare and Rosen are entitled to summary judgment on Plaintiff's state-law claims.

IV.     **CONCLUSION**

For the reasons stated above, Defendants Jason Bare and Zachary Rosen jointly and respectfully ask this Court for an order granting them summary judgment and dismissing all claims asserted against them with prejudice.

Respectfully submitted,

/s/ Westley M. Phillips
Westley M. Phillips (0077728) - LEAD
Timothy J. Mangan (0025430)
Andrew D.M. Miller (0074515)
Assistant City Attorneys
CITY OF COLUMBUS, DEPARTMENT OF LAW
ZACH KLEIN, CITY ATTORNEY
77 North Front Street, Columbus, Ohio 43215
(614) 645-7385 / (614) 645-6949 (fax)
wmphillips@columbus.gov
tjmangan@columbus.gov
admmiller@columbus.gov
Attorneys for Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that, on **October 23, 2018**, I electronically filed the foregoing with the

Clerk of the Court by using this Court's e-Filing System, which will send a notice of this electronic

filing to the following individuals:

Sean L. Walton (0088401)
Chanda L. Brown (0081076)
WALTON + BROWN, LLP
395 E. Broad St. Suite 200
Columbus, Ohio 43215
Telephone: (614) 636-3476
Facsimile: (614) 636-3453 (fax)
swalton@waltonbrownlaw.com
cbrown@waltonbrownlaw.com

*Attorneys for Plaintiff*

/s/ Westley M. Phillips
Westley M. Phillips (0077728)