# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

ADRIENNE HOOD,

          Plaintiff,

   v.

CITY OF COLUMBUS, OHIO, et al.,

          Defendants.

Case No. 2:17-cv-471

Judge George C. Smith

Magistrate Judge
Elizabeth A. Preston Deavers

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS JASON BARE AND ZACHARY ROSEN'S MOTION FOR SUMMARY JUDGMENT**

---

      COMES NOW Plaintiff Adrienne Hood, by and through counsel, and files this Response in Opposition to Defendants Jason Bare and Zachary Rosen's Motion for Summary Judgment. Supporting exhibits have been filed separately.

                        Respectfully submitted,

                        */s/ Sean L. Walton*
                        Sean L. Walton (0088401)
                        Chanda L. Brown (0081076)
                        Walton + Brown, LLP
                        395 E. Broad Street, Suite 200
                        Columbus, Ohio 43215
                        T: (614) 636-3476
                        F: (614) 636-3453
                        swalton@waltonbrownlaw.com
                        cbrown@waltonbrownlaw.com
                        *Attorneys for Plaintiff*

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................... ii

TABLE OF AUTHORITIES ................................................................................... iv

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 1

II.   PLAINTIFF'S STATEMENT OF THE FACTS .......................................... 5

    A. UNDISPUTED MATERIAL FACTS .......................................................... 5

    B. DISPUTED MATERIAL FACTS THAT PRESENT GENUINE ISSUES FOR TRIAL ............... 8

III.  ARGUMENT AND AUTHORITIES ......................................................... 42

    A. DEFENDANT'S FAIL TO MEET THEIR INITIAL BURDEN AS MOVANTS FOR SUMMARY

      JUDGMENT ......................................................................................... 42

    B. STANDARD FOR THE COURT'S RULING ON THE MOTION FOR SUMMARY JUDGMENT

       ...................................................................................................... 44

    C. FACTS THAT THE COURT MAY NOT CONSIDER .................................... 45

      1. Facts not known by Defendants at the time they shot and killed Henry Green

         ...................................................................................................... 46

      2. Facts concerning South Linden being "dangerous" or Henry Green's
          purported reputation or propensity for violence ................................ 48

    D. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFF'S
       FOURTH AMENDMENT EXCESSIVE FORCE CLAIM AND THEIR MOTION FOR
       SUMMARY JUDGEMENT AS TO THAT CLAIM SHOULD BE DENIED ............... 42

      1. Material facts and reasonable inferences viewed most favorably to Plaintiff 42

      2. Two-prong test for whether Defendants are entitled to qualified immunity . 44

         a. First Prong ................................................................................ 44

         b. Second Prong ............................................................................ 45

      c.    Temporal Segments approach to analyzing excessive force claims ........... **46**

      d.    Exclusion of certain post-June 6, 2016 cases .................................................... **48**

   **3.**   **First prong satisfied: Defendant's violated Green's Fourth Amendment right not to be seized by excessive, deadly force that was objectively unreasonable** ........................................................................................................................ **49**

   **4.**   **Second prong satisfied: Green's right not to be seized by excessive, deadly force was objectively unreasonable under the circumstances was clearly established at the time Green was killed** ................................................................ **50**

      a.    Defendants did not identify themselves as police officers .......................... **51**

      b.    Rosen began shooting at Green at about the same time as the GMC stopped, without provocation and without warning ................................... **56**

      c.    (i) Rosen was the first to shoot during the incident and he shot Green, and at the time Rosen shot Green: (ii) Green was walking away from the GMC (iii) with his hands down at his sides, (iv) he was not reaching for a gun and had not pulled a gun and (v) he had not pointed a gun at Rosen ........................................................................................................................ **58**

      d.    The Defendants shot Green after he had dropped his gun, had fallen to the ground, and was incapacitated and neutralized ................................... **63**

**E.**   **DEFENDANTS ARE NOT ENTITLED TO STATE STATUTORY IMMUNITY ON PLAINTIFF'S STATE LAW CLAIMS FOR ASSAULT, BATTERY AND WRONGFUL DEATH AND THEIR MOTION FOR SUMMARY JUDGMENT AS TO THOSE CLAIMS SHOULD BE DENIED** .................................................................................................................. **66**

**IV.**    **CONCLUSION** ......................................................................................................... **69**

# TABLE OF AUTHORITIES

## CASES

*Alley v. Bettencourt*, 134 Ohio App. 3d 303, 313 (Ohio Ct. App. 4th Dist. 1999)------------------76

*Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006)------------------------------------------71

*Baynes v. Cleland*, 799 F.3d 600, 610-12 (6th Cir. 2015)------------------------------------------------51

*Bletz v. Gribble*, 641 F.3d 743 (6th Cir. 2011)------------------------------------------------------------51

*Bouggess v. Mattingly*, 482 F.3d 886, 89-97 (6th Cir. 2007) --------------------------------- passim

*Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004) --------------------------------------------------------55

*Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006)------------------------------------------------41

*City of Cincinnati v. Nelson*, No. C-74321, 1975 Ohio App. LEXIS 7443, at *5 (Ohio Ct. App.

   1st Dist. May 5, 1975) -------------------------------------------------------------------------------------76

*Claybrook v. Birchwell*, 274 F.3d 1098, 1103 (6th Cir. 2001)--------------------------------51, 60, 61

*Coley v. Lucas Cnty.*, 799 F.3d 530, 538 (6th Cir. 2015)-------------------------------------------------42

*Correa v. Simone*, 528 Fed. Appx. 531, 535-36 (6th Cir. 2013) -------------------------------------68

*Craighead v. Lee*, 399 F.3d 954 (8th Cir. 2005) -------------------------------------------------- 64, 69

*Crawford v. Geiger*, 656 Fed. Appx. 190, 198 (6th Cir. Aug. 11, 2016)------------------------ 42, 43

*Davis v. Bergeon*, 1999 U.S. App. LEXIS 17984, *16 (6th Cir. July 27, 1999) --------------------62

*Dickerson v. McClellan*, 101 F.3d 1151, 1162-63 (6th Cir. 1996)--------------------- 44, 66, 67, 72

*Dugan v. Starrett*, 2014 U.S. Dist. LEXIS 23600, *20-21 (S.D. Ohio Feb. 25, 2014)-------- 54, 63

*Estate of Kirby v. Duva*, 530 F.3d 475, 477, 484 (6th Cir. 2008) ------------------------------- 45, 46

*Felix v. Young*, 536 F.2d 1126, 1135 (6th Cir. 1976) -------------------------------------------------39

*Gradisher v. City of Akron*, 794 F.3d 574, 587 (6th Cir. 2015) -------------------------------------75

*Graham v. Connor,* 490 U.S. 386 (1989) ------------------------------------------------------- 49, 55

*Green v. Taylor*, 239 Fed. Appx. 952, 960-61 (6th Cir. August 30, 2007) -------------------------55

*Griffith v. Coburn*, 473 F.3d 650, 657 (6th Cir. 2007) ----------------------------------------63

*Hamilton v. Spriggle*, 965 F. Supp. 2d 550, 563 (M.D. Pa. 2013) ----------------------------------53

*Harris v. Langley*, 647 Fed. Appx. 585 (6th Cir. 2016) ----------------------------------------76

*Hickle v. Am. Multi-Cinema, Inc.*, 296 F. Supp. 3d 879, 884 (S.D. Ohio 2017) --------------------38

*Hope v. Pelzer*, 536 U.S. 730 (2002) --------------------------------------------------------50

*Hopper v. Plummer*, 887 F.3d 744, 760 (6th Cir. 2018) ----------------------------------------75

*Jefferson v. Lewis*, 594 F.3d 454, 461 (6th Cir. 2010) ----------------------------------------42

*Jennings v. Fuller*, 659 Fed. Appx. 867, 871 (6th Cir. 2016) ----------------------------------52

*King v. Taylor*, 694 F.3d 650 (6th Cir. 2012) ----------------------------------------- 68, 69

*Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) ----------------------------------------42

*Latits v. Phillips*, 878 F.3d 541, 552 (6th Cir. 2017) ----------------------------------------62

*Maben v. Thelen*, 887 F.3d 252, 269 (6th Cir. 2018) ----------------------------------------41

*Marie v. Am. Red Cross*, 771 F.3d 344, 351 (6th Cir. 2014) ----------------------------------38

*McCloud v. Testa*, 97 F.3d 1536, 1554 n. 25 (6th Cir. 1996) ----------------------------------52

*McDonald v. Flake*, 814 F.3d 804, 810 (6th Cir. Feb. 29, 2016) ----------------------------------62

*Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015) ----------------------------------- passim

*Presnall v. Huey*, 657 Fed. Appx. 508 (6th Cir. Filed September 22, 2016) ----------------------53

*Rucinski v. Cnty. of Oakland*, 655 Fed. Appx. 338 (6th Cir. Filed July 6, 2016) ------------------53

*Russo v. Cincinnati*, 953 F.2d 1036 (6th Cir. 1992)----------------------------------------- 71, 72

*Schweder v. Baratko*, 103 Ohio App. 399, 403 (8th Dist. 1957) ----------------------------------76

*Scott v. City of Cleveland*, 555 F. Supp. 2d 890, 892-23 (N.D. Ohio 2008) ------------------------59

*See, e.g., Bletz v. Gribble*, 641 F.3d 743 (6th Cir. 2011) ----------------------------------- 51, 52

*Tenn. v. Garner*, 471 U.S. 1, 8-9, 11-12 (1984)----------------------------------------44, 49, 63

*Thomas v. City of Columbus*, 854 F.3d 361 (6th Cir. 2017) (decided: April 19, 2017) -----------53

*Thornton v. City of Columbus*, 727 Fed. Appx. 829 (6th Cir. March 14, 2018) -------------------53

*Tolan v. Cotton*, 572 U.S. 650 (2014) ------------------------------------------------------------------- 40, 41

*Wells v. City of Dayton*, 495 F. Supp. 2d 797, 803 (S.D. Ohio 2006) --------------------------------41

*White v. Pauly*, 137 S. Ct. 548, 550 (2017)-----------------------------------------------------------------42

*Williams v. Collins*, 2017 U.S. Dist. LEXIS 49082 (S.D. Ohio March 31, 2017) ------------ 75, 76

*Wilson v. Zanesville*, 954 F.2d 349, 350-51 (6th Cir. 1992) ------------------------------------------39

*Yates v. Cleveland*------------------------------------------------------------------------------------56, 57, 58

*Zulock v. Shures*, 441 Fed. Appx. 294, 301-02 (6th Cir. 2010)------------------------------- 49, 65

STATUTES

Ohio Rev. Code § 2744.03(A)(6) ------------------------------------------------------------------------73

# I.   INTRODUCTION AND SUMMARY OF ARGUMENT

The Defendants' Motion for Summary Judgment is wrong: on the law, on the facts and in just about every other way a motion can be wrong.  It ignores and fails to meet the Defendants' initial burden of proof as the movants on the motion; it ignores the standard that this Court will apply in ruling on the motion; and it ignores the abundant evidence in the record that contradicts the fiction created mainly by the self-serving testimony of the Defendants.

As movants, Defendants have the initial burden of *demonstrating the absence* of a genuine issue of a material fact and *identifying* the relevant portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, that they believe demonstrate that absence.  This, Defendants fail to do; they do not even attempt to do it. Nor could they.  The record in this case contains voluminous evidence, including testimony from impartial eyewitnesses, that contradicts Defendants' testimony and their other evidence and thereby creates genuine issues of material fact.   Under controlling law, Defendants' failure to meet their initial burden is fatal; it is grounds for denying the motion, even if Plaintiff did not respond to the motion. *See* Section III.A below.

In this Court, the standard in ruling on a motion for summary judgment by a defendant, is that the Court must assume the truth of all record-supported facts viewed most favorably to the plaintiff and draw all reasonable inferences in favor of the plaintiff.  If such assumed facts and inferences are sufficient for a trier of fact to find for the plaintiff, then a genuine issue of material fact exists, and the defendant's motion must be denied.  In their motion, Defendants do not even acknowledge, much less comply with the legal standard.   Instead, Defendants address only evidence favorable to them and ignore the abundance of evidence that contradicts their evidence.  Accordingly, as Defendants' arguments are based on the wrong facts, they are irrelevant to ruling on the motion and should be disregarded.  *See* Section III.B below.

In addition to ignoring material facts, Defendants attempt to bolster the holes in their motion by references to multiple immaterial facts that the Court may not consider under controlling law, including particularly the law governing qualified immunity and Section 1983 claims. The Court should ignore and not consider any and all of such facts.  *See* Section III.C.

Applying the correct standard, the facts and reasonable inferences therefrom viewed most favorably to Plaintiff along with citations to the raw evidence in the record supporting those facts are set forth in Section II.B; just the facts are listed in Section III.D.1. These facts are the proper factual basis for the Court's ruling on the motion for summary judgment. As shown in the following, these facts tell a far different story than the fiction set forth in Defendants' motion.

On June 6, 2016, at about 6:00 pm, Henry Green V and his friend Christian Rutledge were walking north on Ontario Street in the Linden neighborhood of Columbus, Ohio. As they came to the intersection of Ontario and 26th Avenue, an unmarked white GMC with tinted windows was speeding west on 26th and almost hit Green as it screeched while passing Green and Rutledge. Green did not walk into 26th as if to force the GMC to stop and hit him but stopped himself--and Rutledge--when he was just barely into 26th and just a little bit in front of the GMC. The occupants of the GMC--Defendants Officer Zachary Rosen, who was the driver, and Officer Jason Bare, who was in the back seat on the passenger side--did not identify themselves as police officers, and Green and Rutledge did not know who they were and did not know they were police officers. Green did not point a gun at the GMC.

Green and Rutledge continued walking north on Ontario, but were alert and observant of the GMC, because it had almost hit them, it had creeped away slowly after the near-hit, like the occupants were watching Green and Rutledge, it had continued west on 26th but turned right (north) onto Gerbert Road (one block west of Ontario), and Green and Rutledge did not know who they were.

As Green and Rutledge were approaching the intersection of Ontario and Duxberry Avenue (two blocks north of 26th), they looked west down Duxberry and saw the GMC sitting on Gerbert Road, completely stopped, not in motion. As Green and Rutledge looked west and saw the GMC on Gerbert, they did not stop but continued walking toward the intersection. The GMC was not halfway down Duxberry when Green and Rutledge first walked into view of the GMC.

As soon as Green and Rutledge were in view of the GMC, the GMC turned right (east) and came down Duxberry speeding toward Green and Rutledge. Green and Rutledge did not stop but continued walking toward Duxberry and then began to cross Duxberry. At no time did Green

stand in the middle of Duxberry with his hands in his waistband or make any threats or threatening gestures toward the GMC or the people in the GMC.

The GMC was moving at about 50 mph (the speed limit was 25) and tried to hit Green and Rutledge and almost hit them. Green and Rutledge were walking north and slightly west to cross Duxberry and did not stop until the GMC tried to hit them. They jumped back and the GMC stopped just in front of them, just before the intersection, facing east. Green threw his empty hands up, apparently cussed at the GMC for trying to hit Rutledge and him, then his arms and hands went back down to his side and he turned to his right and continued walking north away from the GMC and toward the sidewalk with his hands down.

During the period when the GMC was speeding toward Green and Rutledge and then stopped, the driver (Officer Rosen) had his left hand on the steering wheel and was holding a gun in his right hand, and the gun was pointing toward the windshield. During that same period, Green was not holding a gun and was not reaching for a gun.

The driver of the GMC (Rosen) began shooting at Green at about the same time as the GMC stopped. No warning was given. Rosen was inside or just stepping out of the GMC when he fired two shots, one through the window on the driver's side door, which shattered the glass; and then he stepped around the door and window and fired another shot. At least one and maybe both of those shots hit Green while Green was walking north toward the sidewalk and away from the GMC and Rosen with his hands down at his sides. Green did not have his gun out and was not pointing his gun at Rosen when Rosen shot him. Green did not pose a threat to Rosen, Bare or any bystanders at the time this shooting began.

Rosen was the first to shoot during the incident. Green did not pull his gun out until after Rosen had fired the two shots at Green.

After Green was shot by Rosen, his right side dropped and then he came back up, pulled out his gun, and started to fall and, as he was falling, Green fired four shots in Rosen's direction. Rosen moved from behind the driver's door of the GMC and got closer to Green while firing shots at Green, and Bare came around the GMC and fired at Green. Then Green was staggering and falling and moving away from the officers and dropped his gun; and, after he dropped his gun, Rosen and Bare continued to shoot at him. Then Green, without the gun, fell down and was on

one knee, with his head down, lifeless, done, and the officers continued to shoot at him and hit him with at least one shot. Green then ended up lying flat on his back on the sidewalk.

Rosen for sure, and likely Bare also, shot Green while he was lying collapsed on the sidewalk without his gun in his hand and after he appeared to be dead.

The above-recited facts in light of controlling law plainly meet the two-prong test for denying qualified immunity; namely those facts establish that Defendants' use of deadly force in shooting and killing Green violated Green's Fourth Amendment right not to be seized with excessive force that is objectively unreasonable under the circumstances, principally that Green posed no threat to the Defendants or others at the times of the initial shooting by Rosen and the subsequent shootings by Rosen and Bare after Green was incapacitated and neutralized; and that such a right was "clearly established" at that time. Because Defendants are not entitled to qualified immunity from Plaintiff's Section 1983 claim for excessive force, it follows that the Court should deny Defendants' motion for summary judgment on the Section 1983 claim due to genuine issues of material fact. *See* Section III.D.2-4.

Moreover, Defendants' claim of Ohio state statutory immunity from Plaintiff's claims for assault, battery and wrongful death under Ohio state law is based on the same disputed material facts that are the basis for denying qualified immunity on the Section 1983 claim. Therefore, it follows that Defendants are not entitled to statutory immunity from the state law claims and, accordingly, the Court should deny Defendants' motion for summary judgment on Plaintiff's state law claims. *See* Section III.E.

Lastly, Plaintiff has chosen not to respond to Defendants' arguments in connection with her Section 1983 Fourteenth Amendment Equal Protection Clause claim against the Defendants. Def's. Mot. Summ. J. 35-36 (R.171 #3210-3211).

## II.     STATEMENT OF FACTS

### A.  Undisputed Material Facts

This Section II.A sets forth undisputed facts that are material to the issues raised by Defendants' motion.

1. *Rosen and Bare (1) had no knowledge of or history with Green prior to the incident on June 6, 2016; (2) had no reason to be believe that Green was connected to any prior violent or gang activity; and (3) had no indication and made no allegations that Green appeared to be under the influence of drugs or alcohol.*

   Rosen and Bare had never come into contact with or heard of Henry Green prior to the June 6, 2016 incident. Green also went by the nickname "Bubby," and Rosen and Bare had never heard of any nicknames, aliases or incidents providing any prior knowledge of Green that would be relevant or material to the facts of this incident. In fact, Rosen concedes that any alleged "gang status at that point was irrelevant." Rosen Dep. 235-236 (R.185 #4093-4094). Rosen admits that he did not believe Green to be nor did he know him to be a gang member. *Id*. at 235-236 (R.185 #4093-4094). Bare had never seen or heard of Green prior to the June 6, 2016 incident. Bare Dep. 271-272 (R.184 #3531-3532). Rosen and Bare did not know at the time of the encounter whether Green was under the influence of drugs and or alcohol. *Id.* at 327 (R.184 #3587); Rosen Admis. 27 (R. 198 #6649); Bare Admis. 28 (R. 199 #6655).

2. *At all relevant times, including both encounters with Green and Rutledge, Rosen and Bare (a) were in plainclothes; (b) were in an unmarked white GMC with out of state license plates and tinted windows; and (c) had taken numerous steps to ensure they could not be identified by anyone as police officers.*

   On June 6, 2016, Rosen and Bare were assigned to the Community Safety Initiative (CSI) in a plainclothes capacity. Their role was to provide surveillance and "remain unseen." Bare Dep. 78 (R.184 #3338).  Bare was wearing camouflage shorts, a gray t-shirt, a ball cap, and tennis shoes. His badge was on a lanyard and concealed under his t-shirt at all times, with one exception: Bare contends to have taken the lanyard out in the moments prior to the shooting, but that contention is disputed by eyewitnesses. *Id*. at 210-211 (R.184 #3470); Section II.B.1 below.  Rosen was wearing blue jeans, a blue t-shirt and a black baseball cap. His badge was also on a lanyard and concealed

under his t-shirt at all times, although he too contends to have taken the badge out in the moments prior to the shooting, and that contention is also disputed by eyewitnesses. Def's. Mot. Summ. J. 5 (R. 171 #3180); Section II.B.1 below.

Rosen was driving an unmarked white 2015 GMC Acadia SUV with tinted windows and out of state license plates, and Bare was a passenger riding in the second row on the passenger side. Def's. Mot. Summ. J. 5 (R. 171 #3180); Rosen Dep. 88-89 (R.185 #3946-3947). Bare was riding in the rear, "because the rear windows were tinted, making it less likely for someone to recognize his face from his uniformed duties in the area." Rosen Dep. Ex. C (R.185 #4351). Other than their badges, Rosen and Bare possessed no items which would have identified them as police officers. In fact, their "objective was to – to try not to let people recognize us as the police." Rosen Dep. 172-173 (R.185 #4030-4031). Rosen and Bare's plainclothes training in the CSI taught them that "[T]he goal would [sic] not to be noticed by the criminal or whoever you're following." Bare Dep. 71-72 (R. 184 #3331-3332).

3. *During their initial encounter with Green and Rutledge, at the intersection of 26th and Ontario, Rosen and Bare did not identify themselves to Green and Rutledge as police officers in any way, and Green and Rutledge did not know they were police officers.*

During the initial encounter at 26th and Ontario, Rosen and Bare did not identify themselves as police officers and did not make any statements or give any commands to Green or Rutledge. The first and only statements Rosen and Bare even allege to have made toward either Green or Rutledge were at the intersection of Duxberry and Ontario, although eyewitnesses dispute that Rosen and Bare ever announced that they were police officers at any point. Def's. Mot. Summ. J. 5-7, 9-10; Section II.B.1 below. The only words spoken at the intersection of 26th and Ontario were by Green, who said "What the fuck, bro? What the fuck?" after nearly being hit by the speeding white GMC, indicating he did not know who was in the GMC at that point in time. Rutledge Dep. 130-131 (R. 148 #1788-1789). Christian Rutledge testified that, because of the black tint in the windows of the GMC, he and Green did not know who was in the vehicle or what their intentions were. "[I]t's real tinted. We don't know who you are. We don't know what's going on … they could have been anybody else and we didn't – we wouldn't have been able to know because the tint was so dark. … [W]e both were being so observant of the car because we didn't

know who it was in the car." *Id.* at 155 (R. 148 #1813). Rutledge further testified that he had no idea that the two white males in the white GMC were police officers until after the shooting incident. "[I]t set me off, because I didn't know who it was." *Id.* at 209 (R.148 #1867). "I put two and two together after all the initial shots, because when they first rode up, I'm like – I'm not thinking that way, because I – I have got into it with white boys before out there on that same street on Ontario. And I actually got shot at by them." *Id.* at 217 (R.148 #1875).

4. *Rosen had his gun in his right hand pointed at the windshield of the GMC as he drove down Duxberry toward Green and Rutledge and stopped just before hitting them.*

Rosen unholstered his pistol as he drove down Duxberry toward Green and Rutledge. "My gun is out at the low ready." Rosen Dep. 212, 218 (R.185 #212, 218); Rosen Dep. Ex. G (R.185-7 #4359). Rosen drove down Duxberry and aimed his gun with his right hand through the front windshield of the GMC as he reached his left hand over his body to throw the GMC into park, and then he reached his left hand back over to start opening the driver's side door to get out of the GMC. Def's. Mot. Summ. J. 9-10 (R. #3186-3187). Rosen had the gun pointed at the windshield as he drove down Duxberry and prior to putting the vehicle into park. "As I was coming to a stop in front of Mr. Green, I had the gun in my right hand, and I began putting the gun above the --- through the windshield … . " Rosen Dep. 216 (R.185 #4074). "I raised and aimed my gun at the suspect through the front windshield of our vehicle and put the vehicle into park." *Id.* at 217 (R.185 #4075). Eyewitnesses corroborate that Rosen had his gun in his right hand pointed at the windshield of the GMC as he drove down Duxberry toward Green and Rutledge. Section II.B.6 below. Bare admits that he never saw Rosen's gun in his lap or at the "low ready," and the first time that he saw Rosen's gun, it was pointed out towards the windshield. Bare Dep. 249-250 (R.184 #3509-3510). Rosen stopped the GMC directly in front of Green, nearly hitting him. Rosen Dep. 212 (R.185 #4070); Rosen Dep. Ex. G (R.185-7 #4359); Section II.B.5 below.

5. *Rosen and Bare both used deadly force against Green, by shooting at Green with their service revolvers.*

Rosen and Bare unquestionably used deadly force against Green, by shooting at Green with their service revolvers. Rosen fired several shots at Green in rapid succession through the "A"

pillar on the driver's side of the GMC. Rosen then came from behind the driver-side door and continued using deadly force, firing several shots in rapid success. Def's. Mot. Summ. J. 10-11 (R. 171 #3187-3188). Bare, from his position exiting the rear passenger side of the GMC, quickly circled the front of the GMC and fired several shots at Green. Rosen fired a total of fifteen shots. Bare fired a total of seven shots. *Id.* at 10-11. As a result of the use of deadly force by Rosen and Bare against Green, Green suffered eight gunshots wounds and died from his injuries. Sheppard Aff. Ex. D at 1 (R.164-4 #2985); Diaz Expert Disclosure 2-5 (R.196 #6387-6390).

Green suffered gunshot wounds to the top of his right shoulder, his right back, his left elbow, left forearm, right forearm, left hip, left thigh and his left flank. He also suffered abrasions on his left forehead, left cheek, left upper back and left shoulder. *Id.* at 2-4. The gunshot to the top right shoulder caused Green the most anatomical damage, and "produced massive hemorrhage and injuries that couldn't be contained and repaired despite heroic surgical measures." *Id.* at 2, 5. Rosen hit Green with at least three fired bullets (top of the right shoulder, left hip and left elbow). Noedel Dep. 23 (R.194 #5496). Bare hit Green with one or more bullets, with the impact being to Green's lower left hip and possibly his left arm as well. *See* Section II.B.9-10. Recovered bullets from Green's body were matched by the Columbus Division of Police Crime Lab to the guns of Rosen and Bare. Sheppard Aff. 11-15 (R.164 #2949-2953).

**B.   Disputed Material Facts that Present Genuine Issues for Trial**

This Section II.B sets forth disputed facts that are material and present genuine issues for trial. These are facts that Defendants do not cite in their motion and that contradict facts that Defendants do cite in their motion. Thus, these two sets of facts that contradict each other-- Defendants' set forth in their motion, and Plaintiffs' set forth below--establish the dispute, a genuine issue for trial. The headings for each category of material facts below is a statement (or summary) of the raw facts set forth under the heading and reasonable inferences therefrom *viewed most favorably to Plaintiff*, because, as shown in Section III.B above, those facts and inferences must be assumed to be true for the Court's ruling on the motion.

1. *At no time did Rosen or Bare identify themselves as police officers and at all times, Green and Rutledge did not know and had no reason to know that they were police officers.*

This statement is largely undisputed. See Section II.A.2 and 3 above. The only exceptions to Defendants' admission that they never identified themselves as police officers are their contentions concerning what occurred just a few moments before the shooting started. See below. Rosen actually contradicts some of these contentions himself; and several eyewitnesses dispute all of these contentions, testifying that that they did not hear Rosen and Bare identify themselves as officers and did not see any badges displayed until the conclusion of the shooting.

- Defendants contend that when the GMC pulled up directly in front of Green and Rutledge at the intersection of Duxberry and Ontario, Rosen opened the driver's side door and repeatedly shouted "Police!" and "Don't move," "Don't do it," or words to that effect, and that Bare yelled "Police, Police, Police" and tried to put his badge up while he was seated in the back seat on the passenger side of the GMC. Def's. Mot. Summ. J. 12 (R.171 #3187).

  - Rosen does not know whether Bare yelled "Police!" at Green and does not know whether Bare flashed his badge at Green. "A I don't know if Officer Bare yelled "police" or not. I didn't hear it. Q Did you see him flash his badge or raise his badge toward Henry? A No." Rosen Dep. 257 (R.185 #4115); Rosen Admis. 14-15 (R.198 #6647).

  - Rosen also admits that he, Rosen, did not lift his badge towards Green. Rosen Admis. 15 (R. 198 #6647).

  - Bare does not know the exact wording of the commands that he and Rosen allegedly gave to Green. Bare Admis. 12-15 (R.199 #6653). "I think I remember [Rosen] saying 'Police,' and then I think I remember I heard 'drop the gun'; but words to that effect. Maybe not the exact wording… " Bare Dep. 256 (R.184 #3516). Bare is unsure whether he or Rosen used profanity towards Green at the intersection of Duxberry and Ontario. "Q Did [Rosen] … curse at all? A I don't remember if he cursed or not. Q Did you? A I don't think so. … Q So you're not for certain? A I don't know what I yelled." *Id.* at 257 (R.184 #3517).

  - Bare does not know whether Green saw his badge and does not know whether Green actually heard any commands that Bare allegedly shouted from the second row, passenger side of the GMC, admits that his door was not open, does not know whether Rosen's door was open, does not know whether Rosen's window was down, and thus cannot allege that Green refused to comply with any of his alleged commands. *Id*. 288, 289 (R.184 #3548-3549). "Q How sure are you that he heard

your commands? A I'm not sure. Q So you're not sure if he refused to comply with your commands? A True." *Id.* at 289 (R.184 #3549).

- Rosen's badge was not visible to Green at any time prior to, on through the completion of the shooting at Duxberry and Ontario. "Q So is it safe to say that your badge would have been either behind the door or behind the window of the vehicle the entire time? A It would have been physically behind them." Rosen Dep. 246 (R.185 #4104).

• <u>Eyewitness Christian Rutledge</u> was walking, standing and talking to Green in the minutes leading up to the encounter at Ontario and 26th, through the moment the shooting began at Duxberry and Ontario. At all relevant times, up until the moment the shooting began and Rutledge ran towards Green's aunt's house, Rutledge was in the immediate proximity of Green. "When I reached 26th and Ontario, I was just a little bit … we was side by side… ." Rutledge Dep. 121 (R.148 #1779). "Q Were you walking faster than Henry Green at that point in time? So between 26th and Duxberry? A At that time, we were probably neck in neck that time." *Id.* at 146-147 (R.148 #1804-1805). "Q And how close are you to Henry Green as the vehicle's driving eastbound on Duxberry? A Again, I can grab him." *Id.* at 167 (R.148 #1825).

- During the incident at Ontario and 26th, Green and Rutledge could not tell who the people inside the GMC were because the GMC windows and other glass were dark tinted. The people inside the GMC (who turned out to be Defendant Officers Rosen, the driver, and Bare, in the back seat, unbeknownst to Rutledge and Green at the time) never identified themselves as police officers and did not show their badges, there was no other indication that they were police officers, and Green and Rutledge did not know they were police officers. *Id*. at 155, 196, 217 (R.148 #1813, 1854, 1875).

- With regard to the incident at Duxberry and Ontario, Rutledge testified that he heard the driver pull up say, "Want to pull a gun on me, mother fucker?" and "gun," and heard Green say, "Bro, bro, bro, …," but he did not hear anyone say, "Drop the gun" or "Get on the ground"; that he didn't see a badge; and that he and Green did not know the two people in the GMC were police officers. "I'm pretty sure we both didn't know they was cops;" "Again, at that time we didn't know they were the police;" "He was just yelling – he assumed he was yelling at a random person." *Id*. at 175-176, 186-88, 198 (R.148 #1833-1834, 1844-1846, 1856).

- Rutledge testified that it was not until after the entire shooting incident ended that he then "put two and two together," stating that when they first rode up he wasn't thinking that way, believing they were just two white males. "We don't know who you are, you look like a random person to us now;" "I'm putting two and two in my head when – now here come the – plain – like the officer in his uniform to actually

– so I can clarify this, stamp it, like its actually police. This is actually police." *Id.* at 176, 217, 223 (R.148 #1834, 1875, 1881).

- Eyewitness Jamar Jordan at all relevant times was positioned directly in front of the shooting incident, standing in his yard in front of his home situated at the corner of Duxberry and Ontario. Jordan had a direct, unobstructed view of the entire incident, start to finish. Jordan Dep. 53, 56, 63 (R.186 #4443, 4446, 4453); Jordan. Dep. Ex. C. (R.186-3 #4627).

  - Jordan saw the white GMC coming down Duxberry but didn't know the people inside the GMC were police officers until after the shooting stopped; that the first time the officer on the driver side had his badge out, the first time he pulled out his badge, was after the shooting stopped and the uniformed police officer was addressing the scene; and that he never saw the badge out for the other officer, from the passenger side, and never saw that officer pull his badge out. "At the beginning of that instant in all of our lives, I did not know they were cops;" "When the uniformed cop got there, that's when he pulled his badge out". Jordan was adamant throughout his testimony in this matter that he had no reason to believe that Rosen and Bare were officers. "A At the time of the shooting, they was two white dudes Q Did you have any reason to believe they were police officers? A No. No." Jordan Dep. 25-27, 57-58, 128-29, 210 (R.186 #4415-4417, 4447-4448, 4518-4519, 4600).

  - Jordan asked Rutledge in the days after the shooting whether Rutledge knew it was the police, indicating their shock at the situation and the lack of self-identification by officers. ("How – how I noticed that – that was the police, after everything, was involved a car – like the street got blocked off so quick;" "That's when they started pulling they badges out;" "It's just like that – that – it was crazy like. We're in shock. We in shock;" "Who was that? Who the hell was that? Did you know who that was? That was my first question, because I didn't know who they was;" "I didn't hear the passenger say anything." *Id.* at 25-27, 22, 218 (R.186 #4415-4417, 4412, 4608).

  - Jordan testified that Rosen did not identify himself as he exited the vehicle. He did not start yelling any commands at Green until after he began shooting. *Id.* at 217-218 (R.186 #4607-4608). Jordan believed at the time of the incident, they were "the two white dudes that was shooting." *Id.* at 209-210 (R.186 #4599-4600).

- Eyewitness Ericka Hickman at all relevant times was positioned near the sidewalk in front of 1210 Duxberry Avenue, with just one house positioned between her and the intersection of Duxberry and Ontario where the shooting occurred. Hickman was facing a south, speaking to her boyfriend Harold Newsome, and had a direct unobstructed view of the shooting incident when simply looking west towards Duxberry and Ontario.

Her children were also in the direction of Duxberry and Ontario, playing near the intersection, so she was keeping an eye on them. Hickman Dep. 26-28 (R.187 #4658-4660); Hickman Dep. Ex. D (R.187-4 #4775).

- Hickman testified that "I didn't hear no officer identify theirself as police officers;" and "I didn't hear no officer say get down … [until] after they started shooting Mr. Green. That's where that [cops saying, "get down"] come into play at." "I didn't think [they] was officers at the time because I never seen anything to identify them or hear -- heard, you know, them say what they was." "I didn't hear them say they were cops or show any badges." "I didn't see nothing hanging or nothing to identify them." *Id.* at 55-56, 46, 76. (R.187 #4687-4688, 4678, 4708).

- Hickman had no reason to believe that Rosen and Bare were officers, and in fact, she actually thought they were gang-members. "When the altercation happened, I thought it was like gang-related." "I thought it was like some gang-related stuff, like they were about to start fighting." "I thought it was an altercation amongst gang-related things. That's what I thought it was. That's how it – outcome came to me until after I found out, once he had died, that they were officers." "I just thought it was like gang-related stuff." *Id.* at 40,49, 55, 124. (R.187 #4672, 4681, 4687, 4756).

- <u>Eyewitness Harold Newsome</u> at all relevant times was positioned near the sidewalk in front of 1210 Duxberry Avenue, with just one house positioned between he and the intersection of Duxberry and Ontario where the shooting occurred. He was sitting in the driver's seat of his Chevy S-10 pickup truck, with the vehicle facing eastbound, his driver's side door completely open, his legs out of the truck, and he was able to see everything from left to right. The intersection of Duxberry and Ontario would have been directly to his west. He was talking to his girlfriend, Ericka Hickman, and keeping an eye on their children as well. Newsome Dep. 36-37 (R.188 #4811-4812); Newsome Dep. Ex. B (R.188-2 #4936).

- Newsome testified that he did not know that Rosen and Bare were police officers at the time of the shooting, that he never heard them say "Police," "Freeze," or announce themselves as officers. "At that time, I did not know that was the police. They jumped out the car with white shirts and blue jeans on." Newsome Dep. 51, 113 (R.188 #4826, 4888).

2. *At the intersection of 26th and Ontario, (a) the GMC was speeding and almost hit Green and Rutledge; (b) Green did not walk into the middle of 26th as if to force the GMC to stop and hit*

*him, but stopped when he was just barely into 26th and just "a little bit" in front of the GMC; and Green did not point a gun at the GMC.*

- **Defendants** contend that at 26th and Ontario, they were driving the speed limit of 25 mph as they headed westbound on 26th, that Green walked into the middle of East 26th Avenue as if to force Rosen to stop or hit him with their vehicle, and that Green proceeded to point a gun at the vehicle. Def's. Mot. Summ. J. 7-9 (R.171 #3182-3184).

  - Bare testified when he first saw Green and Rutledge walking down Ontario towards 26th, he and Rosen were just a few houses down from Green and Rutledge, and they were not yet in the street, but rather at the "southwest corner." Bare Dep. 269 (R.184 #3529); Bare Dep. Ex. W (R.184-23 #3846).

  - Bare in fact admitted during his testimony that Green was never actually in the intersection of 26th and Ontario. When Rosen and Bare drove past the intersection of 26th and Ontario, they only had to "slightly swerve and kind of go a little bit north" and that Henry stayed stationary rather than jumping back. According to Bare, Green's location on Exhibit X was the furthest Green ever stood into the intersection, and Green's location is actually south of the intersection. Bare Dep. 270-271 (R.184 #3530-3531); Bare Dep. Ex. X (R.184-24 #3847).

  - Bare admits that Green could have simply been attempting to cross the street at 26th and Ontario. "Q So you had no idea why he walked into the intersection [at 26th and Ontario]; correct? A No. Q Could he have been trying to cross the street? A I'm sure at some point he was." Bare Dep. 314-315 (R.184 #3574-3575).

  - Bare admits that he did not see Green point a weapon at 26th and Ontario. Bare Admis. 19 (R.199 #6654).

- **Eyewitness Christian Rutledge**

  - Rutledge testified that because the GMC was far back when Rutledge first saw it, at first, he thought he and Green could beat the GMC across 26th, that there was enough time to walk across. But the GMC was speeding. Green and Rutledge were about to walk into 26th, but Green stopped Rutledge, and that's when Rutledge heard the screech of the tires of the GMC and felt Green stop. The GMC almost hit Henry. That's when Christian heard Henry saying, "The fuck? The fuck?" Rutledge Dep. 121-122 (R.148 #1779-1880).

  - When the GMC screeched to a halt, Green was only "a little bit" in front of the white GMC, not like directly in the middle in front of the GMC, not like he was

trying to force the GMC to stop or hit him. *Id.* at 124 (R.148 #1782). Rutledge and Green were only slightly in 26th Avenue when he and the GMC stopped. Exhibit N and Exhibit O, street maps marked by Rutledge at his deposition under directions from counsel for Defendants to show the locations of the GMC and Henry when the GMC stopped, shows plainly that Green's location was just barely into 26th Avenue (in the southernmost portion) and the GMC was several feet northeast of Green. *Id. at* 137-140 (R.148 #1795-1798); Rutledge Dep. Ex. N (R.148-14 #2122); Rutledge Dep. Ex. O (R.148-15 #2123).

- Rutledge's statement to the police that he thought Green was wrong for walking in front of the GMC was his view of walking in traffic in general that he told everyone and had nothing to do with the circumstances of the incident at Ontario and 26th. Rutledge Dep. 128 (R.148 #1786).

- After the GMC stopped, it started moving slowly, "creeping off", and Rutledge thought "they"--whoever was in the GMC--were trying to watch what he and Henry were about to do. Christian thought "this is going into weird. Like this like not normal. This ain't normal." *Id.* at 122 (R.148 #1780).

- Rutledge did not see Green pull a gun on the white GMC on 26th Avenue and was close enough to Green that he would have seen the gun if Green had pulled it. "We were close enough to each other to like if he did pull a gun out on the car, I would have seen it in time. I would have seen it. There's no way -- he's not -- you're not fast enough to pull a gun out on a car and put it back in your pocket" *Id.* at 133 (R.148 #1791). "After we got into the altercation with the car I got out of my phone." *Id.* at 148 (R.148 #1806).

3. *While Green and Rutledge were walking toward the intersection of Ontario and Duxberry, the white GMC was sitting on Gerbert Street, completely stopped, and not in motion. Green and Rutledge looked east and saw the GMC on Gerbert and did not stop but continued walking. The GMC was not halfway down Duxberry when Green and Rutledge first walked into view of the GMC.*

   • Defendants contend that after sitting stationary on Gerbert, they turned the corner either after a very brief stop or a rolling stop, that their GMC was halfway down Duxberry when Green and Rutledge came into view, and that they saw Green in the middle of Duxberry Avenue, looking westbound at Rosen and Bare. Def's. Mot. Summ. J. 9-11 (R.171 #3184-3186).

   • Eyewitness Christian Rutledge

- Rutledge testified that after the incident at 26th and Ontario, Green and Rutledge were alert and observant of the white GMC, and while they lost sight of the GMC when it turned north on Gerbert, they continued walking north on Ontario. Rutledge Dep. 153-155 (R.148 #1811-1813).

- Rutledge testified that he and Green were walking north on Ontario, and as they were approaching Duxberry, they immediately looked to the left/west and saw the white GMC sitting on Gerbert Street, completely stopped, no motion; and they kept on walking. "We were already crossing. We didn't like stop, look at the car, then start walking again. We already looked at the car and just kept walking;" "When we got to the corner, that's when we both were looking, because we were – we weren't expecting, but we were just seeing because we [sic] just went on Gerbert. And then, sure enough, they were just sitting there like they were waiting on us." *Id.* at 153, 166-167, 154-155 (R.148 #1811, 1824-1825, 1812-1813).

- "I'm going to say trying to hit, because he was coming very fast and almost did hit us." *Id.* at 173-174 (R.148 #1831-1832).

- Eyewitness Jamar Jordan

  - Jordan testified that he was standing in his front yard waiting for Green and Rutledge to cross Duxberry and greet him. At this time, Green and Rutledge were walking northbound on Ontario attempting to cross Duxberry to reach him. "They were greeting me. They was coming up crossing the middle of the street;" "They were never stationary." Jordan Dep. 53, 81-82 (R.186 #4443, 4471-4472).

  - Jordan was in his front yard, standing at "J1" on Exhibit C from his deposition testimony, when he looked west down Duxberry and saw the white GMC at "the top of the street." *Id.* at 61-62 (R.186 #4451); Jordan Dep. Ex. C (R.186-3 #4627).

4. *As soon as Green and Rutledge were in view of the GMC, the GMC turned right and came down Duxberry speeding toward Green and Rutledge. Green and Rutledge did not stop but continued walking toward and then began to cross Duxberry. At no time did Green stand in the middle of Duxberry with his hands in his waistband or make any threats or threatening gestures toward the GMC or the people in the GMC.*

- Defendants contend that they drove the speed limit down Duxberry, and it was not until they were halfway down that Green and Rutledge came into view. They testify that at this moment Green was stationary in the middle of Duxberry, facing them and glaring at them

with his hands either down his waistband or in his waistband area, which they considered to be a threatening gesture. Def's. Mot. Summ. J. 9 (R.171 #3186).

- Eyewitness Christian Rutledge

    - Rutledge testified that as soon as he and Green approached the corner of Duxberry and Ontario to go speak to Jamar Jordan, they immediately looked over and saw the white GMC at the corner of Duxberry and Gerbert. Rutledge Dep. 153, 161 (R.148 #1811, 1819). As soon as they looked over and saw the GMC, it began speeding toward them. *Id.* at 161 (R.149 #1819). "It's like as soon as they noticed us get around the corner – like when we first come around and we're still in the process of walking, they're turning and they're coming down now. So we're both like just looking at the car now, crossing the street." *Id.* at 167 (R.148 #1825).

    - Green did not stop and glare at the white GMC in the sense that Defendants claim. He Green and Rutledge did not stop and continued crossing the street. "When we seen them, we crossed the street. We were – we were already crossing. We just didn't like stop, look at the car, then start walking again. We already looked at the car and just kept walking." *Id.* at 163-164 (R.148 #1821-1822).

    - Rutledge stated that Green never stood in the middle of Duxberry with his hands in his waistband, but rather he saw Green's arm straight out to his side. "Henry's arm was like this, straight. Just like if I see anybody's arm straight, they don't necessarily have to have a gun;" "No gun was out, present at no time." *Id.* at 191, 185 (R.148 #1849, 1843).

    - Green was yelling "Bro, bro, bro," assuming he was yelling at random person who had almost hit him with their vehicle, and who now had guns pointed at him. "Again, at that time, we didn't know they were the police." *Id.* at 188-189 (R.148 #1846-#1847).

- Eyewitness Jamar Jordan

    - Jordan testified that when he saw Green and Rutledge crossing Duxberry, they continued walking and did not stop, and that the white GMC was speeding. "They were never stationary;" "[H]e's walking in the street now crossing over to cross the street." Jordan Dep. 82, 53 (R.186 #4472, 4443).

    - As Green and Rutledge were crossing the street, Jordan heard the GMC revving its engine and noticed the vehicle turning onto Duxberry. *Id.* "I saw at least 50[mph]." *Id.* at 82, 53, 66 (R.186 #4472, 4443, 4456).

- During this time, he heard a car revving its engine and noticed the white GMC turning from Gerbert onto Duxberry. He noticed the GMC speeding, stating that the GMC "didn't do 25" [the speed limit], it "was getting up there, it "wasn't cruising," and it "was climbing." *Id.* at 57-64, 66 (R.186 #4447-4454).

- Eyewitness Ericka Hickman

  - Hickman testified that she witnessed this entire interaction from the moment the GMC drove down the street, and that Green and Rutledge were crossing the street as the white GMC drove down the street, and that Green only stopped walking when he was almost hit by the white GMC. "He was trying to cross to go to his home over there." Hickman Dep. 57 (R.187 #4689).

  - Hickman testified that right after the GMC stopped after almost hitting Green and Rutledge, Green faced the GMC and "threw his hands up" and said something to whoever the occupants of the GMC were, which, according to eyewitness Hickman, was "like cussing them out. Like, you almost hit me or something … like he was acting out of they almost hit him … [B]ased on his body language, it's something I'd say if somebody almost hit me. Like … did you not see me or something. Like that's what I took that as." *Id.* at 46-47, 53. (R.187 #4678-4679, 4685).

  - Hickman never saw Green put his hands down his waistband or make any threatening gestures. "[W]hen I witnessed his hand going back down, I never seen Mr. Green go like this and then like … none of that. I just seen his hands to his side." *Id.* at 63-64 (R.187 #4695-4696).

5. *The GMC was moving at about 50 mph and tried to hit Green and Rutledge and almost hit them. Green and Rutledge were walking north and slightly west to cross Duxberry and did not stop until the GMC tried to hit them. They jumped back and north towards the sidewalk and the GMC stopped just in front of them just before the intersection, facing east. Green threw his empty hands up, apparently cussed at the GMC for trying to hit Rutledge and him, then his arms and hands went back down to his side and he turned to his right and continued walking north away from the GMC and toward the sidewalk with his hands down.*

- Defendants contend that Green blocked their path by standing in the middle of the intersection, confronting them with his hands in or around his waistband and forced Rosen and Bare to stop and engage them.

- <u>Eyewitness Christian Rutledge</u>

  - As Green and Rutledge were crossing the street they were then almost hit by the white GMC, being forced to jump to the curb. "We just kept walking up there. Then like we didn't even make it all the way up to the curb, that's what I meant by like he had stopped, because they almost hit us. And they stopped like right before, and we jumped, both jumped to the curb." *Id*. at 164

- <u>Eyewitness Ericka Hickman</u>

  - According to Hickman, "Mr. Green was pursuing towards Duxberry on Ontario, and the officers like slammed on they brakes." She actually thought the GMC stopped because Green was walking across the street. She testified that Green and Rutledge "walked right in front of the vehicle" and were almost hit by the GMC. "Me, from my perspective, I'm thinking like Mr. Green and his friend are just walking out in front of a vehicle ...;" "They were walking, the car came, slammed on the brakes..." Hickman Dep. 40-41, 49-50, 46 (R.187 #4672-4673, 4681-4682, 4678).

  - Hickman testified that she did not believe Green intentionally walked in front of the vehicle, forcing it to stop. "I wouldn't say he intend - - I wouldn't say he just walked out there... ." "I'm not saying he intentionally just walked into the street, though. He was walking." "To me he wasn't paying attention to traffic." *Id*. at 50, 127 (R.187 #4682, 4759).

  - Hickman also witnessed Green throw his hands up, "like watch what the fuck you're doing, or did you not see me or something?" and indicated that his arms only went to his side as he tried to again head towards the sidewalk, and that she never saw Green reach into his waistband or have a gun in his hand at that time. "Once he had his hands up, his hands went back down. Mr. Green pursued, to me, to walk towards the sidewalk." "I just seen his hands to his side." *Id*. at 63-64 (R.187 #4695-4696). Green then turned to his right and walked away from the GMC toward the sidewalk. "He just was walking. He just was walking. ... Hands out like this." *Id.* at 63 (R.187 #4695).

  - Hickman never saw Green with a gun. "Like I didn't see Mr. Green have a gun at all." *Id*. at 53, 46, 69 (R.187 #4685, 4678, 4701). A reasonable inference from this testimony is that Green's hands were empty when he threw his hands up.

- <u>Eyewitness Jamar Jordan</u>

- Jordan saw the vehicle speeding down Duxberry toward Green and Rutledge. "Q How fast was the car going? A Well, Duxberry a 25. So, man, I say at least 50." Jordan Dep. 66 (R.186 #4456).

- Jordan witnessed Green and Rutledge crossing the intersection as they were almost hit by the GMC. "I saw him moving out the way, because, if he wouldn't move, he would have gotten ran over." *Id.* at 39 (R.186 #4429).

- Green and Rutledge did not stop until the GMC tried to hit them, and they jumped out the way to avoid being hit. "They were walking towards me [as the GMC was speeding down the street] … ." "[Green and Rutledge] had a split decision to back up a step, because that's exactly what they did. When [Rosen] pulled down on them, they went like – they're like whoa." "I saw [Green] moving out the way, because, if he wouldn't move, he would have got ran over [by the GMC].") *Id.* at 83-84, 39-40 (R.186 #4473-4474, 4429-4430).

6. *During the period when the GMC was speeding toward Green and Rutledge and then stopped, the driver (Officer Rosen) had his left hand on the steering wheel and was holding a gun in his right hand, and the gun was pointing toward the windshield. During that same period, Green was not doing anything with his shirt or waistband, was not holding a gun and was not reaching for a gun.*

- Rosen contends that when he drove the GMC down Duxberry towards Green and Rutledge and then stopped, that Green lifted his shirt, had his hands down his waistband and reached to pull a gun out. Rosen contends that he then pointed his gun in the windshield at about the same time that Green lifted his shirt to pull a gun. Bare admits that the first time he saw Rosen's gun, it was pointed out the windshield. Bare Dep. 249-250 (R.184 #249-250.

- Eyewitness Jamar Jordan

  - Jordan did not see Green holding or reaching for a gun as the GMC approached. ("Q …[H]e was pulling the gun out as the car came up, right? A No;" "Q At the point when the officer pulled up, do you know if Henry had his gun out at that time? A No, he didn't have a gun out. Q So the officer already had his gun out, and Henry did not have his gun out? A Correct." Jordan Dep. 74, 206 (R.186 #4464, 4596).

  - Jordan testified that he did see a gun in Green's hand at some point, but only after the shooting had begun. "Q [W]hat I'm asking, you saw him [Henry Green] actually drawing a gun out of his holster at some point? A After he got shot, yeah;" "[A]fter

the two shots, Bub pulled out his gun." Henry's nickname was Bubby. *Id*. at 39-40, 78 (R.186 #4429-4430).

- Jordan witnessed the gun pointed at the windshield as the GMC drove down Duxberry after turning from Gerbert, which he witnessed through the driver's side window. "Well, from back there, you just saw a white car coming, but as I'm starting to look in there, I see a white arm like this and a gun like that;" "Well, [Rosen] had one hand on the steering wheel and … [his right hand] was on his gun. Had his gun in his hand." *Id.* at 64, 67 (R.186 #4454, 4457).

- Eyewitness Christian Rutledge

  - Rutledge witnessed the driver of the GMC [Rosen] holding a gun in his right hand pointed at the windshield.as he drove down Duxberry. He did not understand why a gun was pointed at them since neither he nor Green had a weapon out. "I felt like – when I seen it out the car – because they had them out while they were driving. Not out the car, but in the window [sic; windshield]. So when they're coming up to us like this, I was really like, who the fuck is this and why the fuck do they got a gun out?" Rutledge Dep. 195 (R.148 #1853).

  - Rutledge told Detective Gregory Sheppard that he did not witness Green pull the gun out. "I didn't see him pull it out… ." "He didn't reach for nothing." "I was saying he – I didn't see anybody reach. So when we got pushed back to the curb I'm like – that like I didn't see anybody reach when we got pushed on the curb." Rutledge Dep. 162, 165 (R.148 #1820).

  - Rutledge testified that Green's hands were down at his side during the encounter. He did not see Green raise his hands in the manner described by Defendants. "[L]ike not extended. More as like down. But it was out just a little bit. … if he had his hands by his side like I seen. Just a little extension. Just a little extension." *Id*. at 183 (R.148 #1841).

  - When Rutledge refers to Green having his hands at his side, Defendants contend that Rutledge is saying that Green had a gun at his side. Rutledge contradicted that view when he clarified during his testimony that he did not know whether Green actually had a gun, had not seen him pull it, and just assumed the white males that jumped out of the SUV were not "doing nothing for no reason." However, he stated the he did not see a gun. *Id.* at 176 (R.148 #1834).

- Rutledge testified that he didn't believe Green had to have a gun in his hand at the time when his arm was out to the side, but that he could have been holding anything. "Just like if I see anybody's arm straight, they don't necessarily have to have a gun. They probably could have something they could throw at somebody." *Id*. at 191 (R.148 #1849).

- Detective Sheppard admitted during his testimony that Rutledge did not state in his own words that he believed Green had a gun at that moment because of how he was standing, but that he stated it himself after assuming that Rutledge was talking about a gun. "But the way he indicated and stuck his arm out, that made me think that he was talking about a gun until he went up and stuck his arm out. So that's what made me think that." When asked whether Rutledge made the statement that "typically people standing that way are holding a gun," Sheppard admitted that he made the statement himself. Sheppard also admits that Rutledge "claims he never saw the gun until afterwards and it was laying on the ground next to his body." Sheppard Dep. 184-189 (R.195 #5844-5849).

- **Eyewitness Ericka Hickman**

  - Hickman indicated that once Green's hands went up and then went down, she never saw him reach in his shorts or waistband. "When I witnessed his hand going back down, I never seen Mr. Green go like this and then like … none of that. I just seen his hands to his side. That's all I seen;" "I didn't see Mr. Green have a gun at all." Hickman Dep. 63-64, 69 (R.187 #4695-4696, 4701).

  - Hickman indicated that had Green done anything with his shirt or reach for anything she would have saw him do it. "Q And so if he did anything with his shirt or anything like that, could you have seen it. A Yeah I have good vision … if you go reach for … anything pertaining to anything in front of you or whatever, your arm is going to make a certain type of movement." "From my vision, I would see his hand aim with the gun shooting at them, and I never seen him with a gun at all." *Id*. at 64, 74-75 (R.187 #4694, 4706-4707).

  - When questioned about whether Hickman saw Green with his hands lowered towards his waistband, she testified that his hands were at his side, outside of his waistband, and it to her was the same way anyone would have their hands while walking. She makes it clear in her testimony that if he had moved his hand to his waist, she would have seen that. "Just like a normal like, okay, we done said what we said, go on about your day." "[Y]ou still have motion with your – your body, period, from like your limbs. So like, yes, to me, I would see that." *Id*. at 74-75 (R.187 #4706-4707).

7. *The driver of the GMC (Rosen) began shooting at Green at about the same time as the GMC stopped. No warning was given. Rosen was inside or just stepping out of the GMC when he fired two shots, one through the window on the driver's side door, which shattered the glass; and then he stepped around the door and window and fired another shot. At least one and maybe both of those shots hit Green while Green was walking north toward the sidewalk and away from the GMC and Rosen with his hands down at his sides. Green did not have his gun out and was not pointing his gun at Rosen when Rosen shot him. Green posed no threat to the life of Rosen, Bare or any bystanders at the time the shooting began.*

- Rosen contends that he was stopping the GMC, putting it into park, raising and aiming his gun with his right hand through the windshield of the GMC, and opening the driver's door to get out of the GMC "nearly simultaneously." Def's. Mot. Summ. J. 9-10 (R.171 #3186-3187). Defendants, further contend that Rosen was repeatedly shouting "Police" and "Don't move" as he exited the vehicle, that he pointed his pistol at Green in the gap between the A pillar on the open driver's side door and the driver's side of the vehicle, and at that point Green quickly pulled and leveled his black pistol at about chest height, pointed it directly at Rosen, and approached Rosen's position. Rosen Dep. 254-255 (R.185 #4112-4113). Rosen contends that at this point, Green was either firing or was about to start firing at Rosen, and at this point Rosen fired several shots at Green in rapid succession through the gap between the A pillar and the vehicle. Def's. Mot. Summ. J. at 10 (R.171 #3187). "The gun was pointed at me when I began firing." Rosen Dep. 256 (R.185 #4114). Defendants contend that one or more shots from Green shattered the front driver-side window. Def's. Mot. Summ. J. 21-22 (R.171 #3196-3197). Defendants contend that Rosen fired his weapon at Green because he was in fear for his life and that Green also posed a deadly threat to Bare. *Id.* at 11 (R.171 #3188).

  - Defendants somehow contradict their own expert's opinion, indicating in their motion that "Identifiable damage from Green's gunshots includes … [T]he windows of the driver's door and driver side back door were shattered in the up, or mostly up, position." Def's. Mot. Summ. J. 22 (R.171 #3197).

- Defendants' Shooting Reconstruction Expert, Matthew Noedel

  - Noedel believes, based on his expert opinion, that it was a bullet fired by Rosen that shattered the driver's side window. When asked specifically about a bullet path that he attributed to Rosen's gun, Noedel testified: "Q The first bullet path that you discussed, it says, 'A fired bullet struck the weather stripping and the edge of the door frame of the driver's door'? A Yes. Q "The direction of travel indicated for this damage was from inside the GMC toward the outside (based on the hole in the weather stripping and the bent metal underneath)"? A Yes. Q Could that struck

bullet have shattered the glass there? A Yes. Q Do you believe it's likely that the bullet strike actually shattered the glass there? A If the glass was still present when that shot occurred, then it would have shattered – I believe it would have shattered the glass." Noedel Dep. 67-68 (R.194 #5540-5541).

- Eyewitness Christian Rutledge

    - Rutledge testified that he was confused as to why Rosen and Bare had guns pointed at them, because he and Green had just crossed the street and had not done anything wrong. "[W]e both crossed over. No gun was out, present at no time." Rutledge Dep. 185 (R.148 #1843).

    - Rutledge testified that he assumed that somebody must have done something by the way Rosen and Bare confronted Green, but he asserted that he did not actually witness Green do anything that would have caused the actions of Rosen and Bare. "I'm putting keywords together. It's making me think. Again, all this is assumptions." "I'm just, again, suggesting all these things." "[S]omebody got to be doing something, but, like I said, I didn't see anything.") *Id*. at 188, 190, 176 (R.148 #1846, 1848, 1834).

    - Rutledge testified that Green was provoked by Rosen and Bare pointing guns at him when they confronted Green and that Rosen and Bare did not provide any identification or warning as to who they were. "[W]here I grew up at and stuff like this get to happening and we don't know who you are, you look like a random person to us now." "[A]gain, at the time we didn't know they were police." "[H]e assumed he was yelling at a random person." "I'm pretty sure we both didn't know they was cops." "I mean, somebody got two guns pointed at you … [I]f somebody points two guns at me, I'm going to be mad, too." "I mean, not knowing they're cops, but two people in front of me with guns." *Id*. at 176, 188-189, 192 (R.148 #1834, 1846-1847, 1850).

    - Rutledge was more focused on Rosen and Bare than Green because they hadn't identified themselves, Green didn't have a gun out at any time up to the point that Rosen and Bare confronted them, and Rutledge had no reason to be concerned by Green. "That's my friend. I didn't think nothing of it. And these are two white males with guns in my face. Of course, I'm more focused on the people with guns in my face than anything else." *Id*. at 193 (R.148 #1851).

    - Rutledge testified that the car stopping, Rosen shouting, and shooting Green happened quickly. "[I]t happened so simultaneously." *Id*. at 197 (R.148 #1855).

- Rutledge did not see the shooting start, but he saw Rosen with his gun drawn and pointed at Green, he saw Green's hand straight down and out to his side, and he heard the shooting begin from the direction of Rosen as he turned to look back at Green. "I looked at the police and I tried to get to look at Henry, but by the time I got to that, I heard gunshots. Well, actually, seen the cop – not seen it, but heard it, from his way shot first." "[T]he guns are pointing. I'm trying to get to look at him, and his arm is like that." "I could see his arm, and they – I remember that day, detective kept asking me did you see a gun. I said I didn't see a gun. I only got to – that's why I'm saying I only seen his armed stretched out.") *Id*. at 197, 199 (R.148 #1855, 1857).

- Eyewitness Jamar Jordan

  - The shooting all unfolded very quickly, with Jordan in awe at how quickly Rosen opened the driver's side door and began shooting. "The way he did it – the way he did it was like – it was like a movie I ain't never seen nothing before in my life. Like the way I – I don't even know how he got the door open. Like I thought he used his foot. Because all I saw just like boom, the door was open already. Like I seen both hands, but the door came open. That's like how fast it was going." "Q And you're saying that he shot from – with the door open? A While getting out – like it was special ops." "I know like he shot first out the car. Like how did you – the door was open … I'm just trying to figure out did he real quick and go back or like what dude? It was – it was fast." *Id*. at 69, 71-72 (R.186 #4459, 4461-4462).

  - Jordan testified that Green did not pull his weapon and did not shoot at Rosen until he had already been shot by Rosen, and that Rosen's first shot shattered the driver's side door's window. No warning was given, outside of an actual bullet. "It was like a shot. Like it was like the shot and all of that together. Like the warning shot was like the – that shot through the window was like, yo, freeze, yo. Bow. No, I'm going to say what I need to say." "Q So was the door still closed and he shot? A No. Like – it – it was like cracking open like. … He did it like – like through the window." "The window was shattered, and he's down like this trying to – trying to get it up." "Q …[Y]ou saw him actually drawing a gun out of his holster at some point? A After he got shot, yeah." "…[H]e got hit here, and like everything – like he – like right side dropped. And when he came back up that's when he had his gun… ." *Id*. at 218, 69-71, 40, 44 (R.186 #4608, 4459-4461, 4430, 4434).

- Eyewitness Ericka Hickman

- Hickman described her account of the shooting in vivid detail. "I – me, I didn't hear them say they were cops or show any badges … [T]hey slammed on their brakes. I see Mr. Green throw his hands up, like cussing them out. Like you almost hit me or something, is what I'm thinking he's saying to the officers. Once he had his hands up, his hands went back down. Mr. Green pursued, to me, to walk towards the sidewalk. Before him, I see a gun - - well not a gun. I hear the glass shatter from the side of the vehicle of the officers and start shooting him basically. To me, he died for no reason. He got killed for no reason." Hickman Dep. 47-48 (R.187 #4679-4680).

- Hickman was clear that she had no indication that Rosen and Bare were officers at the time the shooting began. "…I didn't hear no officer say get down. I didn't hear no officer identify theirself [sic] as police officers. My whole – I thought it was an altercation amongst gang-related things." *Id.* at 55 (R.187 #4687). They did not yell at Green to get down or give any warning until after the shooting began. *Id.* at 55-56 (R.187 #4687-4688).

- When describing Green's actions after almost being hit by the GMC, Hickman indicates that Green put his hands down to his side and was attempting to walk to the sidewalk and continue to what she believed was his home. "He was just walking. He just was walking." "[W]hen I witnessed his hand going back down, I never seen Mr. Green go like this and then like – noth – none of that. I just seen his hands to his side." "Q Okay. And then you said he started to walk away? A Yeah. Like if he was … going to – to their home. But before he could even – before – to me, before he could even really get so much of like onto the sidewalk where he was pronounced deceased at, they started firing." "He was going to his home … I thought it was just done and over with until I heard the gunshots which he hadn't even really made it onto the sidewalk all the way before the gunshots started coming." *Id.* at 63-66 (R.187 #4695-4698).

- Hickman indicates that Rosen fired first, and his shot shattered the window in the driver's side door. Like eyewitness Jordan, she believes the officers were shouting commands at Green after the shooting began. "[I]t was only one when the first one did the shot, like shooting through his police vehicle." "I did not see no gun. I just seen everything that took place. The glass shatter, the bullets come out… ." "Q Okay. And at that point, you heard the shots fired such that the window broke out on the side? A Yes, sir. Q And you're certain of that? A Yes, sir;" "Q [Y]ou said I hear them yelling like get down. A That's after they had started shooting Mr. Green … But that's after they had already like started shooting and stuff…" *Id.* at 67-68, 73, 56 (R.187 #4699-4700, 4705, 4688).

- Hickman testified that once Rosen shot and the glass shattered, Green attempted to move away from the vehicle. "And what took place was that when the glass shattered, it was the officer firing out at Mr. Green, because once the bullets started coming out, Mr. Green started to like --- I'm going to say run but not really run. Like he was trying to get out the way like." "When I heard the first two, Mr. Green had been onto the sidewalk by then where he had collapsed." *Id*. at 69, 80 (R.187 #4701, 4712).

- As Green was walking away from the GMC with his hands down on his side, the driver of the GMC shot him. Up until that point, no shots had been fired and Hickman said, "I thought it was just done and over with until I heard the gunshots, which he hadn't even really made it onto the sidewalk all the way before the gunshots started coming." *Id*. 66, 70. (R.187 #4698, 4702).

8. *Rosen was the first to shoot during the incident. Green did not pull his gun out until after Rosen had fired the two shots at Green.*

- Defendants contend that a number of things happened "simultaneously." That Rosen stopped the GMC as Green was reaching into his front waistband and then quickly pulled a pistol from under his shirt. Defendants contend that Rosen, "simultaneously," raised and aimed his gun with his right hand through the front windshield of the GMC and he reached his left hand back over to start opening the driver's side door, while repeatedly shouting "Police!" and "Don't move!" Def's. Mot. Summ. J. 9-10 (R.171 #3186-3187). Defendants contend that Green pointed the pistol directly at Rosen and approached Rosen's position, and Green was either firing or about to fire when Rosen then began shooting. *Id*. a 10 (R.171 #3187).

- Eyewitness Christian Rutledge

- Rutledge testified that he looked at Rosen immediately before the shooting, and before he got a chance to look back at Green, he heard gunshots from Rosen. "I looked at the officer [Rosen]. And I tried to get to look at Henry Green. … I tried to get to look at Henry, but by the time I got to that, I heard gunshots. Well, actually seen the cop –not seen it, but heard it, from his [Rosen's] way shot first." "And then I just heard pop, pop, pop;" "By the time I get back to go look at Bubby – Henry, I – I didn't see anything. All I heard was bop, bop, bop, bop, bop. I took off;" "When I heard pop, pop, pop, I know it wasn't him [Green] shooting first, because your arms – his arms are still down here." Rutledge Dep. 197-198, 202

- Rutledge testified that he did not see Green with a gun prior to the shooting. "… I remember that day, the detective kept asking me did you see a gun. I said I didn't see a gun." *Id*. At 199

- Eyewitness Jamar Jordan

  - Jordan testified that Green did not pull his weapon and did not shoot at Rosen until he had already been shot by Rosen, and only after his arm had been down at his side. "[Green] never made it to the curb. He was shot before he got to the curb." "[Green] got shot once, then brandished his arm and [was] shot again [by Rosen]. He then started shooting." "… I know [Green] got shot that one time, but I want to say like twice. I want to say twice, but that one shot, you saw it. You saw him turned and everything." "Q Okay. And then how many shots hit Mr. Green of those two shots before Mr. Green fired? A I think both."[A]fter the two shots, Bub [Green] pulled out his gun." "Q [Green] was standing up when he got his first shots off, right? A No. Q Where was he? A He was falling." Jordan Dep. 219, 74-75, 78-79 (R.186 #4609, 4464-4465, 4468-4469).

  - Jordan testified that Rosen shot through the window prior to Green reaching for a gun, despite Defendants' counsel's attempt to lead him in that direction. "Q [Rosen] didn't shoot through a window … Did a bullet go through a window – the glass window from the officer? A Yes, because how, if there's no gun from Henry Green, where is the bullet coming from?" "Q …You did see the officer on the driver's side shoot a bullet through the driver's side window, side window, such that it shattered the glass? A Yes Q And you think that was the first shot to be fired? A Yes." *Id*. at 223-224 (R.186 #4613-4614).

  - Jordan stated that Green didn't begin shooting at the police until he was actually shot. "Q I know you say that Mr. Green shot after he was shot at? That's your statement correct? A Yeah. Q… And so you think that when Mr. Green started shooting at the police he had already been shot? A Mm-hmm. Q Yes? A Yes." "Q [Y]ou saw him actually drawing a gun out of his holster at some point? A After [Green] got shot, yeah." *Id*. at 38, 40 (R.186 #4428, #4430).

- Eyewitness Ericka Hickman

  - Hickman did not see Green with a gun prior to the shooting, although she watched the situation unfold start to finish with a direct line of vision. "Like I didn't see Mr. Green have a gun at all." Hickman Dep. 69 (R.186 #4701).

- Hickman was certain that Green didn't have a gun in his hand at the moment she first heard shots and saw the window shatter. "I never seen Mr. Green. Like if a window is going to be shot out, I don't think he's going to be holding the gun down here trying to shoot, from my perspective." "I mean, like from my vision, I would see his hand aim with the gun shooting at them, and I never seen him with a gun at all. Even when he collapsed on the corner." *Id.* at 73-74. (#4705-4706).

- Hickman testified that Rosen fired one or two shots before exiting the vehicle completely, at least one of which shattered the driver's side window. "What I witnessed was gunshots … I don't know what it was. It was just fired coming out." "Q …So the person who's in the driver's side, how many shots does he fire before he eventually opens the door? A I'm going to say one or two before even getting out of the vehicle. I heard the bust [referring to the glass shattering], heard it – heard it, him get out. Like this happened so fast." "One of the bullets hit him and he fell." *Id.* at 68, 76, 80 (R.187 #4700, 4708, 4712).

- Defendants' Shooting Reconstructionist, Matthew Noedel

  - testified that the shot that shattered the driver's side window likely came from Rosen, and that he did not believe any of Green's shots shattered the front driver's side window.

  - When asked specifically about a bullet path that he attributed to Rosen, Noedel testified as follows: "Q The first bullet path that you discussed, it says, "A fired bullet struck the weather stripping and the edge of the door frame of the driver's door"? A Yes. Q "The direction of travel indicated for this damage was from inside the GMC toward the outside (based on the hole in the weather stripping and the bent metal underneath)"? A Yes. Q Could that struck bullet have shattered the glass there? A Yes. Q Do you believe it's likely that the bullet strike actually shattered the glass there? A If the glass was still present when that shot occurred, then it would have shattered – I believe it would have shattered the glass." Noedel Dep. 67-68 (R.194 #5540-5541)

  - When asked specifically whether he knew if any of Green's shots shattered the driver's side window glass, Noedel testified "The front window I do not believe was shattered [by Green]." *Id*. at 68 (R.194 #5541).

9. *After Green was shot by Rosen, his right side dropped and then he came back up, pulled out his gun, and started to fall and, as he was falling, Green fired four shots in Rosen's direction. Rosen moved from behind the driver's door of the GMC and got closer to Green while firing shots at Green, and Bare came around the GMC and fired at Green. Then Green was*

*staggering and falling and moving away from the officers and dropped his gun; and, after he dropped his gun, Rosen and Bare continued to shoot at him. Then Green, without the gun, fell down and was on one knee, "with his head down, lifeless, done," and the officers continued to shoot at him and hit him with at least one shot. Green then ended up lying flat on his back on the sidewalk.*

- Defendants contend that Rosen fell back into his seat to avoid Green's gunfire, and that at this time Green was firing directly at Officer Rosen, riddling the GMC with bullet holes and shooting out the front and back driver-side windows. Defendants contend that Rosen momentarily stopped firing when Green ducked out of view, that Rosen didn't know whether Green was seeking concealment or whether he had been struck by Rosen's gunfire, and that when Rosen stepped from behind the door Green was moving north/northwest and firing upon Rosen. Defendants contend that Rosen fired several additional shots in rapid succession and that Green fell to the ground, dropped his weapon and the Officers immediately stopped firing. Def's. Mot. Summ. J. 10-11 (R.171 #3187-3188).

    - Rosen testified that Green was attempting to run away from Rosen, running towards the sidewalk, and that when his gun fell from his hand, his body continued several feet beyond where his gun fell. "Q Was he standing up when the gun fell out of his hand? A He was still attempting to run, like a crouched run. Q Was he attempting to run away from you at that point? A Yeah. At that point, yes he was." Rosen Dep. 246-247 (R.185 #4104-4105). "He was running toward the sidewalk on the north side of the street;" "I saw him running and shooting like this. He dropped the gun and fell several feet beyond." *Id.* at 247 (R.184 #4105).

    - Bare does not know whether or not he fired any shots after Green stopped firing and dropped his weapon, and he testified that Green dropped his weapon as he was falling to the ground. "Q Do you know if Henry stopped firing before you? A I don't know … Q Do you know if you fired any other shots after Henry stopped firing his weapon? A I don't know. Q So you're not sure when you fired your last shot, if Henry was still firing or not? A No, do not know." Bare Dep. 292 (R.184 #3552). "I believe his gun dropped as he was falling." *Id.* at 291 (R.184 #3551). "Q Did he drop the gun before he fell or after he fell? A I don't know the exact millisecond when he did drop the gun. He was kind of falling to the ground." *Id.* at 291 (R.184 #3551).

    - Bare does not know when Rosen stopped firing. "Q Do you know when Rosen stopped firing? A No. Q Do you know if he stopped firing before you? A I don't know." *Id.* at 291-292 (R.184 #3551-3552).

- Defendants' Shooting Reconstructionist, Matthew Noedel

- Noedel testified that Green's gun struck the GMC between four and six times, and "The paths of fired bullets from Green that could be tracked are travelling generally level to upward which supports that he was lowered, crouching, or on the ground while shooting at the GMC." Noedel Dep. 15-16 (R.194 #5488-5489). "The evaluation of three of the impacts to the GMC, that is, two to the side of the door and the one on the edge of the door, have an angle that indicates a slight upward direction to them … [T]he shot origin must come from lower than where those actually struck on the vehicle." *Id.* at 16 (R.194 #5489).

- Noedel testified, based on his opinion of the shooting reconstruction, that "Mr. Green was in a lowered position while firing his gun. Some may imply that that is a defensive position, but he is in fact, firing shots while in what I described in my report as a lowered position as evidenced by the upward path of some of his shots So I think that the plaintiff's position, that may be argued that may be to their favor is that he was being shot in some of these shots while in a lowered stature." *Id.* at 90-91 (R.194 #5563).

- Noedel provided his expert opinion that "Two of the fired bullets that struck Green (specifically a fired bullet to the right shoulder and a graze to his left side) support that he was lowered and/or bent at the time they struck him." Noedel Dep. 19 (R.194 #5492). Noedel also testified that "Rosen hit Green with at least three fired bullets," with those fired bullets being to the "top of the right shoulder, left hip and left elbow." *Id.* at 23 (R.194 #5496). Noedel was unable to determine Rosen's bullet path for eight of his fired bullets. *Id.* at 24 (R.194 #5497).

- Noedel also clarified unequivocally that the gunshot wound to the top of Green's right shoulder was delivered by Rosen while Green was at least bent or lowered towards the ground. "The entry location and direction of travel generally supports that Green was bent and/or lowered with his right shoulder generally facing the location of Rosen at the time of this shot." *Id.* at 73 (R.194 #5546). "[F]or that bullet to strike that position of Green's body, that shoulder has to be in line with wherever Rosen's gun was aligned at the time that shot occurred." *Id.* at 73 (R.194 #5546). "[O]ne must lower or bend over Green in order to expose that entry site to position where a shooter can achieve while standing on the ground." *Id.* at 74 (R.194 #5547).

- Noedel testified regarding the gunshot wound to Green's left side, "Q [I[f Mr. Green had not been completely, you now, chest touching the ground or back touching the ground, prone on the ground or slightly raised would that also provide an opportunity for this bullet path to occur from Officer Rosen's shot? A Yes… ." *Id.* at 75 (R.194 #5548).

- Noedel provided his expert opinion that "Of the bullet paths that can be tracked, Bare's shots are consistent with one ricocheting toward the north and hitting a fence and the other hitting Green directly in the lower hip. The left hip impact may have first perforated Green's left arm." *Id.* at 26 (R.194 #5499). Noedel was unable to determine the bullet path for five of Bare's fired bullets. *Id.* at. 27 (R.194 #5500).

- Noedel testifies that Bare shot Green in the upper right back, and the inference can be made that Green was moving away from Rosen. *Id.* at 81 (R. 194 #5554).

- Plaintiff's Forensice Pathologist, Dr. Francisco Diaz

  - Dr. Diaz provides in his expert disclosure in this matter, that Green suffered a gunshot wound that entered through the right back. Diaz Expert Disclosure 5 (R.196 #6390).

  - Dr. Diaz provides expert testimony in this matter that, with regard to the gunshot wound to the top of Green's right shoulder, the "location of that wound and its path are indicative that Mr. Green was either down or in the process of going down." This gunshot wound "created the most anatomical damage." *Id.* at 5 (R.196 #6390). Dr. Diaz further provides that Green suffered a graze wound to his left flank that based on "its physical characteristics … also indicate that it was sustained while Mr. Green was down." *Id.* at 5 (R.196 #6340).

  - Dr. Diaz is also of the expert opinion that Green suffered abrasions on his left back that are indicative that Green's back scraped a rough surface. *Id.* at 5 (R.196 #6340).

- Eyewitness Christian Rutledge

  - Rutledge testified that when he initially heard the shooting coming from Rosen's direction, then heard a different caliber gun shooting from behind him, which he believed to be Green returning fire at Rosen. ("Q And you could tell that the gunshots came from different calibers of guns because they sounded different? A Yes, sir;" "Like when I say when I went to go turn to Henry, it was like right when I got to him I could just hear the – the lower caliber gun, the pop, pop, pop, pop, pop. So by the time I get to the door – like get to the yard towards – back by the door, I hear boom, boom, boom, boom. But then I get to like turn around because I – still little – little baby paps in between the booms. Like pap, pap, pap." Rutledge Dep. 204-205

- Rutledge then turned around and saw Rosen and Bare approaching Green, shooting at least two times, while Green lay on the ground. "So I finally turned around and just seen him laying there, and I'm watching them walk up like pap, pap. So I get to banging even harder to get let in the house." "I seen the two shots when he was on the ground." "Q And where were the two males in the white car when you saw the final two shots A When I saw them? Q Yes. A Oh, they were walking up on Henry. They were just walking up on him shooting. Q Were they still close to the car? A Oh, no. They were walking up on his body. Q Were they standing over his body? A Damn near" *Id*. at 205-206

- Eyewitness Jamar Jordan

    - Jordan testified that he actually witnessed Rutledge ran through Rosen's gunfire. "I just told him how luck he was. How he ran in front of every one of them bullets and didn't get hit." Jordan Dep. 21 (R.186 #4411).

    - Jordan testified that after Green had dropped his gun, the officers continued to shoot him. "Like the initial shooting, the initial confrontation between them and while he was down, [Rosen] kept shooting." "Q …[T]he initial shooting where the police shoot, Mr. Green draws his gun out, you see the gun in his hand, [Green] fires back, and to when [Green] shoots his last shot was about five seconds or so, and then any shooting after that you're saying that wasn't Mr. Green shooting after that, correct? … A – gun was out of his hand Q Okay. So that's correct, right? A Yes."[F]or me seeing everything, yes, yes, [Green] been stopped shooting." "[L]et's just say after the [Green's] four rounds was over, it was still shots being fired [by Rosen and Bare]." *Id.* at 43, 46 (R.186 #4433, 4436).

    - Jordan went on to describe the shooting in great detail. "Once the doors – he's [the driver's, Rosen's] shooting. He's not sitting down like this and got the door open shooting through the window. No. He's stepping out, and the door's like going like this. He's stepping in front of the window and shot, then stepped around, kept shooting. Then his partner [Bare] came around, and they kept – just like that." "Q[W]hat you observed was the officer in the driver's seat, and you think he had already gotten out or was in the process of getting out; he had fired twice, at which time Mr. Green fired his first shot; is that accurate? A Correct Q Okay. And do you know if one or two or any of those shots hit Mr. Green? A Yeah. Yeah. The first shot definitely hit him." [Green] got hit here, and like everything – like he – like right side dropped. And when he came back up, that's when he had his gun, and – and that like just pure – just me squeezing like – like all adrenaline. Like he was done after that … and they continued to shoot, and the shoe came off, and he dropped his gun. Now he's on like the sidewalk by the grass bent over, and they

still shooting;" "His gun was out of his hand, and they were still shooting." *Id*. at 72, 76, 44-45, 47 (R.186 #4462, 4466, 4434-4435, 4437).

- Jordan described exactly how Rosen continued to walk up to and fire upon Green as Green fell to the ground and testified that Green's gun was out of his hand even before he fell to the ground, Rosen and Bare continued to fire at Green. "Q Okay. Did [Rosen] shoot at all times from behind his position at the door? A No. Q Okay. A [Rosen] moved and walked down and got closer." "Well, once [Rosen] stepped out from behind the door, he continued to shoot, and, as Green was staggering and falling closer towards the corner of my house, that's when [Rosen] kind of straightened up right here. Kind of got straight right here. And Green was right here, and it was just a straight on boom, boom, boom, boom – [Green] was down." "Once he knew like, okay, Bubby was falling, [Rosen] came on out and still kept shooting." "[Green's] gun – when [Green] went down, he didn't have a gun on him … His gun was in the street." "So the gun dropped right there. [Green's] still staggering, falling. What else we got on him? Why still shooting? [Green is] down taking a knee like the football players is right now. They – just how he was, and they're still shooting. Boom, boom, boom, boom, boom." "[O]nce [Green's] gun was dropped, [Green] was falling. I mean, you're – you're just – I mean, I don't know. You falling, you staggering, and he – he was down on a knee like this. One knee's up like he's taking a knee." "Q Where was Mr. Green when the gun came out of his hand? A Stumbling and staggering over here." "Q Was [Green] still on his feet when he dropped his gun? A Yeah." *Id*. at 107-111, 113 (R.186 #4497-4501, 4503).

- Jordan was adamant throughout his testimony that Green was continuously shot by Rosen and Bare after Green's gun was out of his hand, and even after he had gone down on one knee, eventually collapsing on the ground. "Q Now after the gun came out of Mr. Green's hand, what did the driver's side police officer do? A Continued to shoot Q How many times? A I'm assuming four or five more times more after … Enough to you down … Because [Green] was still staggering. Once the gun dropped – remember, we said he's still on his feet? … So he – yeah, he's still shooting." "Bubby, Henry Green, was on his knees while [Rosen] was still shooting." "[Green] was done … That knee was like – that's how [Green] ended. Like it was done. That knee was done. The head down, lifeless. Done." "[A]s he was in a knee, he was shot. Like I seen one go like right here." "Q And where did [Green] end up? A On the sidewalk." *Id*. at 117-121 (R.186 #4507-4511).

- Jordan testified that both officers continued shooting after Green fell to the ground. "I don't remember who shot the last shot. I just known both of them were just

shooting. Shooting, shooting, shooting, shooting, shooting." *Id*. at 137 (R.186 #4527).

- <u>Eyewitness Ericka Hickman</u>

  - Hickman testified, "I hear the glass shatter from the side of the vehicle of the officers and start shooting him basically. To me he died for no reason." "[B]efore he could even really get so much of like onto the sidewalk where he was pronounced deceased at, they had started firing." "He was going to his home. … he was going towards like the sidewalk to like – I thought it was just done and over with until I heard the gunshots … which he hadn't even really made it onto the sidewalk all the way before the gunshots started coming." "Q And at that point, you heard shots fired such that the window broke out on the side. A Yes, sir. Q And you're certain of that? A Yes, sir." "Heard the bust, heard it – heard it, him get out. Like this happened so fast." Hickman Dep. 47, 65-66, 73, 76 (R.187 #4679, 4697-4698, 4705, 4708).

  - Hickman testified that Green was shot by Rosen, after which he attempted to move away but fell. "And what took place was when that glass shattered, it was the officer firing out at Mr. Green, because once the bullets started coming out, Mr. Green started to like –I'm going to say run but not really run. Like he was trying to get out the way like." "He was like in pursuit of like going towards his house." "One of the bullets hit him and he fell." *Id*. at 69, 72, 80, 83 (R.187 #4701, 4704, 4712).

  - Hickman described how the officers got out and began to walk towards Green, who was on or near the ground. "Once the glass was shattered and whoever the police officer, undercover was, got out with his gun drawn. Also his partner, but his partner got out. The driver got out first, then the partner got out afterwards." "Q So you hear at least two shots before the door even open? A That's what I want to say." "Once his whole body was like out of the vehicle, -- like, you know, you got to get out, you got to stand up out of the vehicle. – [Rosen] had his gun drawn. Boom, boom, boom, boom, boom." "Once [Green] was down, they pursued to walk towards him with the guns drawn." *Id*. at 70, 77, 85 (R.187 #4702, 4709, 4718).

  - Hickman testified that one of the officers shot Green after he had "collapsed" and was down, "not completely on his back, but not on his front side either," and "to me, he [Green] was dead." "I don't know who continued - out of the two who continued to shoot Mr. Green once he was down, but they definitely still were shooting at Mr. Green once he had already collapsed." "One of them was standing over Mr. Green and shot him." Hickman thought the shooting was a "murder," and

"gang-related." "When he fell on the ground, I yelled, they just killed him for no reason." "I'm yelling, why y'all shooting him and he's down, he's down." "[A]fter it all came out, it's identified as two officers who, to me, shot an innocent person. That's what I was yelling while they were shooting him." Hickman Dep. 75, 80, 83-84, 99, 114, 124, 93, 101, 88. (R.187 #4707, 4712, 4715-4716, 4731, 4746, 4756, 4725, 4720).

- **Eyewitness Harold Newsome**

  - Newsome witnessed Green fired upon, collapse to the ground after being struck, and saw Rosen and Bare continue to fire while Green was collapsed on the ground. "After the first shot came out, Henry fell to the ground. At this time, they're coming out of the car. They walk around to the front of the car and they open fire on him; "I think the first shot put him on the ground;" "After they got out of the car, he was laying on the ground, they kept shooting him." Newsome Dep. 67, 69, 72 (R.188 #4842, 4844, 4847).

- **Eyewitness Lavonna Williams** at all relevant times was positioned at the sidewalk in front of her house at 2198 Ontario Street. She was directly north of the intersection of Duxberry and Ontario, where she stood playing with her niece. Williams Dep. Ex. C (R.150-3 #2645); Williams Dep. 30-32 (R.150 #2537-2539). While standing at the sidewalk, she would have been able to look south and see the intersection where the shooting occurred. *Id.* at 28 (R.150 #2535); Williams Dep. Ex. D (R.150-4 #2646).

  - Despite Defendants' contention that Williams' account is "consistent with Office Rosen's description of the event," is not just misleading, it is completely false. Williams actually directly counters Rosen's account. Def's. Mot. Summ. J. 17-18 (R.171 #3192-3193). Her account is actually in such direct contradiction with Rosen's description of the event, that it actually aligns with other eyewitness testimony that describes Rosen and Bare coming around the vehicle and shooting at Green. *See* Section II.B.9-10 below.

  - At no point anywhere in her deposition testimony does Williams ever state or imply that Green shot into the white vehicle, nor does she ever state he shot or even possessed a weapon. "Q The individual that the two people that you now know to be police officers was shooting that individual, did you ever see him fire back at the officers? A Did I see who fire? Q Mr. Green. A No, I didn't see any of that. Williams Dep. 105-106 (R.150 #2612-2613).

- In fact, Williams didn't testify to seeing Green at all prior to later seeing him lying on the ground. She instead saw one of the officer's gun pointed at Green on the ground. "All I could just see was their hand. I didn't see – I couldn't see where I was, I couldn't even see the young man from my porch." *Id.* at 105-106 (R.150 #2612-2613).

- Defendants note that Williams testified that she heard gunshots and looked towards the intersection of Duxberry and Ontario, which is an accurate reflection of her testimony. Williams Dep. 47 (R.150 #2554); Def's. Mot. Summ. J. 17 (R.150 #3192). However, Defendants imply that Williams' testimony that she heard gunshots and "saw a man standing at the front of the vehicle and shooting his gun into the white vehicle" corroborates Rosen's account. *Id.* at 17-18. This is simply not true, considering the fact that in that same deposition testimony, Williams clarifies that with regard to the race of the man shooting into the white vehicle, "he was white." Williams Dep. 97 (R.150 #2604). Henry Green was of course African-American.

- Further, Williams goes on to very clearly and explicitly state that the individual she was referencing as standing in front of the vehicle and shooting, was actually one of the officers shooting at Green. *Id.* at 104-105 (R.150 #2611-2612). "And that's why I didn't know it was an officer, because he was in plain clothes." *Id.* at 72 (R.150 #2579).

- It is clear that from her vantage point and the documented position of Bare next to coming around the front of the vehicle, that after hearing gunshots she looked south towards Duxberry and Ontario and actually saw either *Bare*, *Rosen*, or both, as they were the only white males who were positioned as Williams described in her testimony, and the only white males at the intersection of Duxberry and Ontario at this whom she later discovered to be police officers. *Id.* at 96-97, 53, 60-63 (R.150 #2603-2604, 2560, 2567-2570); Williams Dep. Ex. E (R.150-5 #2647); Williams Dep. Ex. F (R.150-6 #2648).

- After seeing the white male pointing the gun at what she believed to be the white vehicle, she walked towards the intersection where she then saw Green on the ground as the white male, who she referred to in her testimony as a police officer, pointing his gun at Green. "I don't know if he got pulled or he got dragged out. I just remember his body down on the ground and the officer had his gun pointed towards him." Williams Dep. 69-70 (R.150 2576-2577).

- Williams witnessed Green on the ground, lifeless, while the *white male police officer* who she was actually referring to as shooting into the white vehicle in

Defendants' statement of facts, had his gun trained on Green as she and others yelled out "He's not even moving." *Id*. at 69-70 (R.150 A#2576-2577).

10. *Rosen for sure, and likely Bare also, shot Green while he was lying collapsed on the sidewalk and appeared to be dead.*

- Defendants contend that they stopped shooting immediately once Green's gun fell from his hand, and they did not shoot him while he was on the ground. Def's. Mot. Summ. J. 11-12 (R.171 #3188-3189). Rosen and Bare admit that they both kept their guns pointed at Green after he fell to the ground, after his gun was clearly out of his hand, and even as they stood over him and watched him labor to breathe. Rosen Dep. 262-264 (R.185 #4120-4122).

- Defendants' Shooting Reconstructionist Matthew Noedel

  - Noedel testified that he cannot eliminate the possibility that Green suffered the gunshot wound to the top of the right shoulder, that caused the most anatomical damage and likely led to his death while lying on the ground. "Q Is it possible that this bullet wound could have occurred while he was on the ground? A That's a possibility, yes." Noedel Dep. 74 (R.194 #5547).

  - Noedel also provided the expert opinion that of the bullet in the left side of Green, delivered by Rosen, "This bullet path is consistent with having traveled directly into the left side around the left hip and continued downward into the thigh at a time when Green's left side was facing Rosen." *Id.* at 75 (R.194 #5548). "Green can be on the ground laying prone … or he could be in any position between standing or crouching and continuing to lower his statute all the way to the ground … [T]here is nothing diagnostic about those two wounds or three wounds that would identify he's on the ground or eliminate if he's on the ground." *Id.* at 75 (R.194 #5548).

  - Noedel testified that Bare also delivered gunshot wounds that Green possibly suffered while on the ground. With respect to the left side wounds that was suffered while Green was on the ground, "[B]oth Rosen and Bare impacted positions on the left hip. *Id.* at 84 (R.194 #5557).

- Plaintiff's Forensic Pathologist, Dr. Francisco Diaz

  - Dr. Diaz provides expert testimony in this matter that, with regard to the gunshot wound to the top of Green's right shoulder, the "location of that wound and its path are indicative that Mr. Green was either down or in the process of going down." This gunshot wound "created the most anatomical damage." *Id.* at 5 (R.196 #6390).

Dr. Diaz further provides that Green suffered a graze wound to his left flank that based on "its physical characteristics … also indicate that it was sustained while Mr. Green was down." *Id.* at 5 (R.196 #6390).

- Dr. Diaz is also of the expert opinion that Green suffered abrasions on his left back that are indicative that Green's back scraped a rough surface. *Id.* at 5 (R.196 #6390).

• Eyewitness Christian Rutledge

- Rutledge testified that he saw two shots while Green was "on the ground." "[T]hey're basically like this walking up on him now after he's already flat on the ground, shot him twice. Like it was a little distance, but they shot him, bop, bop." "I took off. I take off. I look back, Henry's on the ground. Got shot twice again. Boom." Rutledge Dep. 206, 212, 223

• Eyewitness Jamar Jordan

- Jordan testified that the officers continued to shoot repeatedly when Green was no longer a threat, no gun in his hand and kneeling, partially collapsed and ending up on the ground. "[A]fter the shots, why you still shooting? You got plenty more shots." "My kids was out there, and they were shooting after he was down." "Q [H]ow many shots did you see the police fire after you believe the gun was out of Mr. Green's hand? A Say four;" "…[Y]eah [Rosen's] still shooting … till [Green] was on the knee still shooting. Then [Green] rolled over. That's when [Rosen and Bare] stopped." Jordan Dep. 45, 47-48, 117 (R.186 #4435, #4437-38, 4507).

- Jordan described how Green was positioned as the officers continued to fire upon him. "Like a balled up body. Like his back was just – he just was – his leaning leg was his left leg. His left leg was still like I'm taking a knee. My right leg is behind me bent up back, and my back – like my chest is actually laying on my leg and I'm just down. I'm down. Lifeless. Until I move and boom." *Id.* at 209 (R.186 #4599).

- Jordan testified that he believed the shooting of Green was excessive. "Q Did you observe Henry doing anything, in your perspective, that required the officers to continue shooting? A No. At the time of [Green] being kneeled down, [Green's] gun was feet away from him. So he won't – he couldn't have lunged for it, even tried to make a dying attempt for it. He was done. He was down. He was shot up." "There was a better way. There was a better way." *Id.* at 212-213, 128 (R.186 #4602-4603, 4518).

- Eyewitness Ericka Hickman

  - Hickman repeatedly testified that the officers continued to shoot Green while he
    was down. "[T]hey continued to shoot him when he was down, by the way." "And
    that's when I noticed it was two officers. Came out, came around, and they were
    just blaming [sic] [referring to gunshots "blam"] him, man. Like this didn't even
    make no sense." "All I do know is once Mr. Green was down on the sidewalk at
    the corner of Duxberry and Ontario in front of that house when you see me like
    drawing him to be at, that little sidewalk part, when he was down, they continued
    to shoot him." "When he collapsed, he collapsed to me. To me, he was dead. They
    kept shooting him while he was already down." "I'm going to say they were both
    shooting at him, but it seemed like the driver took care of it. For real. For real. I
    don't know who continued – out of the two continued to shoot Mr. Green once he
    was down, but they definitely still were shooting at Mr. Green once he had already
    collapsed." "Yeah, they shot some shots. And we said like five before Mr. Green
    had actually collapsed. And they continued to shoot him." Hickman Dep. 75-76,
    80, 84, 92-93 (R.187 #4707-4708, 4712,4716, 4724-4725).

  - Hickman believes that Green died without justification. "To me, he died for no
    reason. He got skilled for no reason." "I would stick to he's been murdered." "Yeah,
    because they still didn't have to murder him." "[A]fter it all came out, its identified
    as two officers who, to me, shot an innocent person." *Id.* at 47, 114, 88 (R.187
    #4679, 4746, 4720).

  - Hickman os so convicted by what she witnessed, she even states as much in her
    introduction on the record at her deposition, introducing herself as "Ericka
    Hickman, a witness to the murder." *Id*. at 4 (R.187 #4636).

- Eyewitness Harold Newsome

  - Newsome testified that Green was on the ground doing nothing, and the officers
    continued to fire upon Green. "After the first shot came out, they set in position. …
    They fired at him. …Until the clip was empty." Newsome Dep. 91-92 (R.188
    #4866-4867).

  - As the officers continued to shoot Green while he was lying on the ground,
    Newsome did not think Green was a threat. "Q Did you feel that Henry was a threat
    at all when the officers were shooting at him? A No." *Id*. at 127 (R.188 #4902).

- Eyewitness Jheri Alfred was positioned directly south of the intersection of Duxberry and
  Ontario, entering his vehicle. Alfred Dep. 132 (R.142 #551).

- Alfred witnessed the shooting and testified that Rosen and Bare continued to fire on Green after Green's gun was no longer in his hand and as he was falling to the ground. "I mean, I don't know exactly what point they actually killed the man, but when he's falling to the ground, I watched his Jordan flip across the street. Like from where he was standing getting shot, like his Jordan flipped from off his feet, they still was firing. He was already done. His shots, I guess, he had let off, whatever. He was already done. … It was already over … That was like overkill to me." *Id*. 149-150 (R.142 #568-569).

- Eyewitness Courtney Carter was getting into a vehicle south of the intersection of Duxberry and Ontario and witnessed Green being shot by Rosen and Bare while on the ground. Carter Dep. 23 (R.189 #4960).

  - Carter testified that she turned around after hearing gunshots and saw Green falling to the ground. "I saw a young man fall to the ground. His shoe flew off." *Id*. at 59 (R.189 #4996).

  - Carter witnessed an officer head towards Green once he had fallen. She considered it "overkill." "The young man fell. Then I saw a body run towards him, put like this, like they normally do in the movies when you see a dead – see a lifeless body on the floor. And person step over him like this and kept shooting him." "I seen another person went over his body and kept shooting him;" "He walked towards his body and kept shooting." *Id*. at 56, 62, 66, 68 (R.189 #4993, 4999, 5003, 5005).

- Eyewitness Shawnta Willis was positioned in her vehicle, in the alley near a house located to the north of the intersection of Duxberry and Ontario.

  - Willis testified that she heard shots and turned around to witness the shooting of Green. "When I turned, he was already on the ground, I guess. I just seen the cop shoot him. And I'm like 'Oh my God. What is going on? Is he shooting a dog?'" "And as I was backing out of the alley, that's when I heard the gunshots;" "As I turned, it was still – he was still shooting;" "When I turned, he was just walking, shooting.") [Willis Dep. 36, 49, 64]

  - Willis indicated that one of the officers stood over Green while shooting. "That – just the one that had my attention was the one that was over him shooting." [Id. at 55]

  - From the point when Willis witnessed the shooting, she believed it to be excessive. ("Q And how many shots did he shoot as he was approaching? A It was just a lot.

It was a lot. Like I said, it was like he – he emptied his clip. I don't know if he did. I don't know how many things come in there. But it was just, he did not stop shooting. Q While he was walking? A Yes. Q And then – A And didn't stop;" "When he got as far as he could get on him, he was just standing there shooting, continuing shooting still.") [Id at 66-68]

- <u>Eyewitness Antonie Moss</u>, a seventh-grade student at the time of his deposition and even younger at the time of the shooting, was positioned in a vehicle, in the alley near a house located to the north of the intersection of Duxberry and Ontario.

    - Moss testified that he heard gunshots and turned to look at what was happening, and saw a gun flying from Green's hand as he flew backwards. "As I turned around and I saw them shooting at [Green]. That's when he flew back. I saw a red shirt, because he was wearing a red tank top shirt on. And then that's when – that's when I saw another cop come up and like, shooting, like five more times." [Moss Dep. 35]

    - Moss described the shooting in detail. "So he was walking, and that's when I turned around. That's when I heard the gunshots. He flew back like this with the gun and fell to the ground. And then I saw the – the cops come up in a car. They started to shoot, and that's when one cop came this way, and then the other came this way. That's when, like, he was shooting at him more while he was on the ground. And then another cop came and started shooting at him while he was on the ground." [Id. at 36]

    - Moss witnessed all of the shots from Rosen and Bare when Green was unarmed. "Q Did you see him being shot while he was holding the gun in his hand? A No." [Id. at 40]

- <u>Eyewitness Arman Green</u>, ten-years-old at the time of his deposition and eight-years-old at the time of the shooting, was positioned in a vehicle, in the alley near a house located to the north of the intersection of Duxberry and Ontario.

    - Arman Green was in a vehicle backing up at the time they heard the start of the shooting. "I remember backing out of the driveway, we heard shooting, and then I saw the man on the ground, and I saw him shooting while he was on the ground." [Green Dep. 34]

    - Arman Green testified that he witnessed Henry Green fall to the ground after hearing the gunshots, and saw Rosen and Bare shooting at Henry Green while he was on the ground. "I saw – I heard shooting. Then I looked back and I saw [Henry

Green]. I saw him. He fell down. … [T]he man that shot him was shooting him after he fell down." Arman Green testified that he witnessed about seven more shots after Green fell down. "Q Do you have any idea when those seven shots are happening? A When he was on the ground." [Id. at 24]

- Eyewitness Edward Jackson was positioned a few houses east from the intersection of Duxberry and Ontario, and witnessed Green being shot while on the ground.

  - Jackson testified that he heard gunshots while in front of his house, then headed towards the sidewalk and proceeded west, towards the intersection of Duxberry and Ontario. "Once I heard the noise, I walked down to my – end of my sidewalk and looked down there, and soon as I looked down there, that's when I see the guy getting out the car and just continuing to fire." [Jackson Dep. 35]

  - Jackson saw Green fall and saw the person that shot him continue to shoot while Green was on the ground, not firing back. ("I seen the person fall that he had shot;" "I just see the man approaching, continue to fire, approaching the man that was down;" "Q Did you see any shots coming from the person that was down? A No.") [Id. at 69, 145]

  - Jackson believed the shots fired by Rosen and Bare to be excessive. "I think it was too many shots fired. At a certain point, I felt like that the person was down, and it wasn't all need. That's what I think … Because he was – he was down. He was down." [Id. at 153]

## III.    ARGUMENT AND AUTHORITIES

### A.    Defendants Fail to Meet Their Initial Burden As Movants for Summary Judgment

Defendants ignore their burden as movants for summary judgment, and for good reason: they fail to meet that burden.  Defendants contend that Plaintiff must identify facts showing a genuine issue of material fact.  Doc 171 at 28.[1]  This is incorrect.  Defendants fail to acknowledge that they have the initial burden to demonstrate the absence of a genuine issue of material fact; and

---

[1] All references herein to page numbers of documents in the Court's electronic system identified by a "Doc" number are to the page numbers in that system, i.e., to the page numbers printed at the top of each page, such as "Page 28 of 39," and not to page numbers printed at the bottom of the page.

that only if they meet that burden, does the burden then shift to Plaintiff.  This is settled law in all federal courts, including this Court and the Sixth Circuit:

> The party seeking summary judgment shoulders the initial burden of presenting the court with law and argument in support of its motion as well as identifying the relevant portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. … If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial.

*Hickle v. Am. Multi-Cinema, Inc.*, 296 F. Supp. 3d 879, 884 (S.D. Ohio 2017) (Citations and internal quotes omitted) (emphasis added).  See also *Marie v. Am. Red Cross*, 771 F.3d 344, 351 (6th Cir. 2014).

The significance of Defendants' initial burden as movants is that, if they fail to meet that burden, their motion for summary judgment must be denied even if Plaintiff does not respond to the motion:

> Under Fed. R. Civ. P. 56c), a moving party always bears the burden of demonstrating the absence of a genuine issue as to a material fact. …. Even though the Supreme Court has redefined the moving party's initial burden, … the requirement that the movant bears the initial burden has remained unaltered. …. More importantly, for the purposes of the present case, the movant must always bear this initial burden, whether or not the adverse party responds according to the rules of civil procedure.

*Wilson v. Zanesville*, 954 F.2d 349, 350-51 (6th Cir. 1992) (Citations omitted) (emphasis added). See also *Felix v. Young*, 536 F.2d 1126, 1135 (6th Cir. 1976) ("where the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented.") (Emphasis in original) (internal quotes omitted).

Not only do the Defendants fail to meet their initial burden, they do not even attempt to. Nowhere in Defendants' motion is there any reference to any pleadings, depositions, answers to interrogatories, admissions or affidavits that demonstrate the absence of a genuine issue of material fact, or even a simple reference to just the absence of a genuine issue of material fact.  Defendants do not even bother to make a conclusory assertion that there is an absence of a genuine issue of material fact.  In fact, the word "absence" appears only once in their motion, in a reference to

"absence of malice." Doc 171 at 37. The word "genuine" appears only four times, in the section (*id*. at 28) where Defendants incorrectly contend Plaintiff has the burden of showing genuine issues of material fact.

Instead, Defendants' entire approach is to assume that the facts they recite are the only facts and that "Plaintiff bears the burden" of showing otherwise. *Id*. at 29. As the Sixth Circuit has stated, however, this approach "is misconceived because it reverses the proper burden of proof on a motion for summary judgment." *Felix*, 536 F.2d at 1134. Moreover, as shown in Plaintiff's Statement of Facts above and the arguments below, there is voluminous evidence from multiple eyewitnesses that flatly contradict the Defendants' "facts" and thereby present genuine issues of material fact on all the elements of Plaintiff's claims. Under controlling law, the Defendants' failure to meet their burden of establishing the absence of genuine issues of material is by itself grounds for denying their motion.

### B.     Standard for the Court's Ruling on the Motion for Summary Judgment

As shown above (III.A), the Court should deny the motion for summary judgment because Defendants fail to meet their initial burden. Without waiving her right to denial of the motion due to that failure, for completeness Plaintiff identifies and applies the standard that would apply if the burden had shifted to her to identify facts showing a genuine issue of material fact.

Defendants have sought "qualified immunity and summary judgment for [Plaintiff's] claims" against them for excessive force in the fatal shooting of Henry Green under the Fourth and Fourteenth Amendments. Doc 171 at 29. Because of the breadth of qualified immunity, a showing by Plaintiff that Defendants are not entitled to qualified immunity will also defeat summary judgment on the claims. Moreover, the summary judgment standard is the same for both.

That standard is, in ruling on the motion, the Court must assume the truth of all record-supported facts that favor Plaintiff and draw all reasonable inferences in favor of the Plaintiff. If such assumed facts and inferences are sufficient for a trier of fact to find for the Plaintiff, then a genuine issue of material fact exists, and Defendants' motion must be denied. See *Tolan v. Cotton*, 572 U.S. 650 (2014):

[I]n ruling on a motion for summary judgment, [t]he *evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor*. …

In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks whether the facts, *[t]aken in the light most favorable to the party asserting the injury*, . . . show the officer's conduct violated a [federal] right[.] …

The second prong of the qualified-immunity analysis asks whether the right in question was "clearly established" at the time of the violation. …

[U]nder either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment. … This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. …. Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. … In making that determination, a court *must view the evidence in the light most favorable to the opposing party*.

*Id*. at 651, 655-56 (citations and internal quotes omitted) (emphasis added). *Accord Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006) ("[W]e must assume the truth of the non-moving party's evidence and construe all inferences from that evidence in the light most favorable to the non-moving party…. A genuine issue of material fact exists when there is sufficient evidence for a trier of fact to find for the non-moving party.").[2]

In their motion, Defendants do not even acknowledge, much less comply with the legal standard. Instead, Defendants address only evidence favorable to Defendants and ignore the abundance of evidence that contradicts their evidence (see section II). The Defendants make the same error that the Fifth Circuit made in *Tolan*, i.e., they "failed to view the evidence at summary judgment in the light most favorable to [Plaintiff] with respect to the central facts of this case. By failing to credit evidence that contradicted some of [their] key factual conclusions, the

---

[2] *See also Maben v. Thelen*, 887 F.3d 252, 269 (6th Cir. 2018); *Wells v. City of Dayton*, 495 F. Supp. 2d 797, 803 (S.D. Ohio 2006).

[Defendants] improperly 'weigh[ed] the evidence' and resolved disputed issues in favor of the moving party." *Tolan*, 572 U.S. at 657.

As a consequence, in *Tolan*, the Supreme Court vacated the Fifth Circuit's judgment affirming the police officer's entitlement to qualified immunity in an excessive force case. *Id.* at 660. Here, the Court should just disregard the material facts in Defendants' Statement of Facts and their arguments based on those material facts, as they are off the mark and irrelevant to the proper resolution of the motion for summary judgment. In Sections II and III.D.1, Plaintiff sets forth the facts that comply with the standard and are the proper basis for a ruling on the motion for summary judgment

### C.     Facts that the Court May Not Consider

As shown below, there are two categories of facts that the Court may not consider in determining whether Defendants are entitled to qualified immunity.

#### 1.     *Facts not known by Defendants at the time they shot and killed Henry Green*

It is well-established that, in determining whether a police officer was objectively unreasonable in an excessive force case, "[a] court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) (emphasis added). Accord *Jefferson v. Lewis*, 594 F.3d 454, 461 (6th Cir. 2010) ("[W]e conduct the reasonableness inquiry objectively, based on the 'information possessed' by the officer, without regard to the officer's subjective beliefs and without regard to facts not known by the officer at the time of the incident.") (emphasis added); *Coley v. Lucas Cnty.*, 799 F.3d 530, 538 (6th Cir. 2015) ("what the officer knew at the time").[3]

A good example of how the courts apply this limitation is provided by the Sixth Circuit's decision in *Crawford v. Geiger*, 656 Fed. Appx. 190, 198 (6th Cir. Aug. 11, 2016), which

---

[3] Defendants cite *White v. Pauly*, 137 S. Ct. 548, 550 (2017) (per curiam), for the statement that the Court may consider only the facts that were "knowable" to the officers at the time of the incident. Doc 171 at 31. The *Pauly* Court cited *Kingsley, supra*, which stated the test as what the "officer *knew* at the time," not what was "*knowable*." The Court provided no explanation for why it used "knowable" instead of "knew," so presumably no change was intended. In any event, the Sixth Circuit uses the "knew at the time" test. *See Jefferson* and *Colely, supra*, and *Crawford, infra*.

referenced the "what the officer knew at the time" statement of the limitation. In *Crawford*, the police Sergeant Hart was appealing the district court's denial of qualified immunity in connection with the plaintiff Reed's claims for false arrest and excessive force. *Id.* at 193, 204-08. On the false arrest claim, Hart argued that he was entitled to qualified immunity on facts that seemingly supported his entitlement, except he had no knowledge of those facts at the time of the arrest. The court saw through the artifice and rejected it (and affirmed the denial of qualified immunity):

> In this appeal, Sergeant Hart wishes to hang his hat on knowledge that, at the time he arrested Reed, Reed was reaching for an object at his waist and standing near unsecured weapons. However, there is no evidence that Sergeant Hart--as opposed to one of his fellow officers--had this knowledge. Instead, Hart's own deposition testimony indicates that he arrested Reed for a completely separate and distinct reason: an alleged chest bump. Thus, although Reed's own testimony states that he was reaching for his phone when Hart arrested him, Hart cannot retroactively rely on this act to resolve the qualified immunity question because there is no evidence that Hart *knew* of this act when he arrested Reed. …Evidence relat[ed] to probable cause that [the officers] did not know of is immaterial.

*Id.* at 205-06 (citation and internal quotes omitted) (emphasis in original). The court applied the same reasoning to the excessive force claim: "[C]onstruing the facts in the light most favorable to Plaintiffs, there is no evidence that Hart had knowledge of facts that would give rise to a reasonable belief, on Hart's part, that Reed posed a threat to Hart's safety or anyone else's." *Id.* at 208.

In the present case, Defendants acknowledge that facts not known by them at the time may not be considered, (Doc 171 at 31); and yet they try to pull the same trick Sergeant Hart tried. The Defendants' memorandum is riddled with "facts" that the Defendants did not know and could not have known at the time. The subjects of these "facts"--some are gross exaggerations, others are flatly untrue and contradicted by other evidence, all are irrelevant--are essentially tabloid-quality gossip: assertions that, on the day in question, Henry Green had an argument with a woman in a house on 21st Avenue, was drunk and angry, did not say hello to a woman he knew whom he passed on the street, and purportedly had an "altercation" with, and gave a "menacing stare" to his acquaintance Jherri Alfred; rank speculation about crimes Green purportedly committed; even ranker speculation that Green would have confronted uniformed officers if they had responded in

a marked cruiser; and a diatribe from a disgruntled former girlfriend about what Green allegedly did three weeks before the incident. Doc 171 at 6-8, 10, 26-28.

There is no evidence that the Defendants had knowledge of any of this; and they have admitted they had no such knowledge about Henry Green. See Section II.A.1 above. Nor could they have known. According to Defendants, only two minutes elapsed from the time Green and Rutledge first encountered the white GMC at Ontario and 26th Avenue, until the Defendants killed Green at Ontario and Duxberry. *Id.* at 15. After the first encounter, Green and Rutledge walked north on Ontario, while the GMC took a completely separate route, i.e., it first headed west on 26th, then turned north on Gerbert to Duxberry, then turned east on Duxberry when Rosen and Bare saw Green and Rutledge appear on Ontario while approaching Duxberry. The Defendants were in the GMC for almost the entire two minutes and did not have the time or opportunity to acquire knowledge about any of these irrelevant matters. For that reason, the Court should not consider any of these matters in determining whether Defendants are entitled to qualified immunity.

2. *Facts concerning South Linden being "dangerous" or Henry Green's purported reputation or propensity for violence*

To establish a defendant police officer's justification for the use of deadly force and entitlement to qualified immunity in an excessive force case, courts have repeatedly required a particular danger and a particular use of force. *Tenn. v. Garner*, 471 U.S. 1, 8-9, 11-12 (1984): "In each of these cases, the question was whether the totality of the circumstances justified a particular sort of search or seizure." *Dickerson v. McClellan*, 101 F.3d 1151, 1162-63 (6th Cir. 1996) ("[T]he 'reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene.") (internal quotes and citations omitted).

The courts have also recognized the corollary to the requirement of particularized danger and use of force by rejecting sweeping generalizations about danger as a basis for justifying the use of deadly force. In *Bouggess v. Mattingly*, 482 F.3d 886, 89-97 (6th Cir. 2007), the Sixth Circuit affirmed the denial of qualified immunity to an officer who fatally shot a fleeing suspect, a crack dealer, on the grounds that there was a genuine issue of material fact on whether the suspect posed a threat of serious physical harm to the officer or others when he was shot; i.e., that "viewing the facts in the light most favorable to" the plaintiff, the suspect did not pose such a threat. The

police officer's attempt to bolster the threat issue through arguments about the dangerousness of crack dealers in general was flatly rejected by the court:

> On appeal, Mattingly [the police officer] contends in his reply brief that trained police officers know that drug dealers, especially crack cocaine dealers, usually carry guns. …. Mattingly seems to imply that a general notion that crack dealers are dangerous, rather than a particularized and supported sense of serious danger about a particular confrontation, justifies the use of deadly force. The Supreme Court and this court have never accepted such a sweeping generalization. *Garner*, 471 U.S. at 11-12; *Dickerson*, 101 F.3d at 1162. We will not do so today."

*Id*. at 891.

Defendants attempt to create a threat of danger as a justification for killing Green by characterizing the South Linden neighborhood where Defendants killed Green as dangerous, and a source of "criminal hotspots" and "gang, weapons, and narcotics activities." Doc 171 at 4-7. Under *Bouggess* et al., that attempt should be rejected. The only relevant threat and danger inquiry is whether Defendants had a "particularized and supported sense of danger" about their "particular confrontation" with Henry Green at Duxberry and Ontario. As shown herein (sections II.A and B. and III.), "viewing the facts in the light most favorable to" Plaintiff, the Defendants had absolutely no objectively reasonable sense or threat of danger from Henry Green. That fatal hole in Defendants' story cannot be filled by their "sweeping generalization" that South Linden--and those who hung out there, like Green--was dangerous and a threat in itself.

Similarly, Defendants cannot fill that hole through their attempt to paint Henry Green as having a purported reputation and purported propensity for violence. Even if that were true, which it is not, it is irrelevant under *Bouggess* et al.'s requirement of a particularized and supported sense of serious danger about a particular confrontation to justify the use of deadly force; and rejection of a "sweeping generalization" attempt to establish danger and threat, such as through Green's purported reputation and propensity.

Moreover, the Sixth Circuit has rejected a suspect's reputation for violence as a basis for finding a threat of danger to justify the use of deadly force. In *Estate of Kirby v. Duva*, 530 F.3d 475, 477, 484 (6th Cir. 2008), police officers had obtained a warrant to search the residence and

person of suspected drug dealer Kirby; and decided to execute that warrant on the road, rather than at Kirby's residence, because they had been told by informants that:

> Kirby was a violent, paranoid individual who was often high, kept numerous weapons around his home, and had outfitted his residence with surveillance equipment. According to one source, Kirby opened the door to his home only with a pointed gun, made visitors undress to prove that they were not wearing police wires, and stated constantly that the police were watching him.

*Id*. at 477.   The police located Kirby driving his vehicle on a road and ended up pulling him over in the shoulder of the road and sandwiching his vehicle between two police vehicles.  *Id*. The operation went south quickly, and the police shot multiple times and killed Kirby while he was in his vehicle. The police claimed that Kirby was driving his vehicle toward the police officers and they feared for their safety at the time they shot.  The plaintiff's evidence, however, showed that Kirby's vehicle "was not moving in an aggressive or reckless manner, but was actually being maneuvered so as to avoid hitting any persons or vehicles," and "had stopped moving before shooting broke out."  *Id*. at 479, 482.

In affirming the denial of qualified immunity for the officers, significantly the court emphasized that it was the particularized and factually supported evidence of no danger and no threat in the particular confrontation with Kirby that was controlling, not Kirby's reputation: "Thus, although Kirby may have had a reputation for paranoia and violence, as defendants note, he was not showing indifference towards the officers' safety at the time of the shooting."  *Id*. at 482.

Plaintiff urges the Court to follow *Garner*, *Dickerson*, *Bouggess* and *Estate of Kirby* in determining whether Defendants are entitled to qualified immunity.  The Court should consider only the facts and inferences favorable to Plaintiff regarding whether Defendants had a "particularized and supported sense of danger" about their "particular confrontation" with Henry Green at Duxberry and Ontario; and should not consider any facts concerning the dangerousness of the South Linden neighborhood or the purported reputation of Henry Green for violence as sources of danger or threats used to justify their use of deadly force.

**D.** **Defendants Are Not Entitled to Qualified Immunity on Plaintiff's Fourth Amendment Excessive Force Claim and Their Motion for Summary Judgment as to that Claim Should Be Denied**

1. *Material facts and reasonable inferences viewed most favorably to Plaintiff.*

The following is a listing of undisputed material facts, disputed material facts and reasonable inferences therefrom viewed most favorably to Plaintiff. That is, the facts favorable to Plaintiff and reasonable inferences therefrom are assumed to be true for the purpose of ruling on the Defendants' motion for summary judgment, and the facts listed below are those facts. They are taken from sections II.A and II.B, and reproduced here in this form as a convenience to the reader in following the legal analyses in this section. These facts are the proper factual basis for the Court's ruling on the motion for summary judgment.

1. At no time did Rosen or Bare identify themselves as police officers and at all times, Green and Rutledge did not know and had no reason to know that they were police officers. (Statement of Facts ("SOF") § II.A.2 and 3; § II.B. 1.)

2. At the intersection of 26th and Ontario, (a) the GMC was speeding and almost hit Green and Rutledge; (b) Green did not walk into the middle of 26th as if to force the GMC to stop and hit him, but stopped when he was just barely into 26th and just "a little bit" in front of the GMC; and Green did not point a gun at the GMC. (SOF § II.A.4; § II.B.2.)

3. While Green and Rutledge were walking toward the intersection of Ontario and Duxberry, the white GMC was sitting on Gerbert Street, completely stopped, and not in motion. Green and Rutledge looked west and saw the GMC on Gerbert and did not stop but continued walking. The GMC was not halfway down Duxberry when Green and Rutledge first walked into view of the GMC. (SOF § II.B.3.)

4. As soon as Green and Rutledge were in view of the GMC, the GMC turned right and came down Duxberry speeding toward Green and Rutledge. Green and Rutledge did not stop but continued walking toward and then began to cross Duxberry. At no time did Green stand in the middle of Duxberry with his hands in his waistband or make any threats or threatening gestures toward the GMC or the people in the GMC. (SOF § II.B.4.)

5. The GMC was moving at about 50 mph (the speed limit was 25) and tried to hit Green and Rutledge and almost hit them. Green and Rutledge were walking north and slightly west to cross Duxberry and did not stop until the GMC tried to hit them. They jumped back and the GMC stopped just in front of them just

before the intersection, facing east. Green threw his empty hands up, apparently cussed at the GMC for trying to hit Rutledge and him, then his arms and hands went back down to his side and he turned to his right and continued walking north away from the GMC and toward the sidewalk with his hands down. (SOF § II.B.5.)

6. During the period when the GMC was speeding toward Green and Rutledge and then stopped, the driver (Officer Rosen) had his left hand on the steering wheel and was holding a gun in his right hand, and the gun was pointing toward the windshield. During that same period, Green was not holding a gun and was not reaching for a gun. (SOF § II.A.5; § II.B.6.)

7. The driver of the GMC (Rosen) began shooting at Green at about the same time as the GMC stopped. No warning was given. Rosen was inside or just stepping out of the GMC when he fired two shots, one through the window on the driver's side door, which shattered the glass; and then he stepped around the door and window and fired another shot. At least one and maybe both of those shots hit Green while Green was walking north toward the sidewalk and away from the GMC and Rosen with his hands down at his sides. Green did not have his gun out and was not pointing his gun at Rosen when Rosen shot him. Green posed no threat to Rosen, Bare or any bystanders at the time the shooting began. (SOF § II.B.7.)

8. Rosen was the first to shoot during the incident. Green did not pull his gun out until after Rosen had fired the two shots at Green. (SOF § II.B.8.)

9. After Green was shot by Rosen, his right side dropped and then he came back up, pulled out his gun, and started to fall and, as he was falling, Green fired four shots in Rosen's direction. Rosen moved from behind the driver's door of the GMC and got closer to Green while firing shots at Green, and Bare came around the GMC and fired at Green. Then Green was staggering and falling and moving away from the officers and dropped his gun; and, after he dropped his gun, Rosen and Bare continued to shoot at him. Then Green, without the gun, fell down and was on one knee, "with his head down, lifeless, done," and the officers continued to shoot at him and hit him with at least one shot. Green then ended up lying flat on his back on the sidewalk. (SOF § II.A.6; § II.B.9.)

10. Rosen for sure, and likely Bare also, shot Green while he was lying collapsed on the sidewalk and appeared to be dead. (SOF § II.B.10.)

The facts listed above are the basis for determining whether the Defendant police officers are entitled to qualified immunity under the two part--or two "prong" --test discussed in the next sub-section.

2. _Two-prong test for whether Defendants are entitled to qualified immunity_.

Under the two-prong test for qualified immunity, the court determines "whether: (1) the facts viewed in the light most favorable to the plaintiff show that a constitutional right has been violated; and (2) the violation involved a clearly established constitutional right of which a reasonable person would have known." *Zulock v. Shures*, 441 Fed. Appx. 294, 301-02 (6th Cir. 2010). If both prongs of the test are met, the Defendants are not entitled to qualified immunity and the Court must deny their motion for summary judgment.

a. *First prong.*

Under the jurisprudence of the Sixth Circuit and the Supreme Court, primarily *Garner* and *Graham v. Connor,* 490 U.S. 386 (1989), the key elements of the first prong are the following:

- "[A]pprehension by use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment.… [W]hether the use of deadly force at a particular moment is reasonable depends primarily on *objective assessment* of the danger a suspect poses at that moment. The assessment must be made from the perspective of a reasonable officer in the defendant's position."

- "[O]bjective assessment requires asking whether the officer has ***probable cause*** to believe that the suspect poses a threat of serious physical harm, either to the officer or to others. …. Under that standard, *if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some **warning** has been given*. … Absent such probable cause, however, a police officer may not seize a fleeing felon by employing deadly force.

- In applying Garner's probable cause standard, the Sixth Circuit has focused on the following non-exhaustive list of factors: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. [often referred to as the "Graham factors," *Graham*, 490 U.S. at 396].

*Bouggess*, 482 F.3d at 889 (Citations and internal quotes omitted) (emphasis added). "In excessive force cases, the threat factor is a *minimum* requirement for the use of deadly force, meaning deadly force may be used only if the officer has probable cause to believe that the suspect poses a threat of severe physical harm. *Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015) (Emphasis in original) (internal quotes omitted).

b. *Second prong.*

For the second prong of qualified immunity, the Sixth Circuit has recently set forth a thorough discussion of the meaning of "clearly established" under jurisprudence of the Sixth Circuit and the Supreme Court, primarily *Hope v. Pelzer*, 536 U.S. 730 (2002), the key features of which are the following:

- "A right is 'clearly established' if [t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right. The relevant inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."

- "The purpose of the 'clearly established' prong, clarified by the Supreme Court's decision in *Hope v. Pelzer*, is to ensure that officials are <u>on notice</u> that their alleged conduct was unconstitutional."

- "[T]he salient question … is whether the state of the law *at the time of the action giving rise to the claim* gave respondents <u>*fair warning*</u> that their alleged treatment of [the plaintiff] was unconstitutional."

- "[T]he constitutional right at issue must be clearly established, not just abstractly, but in a *more particularized sense*."

- "[Q]ualified immunity is an objective rather than a subjective inquiry."

- "[F]or purposes of qualified immunity, the precise factual scenario need not have been found unconstitutional … for the right to be 'clearly established.'"

- "[G]overnment officials can still be on notice that their conduct violates established law even in *novel* factual circumstances."

- "This is <u>not</u> to say that an official action is protected by qualified immunity unless the *very action* in question has *previously been held unlawful* …; but it is to say that in the light of <u>*pre-existing law*</u> the unlawfulness must be apparent."

- "[W]e expressly rejected a requirement that previous cases be 'fundamentally similar.' Although *earlier cases* involving *'fundamentally similar'* facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with *'materially similar'* facts."

- "[A]n action's unlawfulness can be 'clearly established' from direct holdings, from specific examples describing certain conduct as prohibited, or from the general reasoning that a court employs."

*Baynes v. Cleland*, 799 F.3d 600, 610-12 (6th Cir. 2015) (Citations and some internal quotes omitted) (some brackets omitted) (emphasis added).

c. <em>Temporal segments approach to analyzing excessive force claims.</em>

In connection with the first prong, the Sixth Circuit "first adopted the practice of several of our sister circuits in analyzing excessive force claims in 'segments' in *Dickerson*." *Claybrook v. Birchwell*, 274 F.3d 1098, 1103 (6th Cir. 2001). For example, in *Dickerson*, the court "segmented the claims … to consider first, the reasonableness of the officers' actions in entering Dickerson's home without following the knock and announce rule and then, second, their use of deadly force against Dickerson. … We limited the second inquiry to 'the moments preceding the shooting' and did not allow consideration of the officers' entry into Dickerson's home to weigh in this determination." *Id.* (Citation omitted).

The Sixth Circuit, however, has pushed back on defendants' efforts to apply the segmenting approach too rigidly and has maintained flexibility on events leading up to the shooting that can be considered in determining whether excessive force was used. *See, e.g., Bletz v. Gribble*, 641 F.3d 743 (6th Cir. 2011), in which the court comprehensively reviewed its excessive force decisions reflecting rejection of the rigid approach and endorsement of the flexible approach as warranted by the circumstances:

> Whether <u>*events leading up to a shooting*</u> are legitimate factors to consider in assessing an excessive-force claim depends on the <u>*totality of the circumstances in question*</u>. …
>
> In [*Dickerson*], the decedent's estate brought two §1983 claims, alleging that the officers violated the knock-and-announce rule and that they used excessive force. *Because* the two §1983 claims in *Dickerson* alleged *different* constitutional violations, the court *analyzed them independently*. '[W]e analyze the §1983 claims separately in this case. Although both claims are premised on Fourth Amendment violations, the violation of the knock and announce rule is conceptually distinct from the excessive force claim.'
>
> <u>*The time-frame is a crucial aspect of excessive force cases.*</u> … Where the events preceding the shooting occurred in close temporal proximity to the shooting, those events have been considered in analyzing whether excessive force was used. *See Claybrook* … (acknowledging that excessive-force claims are viewed in temporal segments, but concluding that where 'the evening's events are not so easily divided[,]' *Dickerson* does not mandate that the court 'look only at what occurred

in the moments immediately' before the shooting); *Yates* [v. *Cleveland*], 941 F.2 [444] at 447 [6th Cir. 1991)] (holding that an officer's actions were unreasonable under the Fourth Amendment where he 'enter[ed] the dark hallway at 2:45 a.m. without identifying himself as a police officer, without shining a flashlight, and without wearing his hat' before shortly thereafter shooting the plaintiff).

*Id.* at 751-52 (Some citations and some internal quotes omitted) (emphasis added). The *Dickerson*, *Claybrook*, and *Yates* cases cited by *Bletz* are key authorities for denying Defendants qualified immunity here, and are discussed further below.[4]

> d. *Exclusion of certain post-June 6, 2016 cases.*

As reflected in the above, a key element of the "clearly established" requirement in the second prong is that the right at issue must have been clearly established by "pre-existing law," i.e., "at the time of the action giving rise to the claim." This means that cases decided *after* the time of the action have no bearing on, and cannot be considered in determining whether the "clearly established" prong has been met. *See McCloud v. Testa*, 97 F.3d 1536, 1554 n. 25 (6th Cir. 1996) ("[T]his case [a U.S. Supreme Court case] obviously cannot be used to fix what patronage law was clearly established in a narrow sense at the time Testa fired the plaintiffs, because the case was decided after that time."). *See also Hamilton v. Spriggle*, 965 F. Supp. 2d 550, 563 (M.D. Pa. 2013):

> "It is rather disingenuous of Defendants to argue that they are entitled to a qualified immunity defense based on Magistrate Judge Carlson's method of analysis when they themselves argue their defense based on a body of case law that was developed after the time of the events in question. Thus, the undersigned is only considering what was firmly established law during the time of the events in question, namely the 2005-2006 school year, and will disregard the body of case law that the parties cited to with regard to the §1983 claim that had been decided after the time of the events in question."

---

[4] *See also Jennings v. Fuller*, 659 Fed. Appx. 867, 871 (6th Cir. 2016) (rejecting police officers' contention that the court should find some of their actions to be not objectively unreasonable under the temporal segments approach: "[W]e cannot neatly separate the objectively reasonable wheat from the clearly unconstitutional chaff—the officers' actions and decisions fit together into a single, fluid incident that began and ended with what a reasonable jury could easily conclude were violations of Jennings's clearly established constitutional rights.").

In this case, the event in question, the killing of Henry Green, occurred on June 6, 2016. Therefore, the Court must disregard *all* cases decided after June 6, 2016 regarding the use of deadly force under various circumstances and whether such use was permitted or not, in its analysis of, and decision on the clearly established prong. In particular, the Court must disregard *all* of the following post-June 6, 2016 cases cited by Defendants for the permitted use of deadly force under various circumstances: *Thornton v. City of Columbus*, 727 Fed. Appx. 829 (6th Cir. March 14, 2018); *Thomas v. City of Columbus*, 854 F.3d 361 (6th Cir. 2017) (decided: April 19, 2017); *Presnall v. Huey*, 657 Fed. Appx. 508 (6th Cir. Filed September 22, 2016); *Rucinski v. Cnty. of Oakland*, 655 Fed. Appx. 338 (6th Cir. Filed July 6, 2016).[5]

3. *First prong satisfied: Defendants violated Green's Fourth Amendment right not to be seized by excessive, deadly force that was objectively unreasonable*.

Based on the facts viewed most favorably to Plaintiff, Defendant Rosen was the first one to shoot, and he shot Green while Green did not pose any threat to Rosen or anyone else, and certainly not "a threat of serious bodily harm" as required for using deadly force. "At no time … did Green make any threats or threatening gestures toward the GMC or the people in the GMC"; and Rosen shot Green "while Green was walking north toward the sidewalk and away from the GMC and Rosen with his hands down at his sides. Green did not have his gun out and was not pointing his gun at Rosen when Rosen shot him." See Facts # 4 and # 7 at section III.D.1.

The second Graham factor, the threat factor, plainly is not met here, which is significant because "the threat factor is a minimum requirement for the use of deadly force, meaning deadly

---

Doc 171 at 32-33. To be clear, *only* the post-June 6, 2016 cases cited by Defendants for the entitled or permitted use of deadly force under various circumstances must be disregarded under the "clearly established" jurisprudence, and *not* other post-June 6, 2016 cases. For example, *Pauly* is cited by Defendants, Doc 171 at 31, for the principle that the Court may consider only facts that were "knowable" to the defendant officers at the time of the incident, which does not run afoul of the "clearly established" jurisprudence. *Pauly* need not be disregarded, in part because the principle pre-dates June 6, 2016, *assuming* that the curious "knowable … at the time," formulation has the same meaning as "knew at the time," the formulation stated by the court in *Kingsley, supra*, which the *Pauly* court cited for the principle at 137 S. Ct. at 550. See discussion at footnote 3 above.

force may be used only if the officer has probable cause to believe that the suspect poses a threat of severe physical harm." *See Bouggess* and *Mullins*, *supra*, at subpart III.D.2.a above.

Moreover, the third factor is not met, because Green obviously did not try to resist or flee from arrest, because (i) Rosen and Bare did not try to arrest Green, they just shot him; and (ii) Green did not know the occupants of the GMC were police officers, so he could not have known he was being arrested even if they had tried to arrest him.[6] As for the first factor, the severity of the crime at issue, based on what the Defendants "knew at the time," it is doubtful they could have lawfully arrested Green for any crime, or even established sufficient suspicion to make a legitimate Terry stop regarding the gun Green had in his waistband, given the Defendants' failure to identify themselves as police officers (see the discussion at footnote 7 below).

Plainly, the first prong of the qualified immunity test is satisfied.

4. <u>*Second prong satisfied: Green's right not to be seized by excessive, deadly force that was objectively unreasonable under the circumstances was clearly established at the time Green was killed*</u>.

The Supreme Court and Sixth Circuit have emphasized that, under the second prong, in order to satisfy the "on notice" and "fair warning" requirements, the right at issue must be "clearly established" in a "more particularized sense," and that typically the general standards set out in *Garner* and *Graham* are "not enough." Nevertheless, those courts also recognize that, "in an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law." *Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004) (emphasis added); *Green v. Taylor*, 239 Fed. Appx. 952, 960-61 (6th Cir. August 30, 2007). The present situation is just such an "obvious case."

This is because (i) the facts and inferences viewed most favorably to Plaintiff show that Green did not pose an immediate threat to Rosen, Bare or others at the time Rosen first shot him,

---

[6] *See Dugan v. Starrett*, 2014 U.S. Dist. LEXIS 23600, *20-21 (S.D. Ohio Feb. 25, 2014) ("Dugan was not knowingly resisting arrest. Rather, Dugan did not know he was being arrested. Defendants were wearing civilian clothes and driving unmarked vehicles. … Dugan did not hear Starrett identify himself as law enforcement. … Necessarily viewing those facts in the light most favorable to Plaintiffs, the Court cannot conclude that that the Neon posed an imminent threat to Starrett that would justify his use of deadly force.").

as shown in Section III.D.3; and (ii) Rosen and Bare continued shooting Green after they had already shot him enough times to render him without a weapon and then after he was rendered incapacitated and neutralized, i.e., again, not posing a threat. *See* Facts # 9 and #10 at Section III.D.1. The right in this situation--not to be shot if "the suspect [does not] pose[] an immediate threat to the safety of the officers or others," *Graham,* 490 U.S. at 396--obviously is "clearly established" by *Garner* and *Graham* alone. Similarly, in *Taylor*, the Sixth Circuit used the "obvious case" approach in affirming the district court's denial of qualified immunity. 239 Fed. Appx at 961-62.

Nevertheless, in addition to using the "obvious case" approach, Plaintiff also shows that the second prong "clearly established" requirement is satisfied using the "more particularized" approach. Legal research identified federal qualified immunity/excessive force case decisions on defendant motions for summary judgment before June 6, 2016 that involved one or more of the facts and inferences viewed in the light most favorable to Plaintiff, or similar facts. In each case, the decisions was denial of qualified immunity, usually due to genuine issues of material fact as to whether the police officer's actions were objectively reasonable or not. In each such case, the court assumed the plaintiff's facts to be true and concluded that such facts, if believed by a jury, would establish a violation by the defendant of a Fourth Amendment right not to be seized by excessive force under the particular circumstances established by such plaintiff's facts. Accordingly, these cases individually and collectively have clearly established a Fourth Amendment right not to be seized by excessive, deadly force under the particular circumstances manifested by Plaintiff's particular facts or similar facts; and thereby the second prong of the qualified immunity test is satisfied.

The following is a summary of the results of that research.

a. *Defendants did not identify themselves as police officers*.

The failure of police officers in plainclothes and unmarked cars to identify themselves as police is a major factor in denial of qualified immunity in the Sixth Circuit. In *Yates v. Cleveland*, *supra*, during the course of a party with family and friends in an upstairs apartment of a house, the four Yates brothers had several altercations with three non-family troublemakers, who had

bloodied and shot one of the brothers.  The police arrived on the scene after receiving a call.  One of the officers, Currie, at 2:45 a.m. entered the dark hallway of the house, in which he could hear shouting and threatening language, without identifying himself as a police officer, without shining a flashlight, and without wearing his hat.   The four brothers, already in a "confused state" from the disturbance at the party and their brother's injury, "perceived an intruder in the hallway and rushed down the steps."  941 F.2d at 445.

Officer Currie contended that the brothers knocked him back through the door and compelled him to draw his gun and fire because he felt vulnerable to attack.  He seriously injured one of the brothers, Jerome Yates, who offered a differing version, claiming that the brothers froze on the steps after one of the brothers yelled "It's a cop!" or "It's a policeman!", and that officer Currie tripped on a warped floorboard while moving back and purposefully shot Jerome while his hands were raised and after he said "Don't shoot."  The court affirmed the district court's denial of Currie's motion for summary judgment on the §1983 claim for qualified immunity.  *Id*. at 445-46.

Officer Currie "concede[d] that he failed to identify himself in the dark hallway, and that he did not utilize a flashlight or wear his police hat, but he characterize[d] these omissions as 'mere negligence'" and not covered by §1983.  *Id*. at 447.   The court agreed that mere negligence was not covered, but held that Currie's actions on the night of the shooting *were* covered:

> "An officer who intentionally enters a dark hallway in the entrance of a private residence in the middle of the night, and fails to give any indication of his identity, is more than merely negligent."  *Id.*

Moreover, significantly the court held that:

> "It was not 'objectively reasonable' for Currie to enter the dark hallway at 2:45 a.m. without identifying himself as a police officer, without shining a flashlight, and without wearing his hat. Thus, because the right Officer Currie is alleged to have violated was clearly established [the right not to be shot unless he was perceived to pose a threat], and because Officer Currie's actions *preceding the shooting* were <u>not</u> those of an *objectively reasonable police officer*, we conclude that qualified immunity is not appropriate." *Id.* (emphasis added).

This statement on its face appears to be the grounds for the court's affirmance of the district court's denial of qualified immunity. In other parts of the opinion, however, the court implied that factual disputes concerning the circumstances of the shooting was the grounds. *Id*.

In any event, the court's conclusion that Currie's failure to identify himself as a police officer before the shooting was not objectively reasonable is significant, particularly in light of the 2011 *Bletz* decision (see Section III.D.2.c). In *Bletz*, the Sixth Circuit expressly acknowledged the *Yates* holding and thereby confirmed (i) that a police officer's failure to identify as a police officer before shooting a suspect *may be considered* in analyzing whether excessive force was used, i.e., that such failure can be *relevant* to whether the force used was excessive; and (ii) that considering such failure to identify in the excessive force analysis is consistent with analyzing excessive force claims in temporal segments.

The *Yates* holding is significant to the present case because of the relevance of failure to identify to whether deadly force was excessive. In *Yates*, the relevance of Currie's failure to identify himself is that the Yates brothers reasonably believed him to be an intruder, particularly given the previous altercations with the three troublemakers. More precisely, the relevance of the failure to identify is to the knowledge of the "objectively reasonable police officer." Like the brothers, the theoretical officer would know that the brothers would reasonably believe him to be an intruder, and also would know that they could reasonably pose a threat to use a level of force against him that is appropriate for him being an intruder. Such a threat might be sufficient to justify the theoretical officer using deadly force *if* he had identified himself as a cop; but it is not enough given his failure to so identify. The relevance of an officer's failure to identify is that it increases the level of threat required to justify that officer's use of deadly force.[7]

Applying these legal principles here, Defendants failed to identify themselves as police officers even though two times within two minutes Rosen almost hit Green and Rutledge with the GMC while they were just walking. *See* Facts ## 1, 2, and 5 at Section III.D.1. An objectively

---

[7] Such an analysis was applied in *Scott v. City of Cleveland*, 555 F. Supp. 2d 890, 892-23 (N.D. Ohio 2008). The suspect in a Terry stop stated that the police officer in plainclothes did not identify himself, so the suspect ran away, and the officer caught and beat him. The court held those facts did not support a reasonable suspicion for the stop: "The Court considers that an individual fleeing in response to an unidentified man holding a weapon *lessens the suspiciousness* of the Plaintiff's flight." *Id*. at 898 (emphasis added).

reasonable police officer in Rosen's and Bare's situation would know that Green reasonably had the right to be angry and believe that some gang member or other bad actor was in the GMC. The reasonable officer also would know that the level of a threat from Green that would justify deadly force in response under these circumstances must be significant. Under the circumstances, that Green did not make any threat at all to Rosen and Bare shows remarkable restraint. And the only response he made to the second attempt to hit him with the GMC--throwing his arms up and cussing at the GMC--is negligible compared to the significant threat that objectively reasonable police officers would know was required to justify responding with deadly force.

Other failure-to-identify cases similarly support a finding of excessive force used by Rosen and Bare. In *Claybrook*, Quintana Claybrook worked at a market and was responsible for depositing the daily cash proceeds from an illegal gambling operation for which the market was a front. Thieves occasionally targeted the market, so her father-in-law, Royal Claybrook, habitually escorted Quintana, while armed, from the store to her automobile. On the night in question, Royal was standing next to Quintana's car holding a shotgun while Quintana sat behind the steering wheel. At the same time, three plainclothes police officers in an unmarked car saw Royal and, because they were aware the market had been the target of recent crimes, they suspected a robbery was in progress. *Id*. at 1100-01.

The unmarked car maneuvered toward Royal and Quintana's car, and one of the passenger undercover officers ordered Royal to drop his weapon, to which Royal responded that the passenger should drop his gun. Thereafter, an exchange of gunfire erupted, which resulted in Quintana being shot (but not killed) and Royal, after he ran behind the market and circumambulated to a concrete steps structure behind the unmarked car, got into a second gunfight with the plainclothes officers and was killed. *Id*. at 1101-02.

Quintana testified that the officers never identified themselves as police officers and had fired the first shot. The officers testified that Royal fired the first two shots during the initial firefight; and, while apparently conceding that they had not identified themselves in the first firefight, they testified that, during the second firefight, they had identified themselves as police officers. *Id*. at 1101.

The court applied the temporal segments approach and ruled that, although the officers' decision to initially approach and confront Royal in the manner they did (including failure to identify themselves as police officers) violated police procedures, "any unreasonableness in their actions at that point may not weigh in consideration of the use of excessive force." *Id.* at 1105 (emphasis added).

Defendants also contended that the court should consider only the second firefight and exclude from its consideration the reasonableness of the force used in the first firefight. The court rejected this contention using language that is illuminating for the Green matter:

> "[T]he defendants cannot ignore the fact that shots were fired at Claybrook twice on the night in question. In the first instance, Claybrook was fired upon by *unidentified, non-uniformed officers whom Quintana Claybrook, and likely Royal Claybrook also, thought to be robbing the market*. Regardless of whether the shots fired at Royal Claybrook were warranted after he had fled to a position behind the concrete steps and aimed his gun at the officers, this initial fire fight also constitutes deadly force used against Claybrook by the officers. Therefore, we must analyze its reasonableness to determine whether this use of force was excessive *under the circumstances*."

*Id.* at 1105 (emphasis added). Plainly, the court included in the "circumstances" under which the reasonableness of the force used by the officers is analyzed the facts that the officers were "unidentified" and "non-uniformed" and that Quintana and likely Royal believed the officers were robbing the market. Superficially, this might appear to be inconsistent with the court's segment-based ruling that the officers' violation of police procedures by the manner in which they initially approached and confronted Royal--including failure to identify themselves as police officers— should not be considered in the excessive force analysis. On a closer look, however, there is no inconsistency.

First, the court did not include the violation of police procedures itself in the relevant "circumstances." *Id.* Second, the court made it clear that the exclusion was for the officers' "decision" to approach Royal in a manner that violated procedures and their actions "at that point," whereas the failure to identify themselves as police officers continued beyond "that point" to the moment immediately before the shooting started in the second segment and continuing thereafter until the third segment at the earliest. *Id.* The failure to identify themselves as police officers

continued for the entire period of the second segment. Third, in other cases the Sixth Circuit has expressly recognized the distinction between a violation of police procedures being relevant to reasonableness in excessive force cases, which it is, and being necessarily dispositive, which it is not. *See Mullins*, *supra*, 805 F.3d at 768: "Whether or not an officer is following police procedures is certainly relevant to the question of reasonableness in excessive force cases, but it is not necessarily conclusive proof that the Constitution has been violated. Rather, the key inquiry is whether a reasonable officer in the same circumstances would have used the same amount of force."[8]

Finally, the court ruled that the "determination of who fired the first shot" was critical to the analysis of the reasonableness of the use of deadly force in the initial firefight; and because "this fact remains in dispute," the court affirmed the district court's denial of qualified immunity to the defendants. *Id*. at 1105.

*Claybrook* is applicable to the Green case in two respects. First, as with *Yates*, it establishes that Rosen's and Bare's failure to identify themselves as police officers is relevant to whether their use of deadly force was reasonable. As shown above, that Green did not know that the occupants of the GMC were police officers increases the likelihood and magnitude of the threat that would be required from Green to justify deadly force to a level that far exceeds Green's only response to the GMC before Rosen shot him--throwing his arms in the air and cussing out the GMC--which was not even a threat. Second, whether Rosen fired the first shot (and the second) is at best a disputed fact for Defendants, and is therefore, under *Claybrook*, grounds for this Court to deny qualified immunity for the Defendants, and also deny their motion.[9]

---

[8] *Accord Latits v. Phillips*, 878 F.3d 541, 552 (6th Cir. 2017) ("[A]lthough police procedures do not set the bounds of the Fourth Amendment, we consider it relevant that Officer Phillips repeatedly violated police procedures in both ramming Latits and running up to his car.") (citing *Mullins*).

[9] *See also McDonald v. Flake*, 814 F.3d 804, 810 (6th Cir. Feb. 29, 2016) (Sixth Circuit affirmed the district court's denial of the officer's motion "for summary judgment on grounds of qualified immunity, … upon finding genuine disputes of material fact, such as … whether Officer Flake … failed to identify himself as a police officer."); *Davis v. Bergeon*, 1999 U.S. App. LEXIS 17984, *16 (6th Cir. July 27, 1999) ("Detective Jones, dressed in plainclothes, allegedly did not identify herself, pointed her weapon at Davis and ordered him to get on the floor. We cannot say as a matter of law that Detective Jones's actions under these circumstances did not constitute excessive force.

b. *Rosen began shooting at Green at about the same time as the GMC stopped, without provocation and without warning*

At the time Rosen began shooting almost immediately after the GMC screeched to a halt facing east on Duxbery just in front of Green, Green had done nothing more than walk north on Ontario, avoid being hit by the GMC at 26th Avenue, continue walking north on Ontario, commence crossing Duxberry, throw his <mark>empty</mark> hands in the air and back down again and cussed at the GMC after it almost hit him at the intersection of Duxberry and Ontario, and continue walking across Duxberry toward the sidewalk. *See* Facts # 2 through # 7 at Section III.D.1. As discussed above, particularly under the circumstances--the occupants of the GMC had not identified themselves as police officers and the GMC almost hit Green and Rutledge on two occasions within two minutes--Green's throwing his empty hands up and cussing was objectively reasonable, not a threat or other provocation at all, and in any event not even close to the kind of threat or other provocation required to justify deadly force. The Sixth Circuit has established that under similar circumstances, the use of deadly force was objectively unreasonable. *Griffith v. Coburn*, 473 F.3d 650, 657 (6th Cir. 2007) ("If Ethel Partee's account of the encounter is credited, i.e., that Officer Sutherland almost immediately and without provocation jumped on Arthur Partee and began choking him, then the force used against Partee is objectively unreasonable.").

Moreover, Rosen gave no warning before he shot Green; and such a warning would have been imminently feasible. *See* Fact # 7 at Section III.D.1; *Garner*, *supra*, 471 U.S. at 11-12 (see Section III.D.2.a). At the time the GMC first spotted Green and Rutledge, the GMC was a block away on Gerbert Street, and Green and Rutledge were simply walking north on Ontario and then crossing Duxberry. Green was not holding a gun or any other weapon and was not threatening anyone, and no one was in any danger. The situation was not even urgent. Rosen had plenty of time to drive safely, i.e., not speed, toward Green and Rutledge, stop before almost hitting them, and use the GMC as a shield behind which Rosen could have warned Green that he might shoot him if Green didn't stop, put his hands up etc. Under similar circumstances, the Sixth Circuit has

---

Again, this presents a factual question for a jury to determine."); *Dugan v. Starrett*, *supra*, see footnote 6 above.

established that the failure to provide a warning was grounds for denying qualified immunity. *See Bouggess, supra*, in which the police officer, Mattingly, shot the suspect, Newby, in the back as Newby was running away:

> "Mattingly never warned Newby that he might shoot, as required by *Garner* when feasible under the circumstances. Nothing indicates that a warning was infeasible. *Craighead* [v. *Lee*,] 399 F.3d [954], at 962 [(8th Cir. 2005)] (denying qualified immunity, in part, because '[t]he facts we are required to assume show that a warning was feasible but not given'). Moreover, nothing in the facts as they must be viewed at this stage indicates that Newby ever threatened Mattingly or anybody else in the area with serious harm."

482 F.3d 886, 888-89, 892.

In summary, the facts viewed favorably to Plaintiff that are assumed to be true, i.e., that Rosen shot Green immediately and without any threat or provocation by Green and without warning, are grounds for this Court to deny qualified immunity for the Defendants and also deny their motion for summary judgment.

> c.  *(i) Rosen was the first to shoot during the incident and he shot Green, and, at the time Rosen shot Green: (ii) Green was walking away from the GMC (iii) with his hands down at his sides, (iv) he was not reaching for a gun and had not pulled a gun and (v) he had not pointed a gun at Rosen.*

The Sixth Circuit has established that each of these five facts/circumstances[10] is grounds for denying qualified immunity in an excessive force case, typically by presenting a genuine issue of material fact as to whether excessive force was used.

(i).  The <u>first-to-shoot circumstance</u> for denying qualified immunity was clearly established at the time Rosen shot Green by *Claybrook, supra*, which held that a genuine dispute of the material fact of whether the police officer or the plaintiff's decedent fired first precluded summary judgment.

(ii)  The <u>walking away circumstance</u> for denying qualified immunity is established in *Zulock, supra*, in which the Sixth Circuit affirmed the district court's denial of the defendant's motion for summary judgment based on qualified immunity in light of the following:

---

[10] Facts # 6, # 7 and # 8, Section III.D.1.

> "[Officer} Shures, who had been trained that an officer needed a minimum of 21 feet between himself and a knife-wielding suspect for safety and who was standing approximately 18 or 20 feet away, shot while Zulock: (1) was standing in his own kitchen, holding a cooking knife; (2) had taken no threatening actions other than saying "fuck you" four or five times; (3) had put down the knife in response to commands, but then had turned toward Shures, picked up the knife, turned toward the back of the house, made a "smart remark," and taken one-half step or one step away from Shures. Even given the speed of this encounter, no reasonable officer could think that a man who had done nothing more than swear four or five times and was walking away represented an immediate threat of serious physical harm."

*Id.* at 302 (emphasis in original). These facts are very similar to those in the present case, as Green also had cussed--at the occupants of the GMC--and then turned and walked away, except Green was not holding a knife or anything else in his hands, so this authority applies *a fortiori* to Green. Plainly, Green's Fourth Amendment right not to be shot by an officer while he was walking away from that officer was clearly established by *Zulock* at the time Rosen shot Green. *See also Bouggess*, *supra*, a running rather than walking away case, in which the court established the same conclusion as in *Zulock*:

> "The question in this case, therefore, is whether Mattingly reasonably could have thought that he had probable cause to believe that Newby posed a serious danger to Mattingly or to others. Under the facts viewed in the light most favorable to Bouggess, Newby was (a) present at a crack deal; (b) uttered no threatening remarks toward Mattingly or anybody else; (c) never drew a weapon; (d) struggled with Mattingly in order to flee; (e) did not reach for Mattingly's gun; (f) did not fire Mattingly's gun at Mattingly's foot; (g) broke free from Mattingly and ran away, facing away from Mattingly; and (h) was shot three times in the back.
>
> Viewing the facts that way, no reasonable officer could have thought he had probable cause to use deadly force against Newby."

482 F.3d at 894.

(iii)   The leading hands-down-at-his-side case in the Sixth Circuit is *Dickerson*, in which the police were called to Dickerson's house after receiving reports from a neighbor that he was drunk and at least nine shots had been fired.  Two officers showed up, went to the front door of the house, looked inside and didn't see anyone, but could hear a man yelling in a threatening tone.

They entered the house with their guns drawn and could smell freshly burnt gunpowder; and heard a man yell "I've got something for your ass" and heard the cylinder close on a revolver. One of the officers then ran back outside the house and took cover, while the other officer took cover inside the house so he was behind Dickerson as he passed by. Both officers heard Dickerson yell, "I'll get you motherfucker" as he ran toward the front door. 101 F.3d at 1154.

The officer who was outside the house shot and killed Dickerson, but the details of the shooting were disputed. The shooter claimed Dickerson followed him outside the house and pointed a handgun at him. A neighbor said that Dickerson was walking slowly to the front door and "he had his arms down by his sides" and before he opened the front door and while he was still in his house a gunshot was fired. The other officer, who was inside the house, gave inconsistent statements, first that Dickerson had pointed a handgun at the officer outside the house, and then that he was unsure what Dickerson was doing with his gun as he exited the house and that he could not see the officer outside the house. *Id.* at 1155, 1163.

The court affirmed denial of qualified immunity in light of the existence of material issues of fact:

> When the facts are viewed in the light most favorable to the plaintiffs, there was evidence that Dickerson had simply walked slowly to the front door, with his hands at his side, and that he was shot while still inside his house before he opened his door. … On this view of the facts, the officers are not entitled to qualified immunity as a matter of law.

*Id*. at 1163. The case is significant for confirming that the key inquiry is whether an objectively reasonable officer in the same circumstances would have used the same amount of force, i.e., whether that reasonable officer would conclude that there was or was not a threat that justified the use of deadly force; and for establishing that a suspect "with his hands down by his sides" generally does not present such a threat. Accordingly, Green's Fourth Amendment right against being subject to deadly force while he had his "hands down by his sides" was clearly established by Dickerson at the time Rosen shot him.

(iv) That Green had a gun in his possession (in his waistband), but had not pulled it at the time Rosen shot Green (twice), was clearly established as a circumstance for denying qualified immunity by the *Bouggess v. Mattingly* case. There, a crack dealer, Newby, was carrying a firearm

in his waistband, but never pulled it. Instead, he ran away from the unidentified plainclothes police officer, Mattingly, who shot him in the back and killed him. 482 F.3d at 888-89. The court found that Newby's possession of the gun alone was not enough to show a sufficient threat from Newby to justify Mattingly's use of deadly force and entitle him to qualified immunity:

> The cases [Mattingly] cites all stand for the proposition that, when a police officer both knows a defendant has a weapon *and* has a reasonable belief that the weapon will be used against him or others, the officer is justified in using deadly force. …. However, even when a suspect has a weapon, but the officer has no reasonable belief that the suspect poses a danger of serious physical harm to him or others, deadly force is *not* justified. *Dickerson*, 101 F.3d at 1160-62; *Brandenburg* [v. *Cureton*], 882 F.2d [211] at 213-14 [(6th Cir. 1989)]; *Craighead*, 399 F.3d at 962. *See also Sova v. City of Mt. Pleasant*, 142 F. 3d 898, 901, 903-05 (6th Cir. 1998) (denying qualified immunity to officers who shot deranged suspect armed with butcher knives, because there were disputed facts as to whether suspect posed a threat to the officers rather than merely to himself). In other words, <u>*mere possession of a weapon is not enough*</u> to satisfy Mattingly's burden at this stage."

*Id.* at 896 (Emphasis original in part and added in part). *See also Correa v. Simone*, 528 Fed. Appx. 531, 535-36 (6th Cir. 2013) ("The precedent in this Circuit clearly holds that a police officer must encounter some level of resistance by the defendant to justify using a taser. The mere possession of a gun is not, in and of itself, resistance unless coupled with something more, such as a physical or verbal action.") Accordingly, Green's Fourth Amendment right not to be shot while he merely had possession of a gun, but had not pulled a gun was clearly established by *Bouggess* at the time Rosen shot Green.

(v) That Green had <u>not pointed his gun at Rosen</u> at the time Rosen shot Green (two times) was clearly established as a circumstance for denying qualified immunity at the time Rosen shot Green. In *King v. Taylor*, 694 F.3d 650 (6th Cir. 2012), State Trooper Taylor, along with officers from the sheriff's office, went to the residence of King to arrest him pursuant to an arrest warrant and emergency protective order. Their knocks on the front door of King's house were not answered, so they went to the back and, looking through two glass doors, saw King lying on a couch. Taylor and the others roused King and what happened next is disputed. Taylor and the other officers testified that King stood up and pointed a gun at them while facing them. The forensic evidence, expert testimony, and the position of King's dead body, however, showed that

King was in a reclining position (such as, lying on a couch) when he was shot and that he had not been pointing a gun at the time he was shot. *Id.* at 653-55, 662-63.

The court reversed the district court's summary judgment based on qualified immunity because of the factual disputes:

> "Viewing the record in the light most favorable to plaintiffs, we conclude that a factual dispute exists whether Taylor reasonably believed that King posed a threat of serious physical harm to Taylor or the other officers. In our view, a jury could find, based upon the forensic evidence, expert testimony, and common sense, that King did not threaten the officers by pointing a gun at them just before he was shot.
> …
> With respect to the second question in the qualified-immunity analysis, we have little trouble concluding that if Taylor shot King while he was lying on his couch and not pointing a gun at the officers, Taylor violated King's clearly-established right to be free from deadly force. It has been clearly established in this circuit for some time that individuals have a right not to be shot unless they are perceived as posing a threat to officers or others."

*Id.* at 662, 664. *See also Craighead*,[11] in which the police officer, Lee, fired a shotgun at two men wrestling, one of whom was the suspect in two recent shooting murders and the other, Craighead, was an innocent victim who had taken the suspect's gun and was holding it over the suspect's head pointing upward while trying to subdue the suspect. Lee knew that the two were the suspect and the victim, but he claimed he did not know which one was the suspect and which was the victim, notwithstanding evidence that he did know or should have known. 399 F.3d at 958-60. The court affirmed the district court's denial of Lee's motion for summary judgment based on qualified immunity in light of disputed material facts:

> "[W]e have no hesitancy in saying that the facts alleged, taken in the light most favorable to Craighead's heirs and next of kin, show that Lee's use of deadly force was objectively unreasonable. The evidence most favorable to Craighead's heirs and next of kin shows that Lee in a continuous sequence exited the squad car, aimed his shotgun at the two men wrestling, and fired without warning, within approximately three seconds, while Craighead was holding the gun overhead, pointed upward. … Craighead never pointed the gun toward Lee."

---

[11] *Craighead v. Lee*, 399 F.3d 954 (8th Cir. 2005), an Eighth Circuit decision relied on by the Sixth Circuit in *Bouggess, supra*. See the discussions in sub-section III.D.4.b and this sub-section III.D.4.c above.

Id. at 959, 961, 963-64. (emphasis added). Viewing the facts in the light most favorable to Plaintiff, at the time Rosen shot Green, Green had not pointed a gun at the Defendants (or anyone else). Green's right not to be shot by an officer, Rosen, while Green had not pulled and had not pointed a gun at Rosen, Bare or others was clearly established by *King* and *Craighead* at the time Rosen shot Green, and those cases would give a reasonable police officer fair warning that the use of deadly force under such circumstances would violate Green's right.

> d. *The Defendants shot Green after he had dropped his gun, had fallen to the ground, and was incapacitated or neutralized.*

The facts viewed most favorably to Plaintiff and applicable case law discussed above show that the first shots fired during the incident, i.e., Rosen's initial two shots at Green, at least one of which hit him, were objectively unreasonable and an excessive use of force in violation of Green's Fourth Amendment right not to be seized by excessive force. Subsequently, however, the Defendants committed additional violations of that right through additional uses of excessive force.

The facts viewed most favorably to Plaintiff show that, after Green had been shot, he was staggering and falling and moving away from the Defendants and then dropped his gun, after which dropping the Defendants continued to shoot him. Then, without his gun, Green fell down and was on one knee, "with his head down, lifeless, done" and the officers continued to shoot at and hit him. One of the officers, apparently Rosen, shot and hit Green while he was lying collapsed on the sidewalk and appeared to be dead. *See* Facts # 9 and # 10, Section III.D.1.

At all three of these times when the Defendants continued to shoot at Green, including the first time when he had dropped his gun and was moving away, Green posed no threat. For the second and third times, when Green was not moving and appeared to be "lifeless, done" and dead, the circumstance went beyond no threat, as Green was plainly incapacitated and neutralized. No objectively reasonable police officer could have thought there was any legitimate governmental interest in using deadly force under these circumstances, and neither does the Sixth Circuit. See *Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006):

"[A] jury could find that Officer Taylor acted unreasonably in striking Baker's knee *after Baker had fallen to the ground*. We have held repeatedly that the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law. *See, e.g., Shreve v. Jessamine County Fiscal Court*, 453 F.3d 681, 687 (6th Cir. 2006); *Champion* [v. *Outlook Nashville, Inc*.], 380 F.3d [893] at 902 [(6th Cir. 2004)] (citing cases); *see also Phelps v. McCoy* [sic], 286 F.3d 295, 301 (6th Cir. 2002) ('[T]here was simply no governmental interest in continuing to beat [plaintiff] after he had been neutralized, nor could a reasonable officer have thought there was.')."

*Id*. at 607 (emphasis added). *See also Russo v. Cincinnati*, 953 F.2d 1036 (6th Cir. 1992), in which three police officers used tasers and repeatedly used revolvers in three separate series against one person, Bubenhofer, who was armed only with knives. After the first series of taser darts and gunshots from the officers, Bubenhofer "fell down six or seven steps … [and ended up] lying at the bottom of the stairwell holding one knife, and the officers stood on the landing above him." *Id*. at 1040.

Then, according to the defendants, Bubenhofer stood up and charged up the steps after them, so they fired more taser darts and fired their revolvers several times, and Bubenhofer fell back down the stairs but was still conscious and still held the knife. *Id*. at 1041. The defendants further contended that soon thereafter Bubenhofer again stood up and again began to come up the stairs after them, at which point all three officers fired at Bubenhofer. *Id*. A neighbor and eyewitness, however, testified that Bubenhofer never stood up and never charged toward the officers. After the third round of shots, Bubenhofer lay still and then died. *Id*. The court held that:

"Bubenhofer was shot a total of twenty-two times by officers Lemker, Scholl, and Sizemore, even though he was armed only with knives. In addition, plaintiffs raise a genuine issue of fact as to whether, in the second and third round of discharges of the officers' revolvers, the officers may have shot Bubenhofer even though he posed no serious threat of physical harm. Finally, the record suggests that some ten to twelve minutes elapsed between the second and third series of shots, during which time Bubenhofer apparently dropped his knife. Given the current state of the record, we believe that a reasonable jury might conclude that the officers' repeated use of their revolvers violated this court's clearly established precedent on the use of deadly force. Therefore we find that summary judgment at this juncture was unwarranted.

> Accordingly, we reverse the district court's grant of summary judgment [and entitlement to qualified immunity] as to all three officers with respect to the shooting of Bubenhofer."

*Id*. at 1045.

Green's right not to be seized by excessive force under the circumstances *inter alia* of being repeatedly shot while posing no threat and while being incapacitated and neutralized was clearly established by *Baker* and *Russo* at the time Green was killed, because that case law would give a reasonable police officer fair warning and put that officer on notice that the use of deadly force under such circumstances would violate Green's right.   It is important to note that this conclusion applies even if the Defendants had been justified in shooting at Green right after he shot in Rosen's direction after Rosen shot him.   This follows from the temporal segments approach and the corollary principle that "[w]hen an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity."   *Dickerson*, 101 F.3d at 1162 n. 9 (quoting a Seventh Circuit decision).  *Accord Mullins*, *supra*, 805 F. 3d at 768.

Moreover, Defendants' use of excessive deadly force while Green was incapacitated and neutralized cannot be excused by the reasonableness guideline "allowing for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation."   *Id*. at 765-66 (citations and internal quotes omitted).   This is because an equally important guideline is that "[t]he fact that a situation unfolds quickly does not, by itself, permit [officers] to use deadly force."   *Id*. at 766.   Moreover, while the Sixth Circuit "acknowledge[s] that … courts must be careful to avoid unduly burdening officers' ability to make split-second decisions, … [t]he legal standard, however, is objective.   Even a split-second decision, if sufficiently wrong, may not be protected by qualified immunity."   *Bouggess*, *supra*, 482 F.3d at 893-94.

Here, any notion that matters were evolving too rapidly to enable the Defendants to perceive that Green was incapacitated and neutralized soon enough to stop shooting is unsupported by the evidence.   Multiple eyewitnesses were able to perceive that Green was incapacitated and neutralized and that the Defendants' continued shooting therefore was unnecessary.  See Facts # 9

and # 10, and the evidence in support at SOF §II.A.6; §II.B.9 and 10. The standard is objective. If these eyewitnesses could tell that the shooting should stop because Green was incapacitated, neutralized, "done," so could a reasonable police officer. That the Defendants could not tell or claim they could not tell is irrelevant.

### E. Defendants Are Not Entitled to State Statutory Immunity on Plaintiff's State Law Claims for Assault, Battery and Wrongful Death and Their Motion for Summary Judgment as to those Claims Should Be Denied

Plaintiff has also asserted Ohio state law claims against the Defendants for assault, battery, and wrongful death.[12] Defendants' argument for summary judgment on these claims is that they are entitled to immunity under Ohio Rev. Code § 2744.03(A)(6). Doc 171 pp. 36-37. Under the statute, the Defendants are not entitled to immunity if their "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b). Defendants contend that "statutory immunity shields them from Plaintiff's state-law claims for the same reasons qualified immunity shields them from the undue-force claim," and that "the same facts that support the Officers' reasonableness of their conduct also support the absence of malice, bad faith, wantonness, or recklessness under" the statute. Doc 171 pp 36-37.

Defendants are incorrect. As shown above, the "same facts" that Defendants relied on for qualified immunity are the wrong facts. That is, in their arguments for summary judgment on the basis of qualified immunity on Plaintiff's § 1983 Fourth Amendment excessive force claim, Defendants rely only on "facts" that support their arguments, and ignore the mountain of facts contradicting their facts. *See* Sections III.A and B above. The correct standard, however, is to view all evidence in the light most favorable to Plaintiff and all justifiable inferences are to be drawn in her favor. Those facts and inferences viewed most favorably to Plaintiff must be assumed to be true for the Court's ruling on Defendants' motion. *Id*. Defendants' failure to apply the proper facts is in itself grounds for denying their motion for summary judgment as to the state law claims.

Moreover, as shown above, based on the proper facts, i.e., the facts and inferences viewed most favorably to Plaintiff, Defendants are not entitled to qualified immunity on Plaintiff's § 1983

---

[12] Doc 1 ¶¶180-187, 204-210; pp. 27-29, 32-33.

excessive force claim due to genuine disputes of material facts. *See* Sections II.A and B. and III.D.1 (the proper facts) and Sections III.D.2-4 (legal analysis based on proper facts). In the Sixth Circuit, if a court denies qualified immunity on a § 1983 excessive force claim due to disputed material facts on whether the force used by the police was objectively unreasonable and excessive, the court also will deny Ohio statutory immunity on state law claims based on the same facts. In effect, the courts equate excessive force with one or more of malice, bad faith, wantonness and recklessness.

For example, in *Martin v. City of Broadview Heights*, 712 F.3d 951 (6th Cir. 2013), the court affirmed the district court's denial of qualified immunity on the § 1983 claim against the three defendant police officers based on disputed material facts as to excessive force. The three *Martin* defendants, as do Defendants Rosen and Bare here, relied on *Chappell v. City of Cleveland*, 585 F.3d 901 (6th Cir. 2009) to support their argument for Ohio statutory immunity for their state law claims. *Id.* at 963; Doc 171 p. 36. The court rejected that argument in light of its denial of qualified immunity on the excessive force claims:

> *Chappell* only says that officers may be entitled to state-law immunity *if* qualified immunity shields them from liability on federal claims. *Id*. at 915 n.3. Qualified immunity does not protect the officers here. As resolution of the state-law immunity issue is *heavily dependent on the same disputed material facts* as the excessive-force determination under § 1983, the district court properly denied summary judgment to the officers on the estate's state-law claims.

*Id.* at 963 (Emphasis added). *Accord Hopper v. Plummer*, 887 F.3d 744, 760 (6th Cir. 2018) ("Defendants' statutory immunity defense *stands or falls* with their federal qualified immunity defense. … For the same reasons that we declined to accept defendants' defense of qualified immunity on plaintiff's deliberate-indifference claim, we decline to accept their defense of statutory immunity under Ohio law." (Citing *Martin*) (emphasis added); *Gradisher v. City of Akron*, 794 F.3d 574, 587 (6th Cir. 2015) ("Because there is a genuine dispute of material fact about whether Craft used excessive force or was objectively reasonable in tasing Gradisher, we reverse the district court's grant of summary judgment in Craft's favor on the state law claims for assault and battery … to the extent that they are related to tasing." (Citing *Martin*).

*See also Williams v. Collins*, 2017 U.S. Dist. LEXIS 49082 (S.D. Ohio March 31, 2017):

> Ohio revised code § 2744.03(A)(6) establishes that where an officer's actions are within the course of their official duties, the officer is immune from liability, subject to limited exceptions. … To prevail, a plaintiff must prove that the officers acted "with malicious purpose, in bad faith, or in a wanton or reckless manner." …. The Sixth Circuit has held that in the context of excessive force claims, state law claims for assault and battery "*rise and fall*" with the federal excessive force claims. …Here, Plaintiff has met his burden of showing that Defendants Collins and Slone are not entitled to qualified immunity for their use of excessive force under federal law, so too has he met his burden under state law.

*Id*. at \*19-20 (citations omitted) (emphasis added).  *Harris v. Langley*, 647 Fed. Appx. 585 (6th Cir. 2016):

> [T]he Fourth Amendment clearly prohibits an absolutely unjustified seizure of an individual. As a matter of law, Officer Pendleton is not entitled to the shield of qualified immunity for this claim. …
>
> The district court denied Officer Pendleton's state-law immunity defense for the claims of assault and battery ….  When federal qualified immunity and Ohio state-law immunity under § 2744.03(A)(6) rest on the *same questions of material fact*, the court may review the state-law immunity defense "*through the lens of the federal qualified immunity analysis*." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 n.1 (6th Cir. 2009). As discussed, conceding the facts in favor of Harris, there is no justification for either the body slam or the detention; accordingly, there is no state-law immunity from the claims arising out of those actions because they were done in bad faith and in a wanton or reckless manner. As a matter of law, Officer Pendleton is not entitled to state-law immunity from Harris' state-law claims.

*Id*. at 592-93 (Emphasis added).

Finally, decisions by Ohio state courts also recognize that excessive force by police officers negates any privileges or immunities.  *See Alley v. Bettencourt*, 134 Ohio App. 3d 303, 313 (Ohio Ct. App. 4th Dist. 1999) ("A cause of action exists under Section 1983 when an officer uses excessive force to arrest an individual. …. Officers are privileged to commit battery when making a lawful arrest, but the privilege is negated by the use of excessive force.") (citations omitted).  "If

an officer uses more force than is necessary to make an arrest and protect himself from injury, he is liable for assault and battery." *City of Cincinnati v. Nelson*, No. C-74321, 1975 Ohio App. LEXIS 7443, at *5 (Ohio Ct. App. 1st Dist. May 5, 1975). *Schweder v. Baratko*, 103 Ohio App. 399, 403 (8th Dist. 1957) ("Force when used lawfully in making an arrest is in the exercise of a government function, and only in cases where excessive force is used, that is, force going clearly beyond that which is reasonably necessary to make the arrest, can such force be claimed an assault and battery by the person arrested.").

For all the above reasons, Defendants are not entitled to statutory immunity on the state law claims and therefore the Court should deny Defendants' Motion for Summary Judgment as to those claims.

## IV.    <u>CONCLUSION</u>

For all the reasons stated above:

- Defendants are not entitled to qualified immunity on Plaintiff's Section 1983 claim that Defendants violated Henry Green's Fourth Amendment right not to be seized by excessive, deadly force that was objectively unreasonable; and therefore, the Court should deny Defendants' Motion for Summary as to that Section 1983 Fourth Amendment excessive force claim; and

- Defendants are not entitled to the State of Ohio statutory immunity on Plaintiff's state law claims for assault, battery and wrongful death; and therefore, the Court should deny Defendants' Motion for Summary as to those state law claims.

Respectfully submitted,

**/s/ *Sean L. Walton***
Sean L. Walton (0088401)
Chanda L. Brown (0081076)
Walton + Brown, LLP
395 E. Broad Street, Suite 200
Columbus, Ohio 43215
T: (614) 636-3476
F: (614) 636-3453
swalton@waltonbrownlaw.com
cbrown@waltonbrownlaw.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was served upon the following counsel of record by the court's electronic filing system, this 21st day of December 2018.

Westley M. Phillips (0077728)
Timothy J. Mangan (0025430)
Andrew D.M. Miller (0074515)
Assistant City Attorneys
CITY OF COLUMBUS, DEPARTMENT OF LAW
ZACH KLEIN, CITY ATTORNEY
77 North Front Street
Columbus, Ohio 43215
wmphillips@columbus.gov
tjmangan@columbus.gov
admmiller@columbus.gov


*/s/ Sean L. Walton*
Sean L. Walton (0088401)