## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**ADRIENNE HOOD,**

        **Plaintiff,**

    **v.**                                **Case No. 2:17-cv-471**
                                                     **JUDGE GEORGE C. SMITH**
                                                   **Magistrate Judge Deavers**

**CITY OF COLUMBUS,** *et al.***,**

        **Defendants.**

### OPINION AND ORDER

This matter is before the Court upon Defendants the City of Columbus, Jason Bare, Zachary Rosen, Kim Jacobs, Gary Cameron, and Eric Pilya (collectively "Defendants") Motions for Summary Judgment (Docs. 171, 172, and 173). The motions are fully briefed and ripe for review. For the reasons that follow, Defendants' Motions for Summary Judgment are **GRANTED**.

## I.      FACTUAL BACKGROUND

Plaintiff's claims in this case arise from a police incident that occurred on June 6, 2016, in the Linden neighborhood of Columbus, Ohio. On the afternoon of June 6, 2016, Christian Rutledge met up with his friend Henry Green V at a house located at 2138 Ontario Street, where Green had been drinking or smoking marijuana and was described by Rutledge as "lit." (Doc. 148, Rutledge Dep. at 55–61; Doc. 148-5, Rutledge Dep. Ex. E; Doc. 148-6, Rutledge Dep. Ex. F). Upon arrival, Rutledge saw bottles of alcohol and observed that Green was drunk. (*Id*. at 73–78, 80).[1] Green and Rutledge left 2138 Ontario Street at approximately 4:30 or 4:40 p.m. and walked

---

[1] Rutledge's observation proved to be correct. Post-incident toxicology analyses revealed that Green was intoxicated at the time of his death, with a blood alcohol concentration of one-tenth of one percent (i.e., 0.10%), and with marijuana in his system. (Doc. 152, Baker Aff. ¶¶ 8–9).

southbound to a house located at 1156 East 21st Avenue, arriving between 5:00 and 5:10 p.m. (*Id.* at 82–83, 85, 87–89; 91, 95; Doc. 148-8, Rutledge Dep. Ex. H; Doc. 147, Miller Dep. at 12–17; Doc. 147-1, Miller Dep. Ex. A; Doc. 147-2, Miller Dep. Ex. B). While at 1156 East 21st Avenue, Green engaged in an argument with a young woman whom he threateningly told, "I'll smack the fuck out of you, I ain't playing." (*Id.* at 96–97, 103–05, 142–43). Green was then told to leave, to which he responded, "I'm just going to leave before she says anything else to make me mad and I won't be able to control myself." (*Id.* at 105–06). Tavares Miller, who was at the East 21st Avenue address, described Green as being "irate" when he left the house. (Doc. 147, Miller Dep. at 28–30).

Green and Rutledge left 1156 East 21st Avenue at approximately 5:45 p.m. and walked northbound on Ontario Street towards Duxberry Avenue. (Doc. 148, Rutledge Dep. at 95, 107–09; Doc. 148-13, Rutledge Dep. Ex. M). Rutledge described Green as visibly angry and stomping his feet as he walked. (*Id.* at 109–12).

Officers Zachary Rosen and Jason Bare (collectively referred to as "Officers") were working as partners on a plain clothes assignment for the City of Columbus' 2016 Community Safety Initiative.[2] (Doc. 153, Bare Aff. ¶ 7; Doc. 162, Rosen Aff. ¶ 7). The Officers were patrolling criminal "hotspots" within 5 Precinct, located in Columbus' South Linden area, looking for gang, weapons, and narcotics activities. (Doc. 153, Bare Aff. ¶ 8; Doc. 162, Rosen Aff. ¶ 7). Officer Rosen was driving their assigned vehicle, a standard unmarked white 2015 GMC Acadia sports utility vehicle ("the GMC"), and Bare was in the second row on the passenger side. (Doc. 153, Bare Aff. ¶ 9; Doc. 162 Rosen Aff. ¶ 8; Doc. 162-2, Rosen Aff. Ex. 2). Rosen and Bare were

---

[2] The intent of the Community Safety Initiative was to strengthen community relations and to combat violent crime. (Doc. 162, Rosen Aff. ¶ 7).

patrolling on East 26th Avenue, approaching Ontario Street, where they first encountered Green and Rutledge.

## A. THE INCIDENT AT EAST 26TH AVENUE AND ONTARIO STREET

Between approximately 6:05 p.m. and 6:10 p.m., Officers Rosen and Bare drove westbound on East 26th Avenue to monitor 1215 East 26th Avenue, the location of the gang-related drive-by shooting which had occurred the previous day.[3] (Doc. 153, Bare Aff. ¶ 19; Doc. 162, Rosen Aff. ¶ 18). Immediately after the Officers passed 1215 East 26th Avenue and approached the intersection of East 26th Avenue and Ontario Street, they saw Green and Rutledge walking northbound on Ontario Street, in the road, just south of East 26th Avenue. (*Id.*). Rutledge stopped just south of East 26th Avenue, yielding to the GMC. (Doc. 162, Rosen Aff. ¶ 19; Doc. 148 Rutledge Dep. at 124). Green, on the other hand, glared at the Officers and continued walking into East 26th Avenue. (Doc. 162, Rosen Aff. ¶ 19). Rutledge described that he and Green were about to cross the street, thinking they could beat the car coming, but it was speeding. (Doc. 148, Rutledge Dep. at 121–22). Green kept walking, not directly in front of the vehicle but "[h]e walked

---

[3] The Officers had knowledge of a number of violent crimes, shootings, and homicides that had recently occurred in the South Linden area within a half mile radius of the intersection of Duxberry Avenue and Ontario Street. (Doc. 153, Bare Aff. ¶ 12; Doc. 162, Rosen Aff. ¶ 11). On December 14, 2015, a 17-year-old male was shot and killed in front of 1136 Duxberry Avenue following a street fight. (Doc. 152, Bare Aff. ¶ 13; Doc. 162, Rosen Aff. ¶¶ 11–12; Doc. 162-4, Rosen Aff. Ex. 4). On May 16, 2016, between approximately 6:00 p.m. and 6:10 p.m., an unknown black male suspect carjacked a victim at the intersection of Cleveland Avenue and East Maynard Avenue. (Doc. 153, Bare Aff. ¶ 14; Doc. 162, Rosen Aff. ¶¶ 11, 13; Doc. 162-4, Rosen Aff. Ex. 4). On May 25, 2016, a female was shot by an unidentified assailant at 1186 East 21st Avenue. (Doc. 153, Bare Aff. ¶ 15; Doc. 162, Rosen Aff. ¶¶ 11, 14; Doc. 162-4, Rosen Aff. Ex. 4). On May 27, 2016, two unknown black male suspects were involved in the shooting of two teenagers in the 900 block of East 21st Avenue. (Doc. 153, Bare Aff. ¶ 16; Doc. 162, Rosen Aff. ¶¶ 11, 15; Doc. 162-4, Rosen Aff. Ex. 4). On May 27, 2016, suspected gang members had reportedly shot at one another near the intersection of East 22nd Avenue and Ontario Street. (Doc. 153, Bare Aff. ¶ 17; Doc. 162, Rosen Aff. ¶¶ 11, 16; Doc. 162-4, Rosen Aff. Ex. 4). On Sunday June 5, 2016, the day before the incident at issue in this case, a gang member had been shot in an unsolved drive-by shooting that occurred at 1215 East 26th Avenue. (Doc. 153, Bare Aff. ¶ 18; Doc. 162, Rosen Aff. ¶¶ 11, 17; Doc. 162-4, Rosen Aff. Ex. 4).

like a little bit to where they probably thought they would have hit him. That's why I said I heard the screech." (*Id*. at 124–25).

Rutledge warned Green to "slow the fuck down," to which Green responded, "I don't give a fuck." (*Id*. at 129). Green then yelled, "What the fuck? What the fuck? What the fuck?" at the GMC. (*Id*. at 130–131). Rutledge asked Green, "What the fuck is wrong with you?" but Green kept angrily saying "What the fuck?" to the GMC. (*Id*. at 131).

According to the Officers, Green lifted his shirt, displayed a black pistol in his front waistband, and started pulling his pistol out. (Doc. 153, Bare Aff. ¶ 20; Doc. 162, Rosen Aff. ¶ 20). Officer Rosen drove past Green and saw Green in his driver side view mirror aiming the pistol at the GMC. (*Id*.). Officer Bare heard Officer Rosen yell, "He just pulled a gun on us! He just pulled a gun on us!" (Doc. 152, Bare Aff. ¶ 21). Officer Rosen continued driving westbound on East 26th Avenue, turned north onto the next street, Gerbert Road, where he lost sight of Green and stopped the GMC. (Doc. 153, Bare Aff. ¶ 22; Doc. 162, Rosen Aff. ¶ 21; Doc. 162-6, Rosen Aff. Ex. 6). Rutledge could not confirm that Green pulled a gun at this time because he said he was on his phone. He did say, Green could have put the gun back in his pocket. Rutledge described: "I heard they said he pulled a gun, so that's why I said, well, he must have put it like -- he must have put it back, because, if he did, I didn't see anything." (Doc. 148, Rutledge Dep. at 135).

Officer Rosen then radioed in the following: "6410. Duxberry, Ontario. Two male blacks walking northbound. Red tanktop, black shorts, short hair on one. Just pulled a 33 on us. [4] We are swinging around the block." (Doc. 168, Synched Video, submitted in support of Rosen Aff.

---

[4] The code "33" is a CPD radio code for gun. (Doc. 162, Rosen Aff. ¶ 23).

¶ 22).[5] The officers intended to address Green's criminal threat as well as the danger he presented to others in the vicinity and wanted to see him taken into custody as soon as possible, ideally by the uniformed personnel who would be responding to Officer Rosen's radio call. (Doc. 153, Bare Aff. ¶ 25; Doc. 162, Rosen Aff. ¶ 24).

## B.  GREEN'S ALTERCATIONWITH JHERRI ALFRED

During the brief period of time that it took Officer Rosen to stop the GMC and radio in, Jherri Alfred encountered Green. Green and Rutledge were walking northbound on Ontario Street from East 26th Avenue to Duxberry Avenue, when Green walked past and stared at Alfred in an intimidating manner as Alfred was getting into his parked car with his fiancé and their two children. (Doc. 142, Alfred Dep. at 10–11, 37–39, 43, 56–68, 71, 206; Docs. 142-8–10, Alfred Dep. Exs. H–J; Doc. 148, Rutledge Dep. at 145–46; Doc. 148-16, Rutledge Dep. Ex. P).

Alfred responded to Green's menacing stare by reaching into his car, picking up his gun from the center console, and putting it into his gun holster in a manner meant to be visible to Green. (Doc. 142, Alfred Dep. at 69, 73–75, 78, 81–82). Alfred states that he was attempting to send the message to Green that "I don't know what you've got under your shirt, but it's not going to kill me." (*Id*. at 78). Green then kept walking northbound on Ontario Street. Alfred did not see a gun on Green when he walked past him on Ontario Street, but he did see Green with gun at Duxberry and Ontario (the location of the incident discussed later) from approximately 200 feet away. (*Id*. at 85–86; 131). Alfred said "I just saw it in the air, and that's when I'm like da- -- oh, damn, dude had a gun, walked past me." (*Id*. at 135). Alfred said that he heard someone say "You like to play

---

[5] The "Synched Video" file is a synchronization of Rosen and Bare's CPD radio transmissions with the video taken by CPD Cruiser #23's cruiser camera video system into one combined recording. The Synched Video file can be found on a flash drive that Defendants manually filed with the Court on October 23, 2018. (*See* Doc. 168, Notice of Manually Filed Exhibits).

with guns?" and then he heard gun shots.  He ducked down by his car when the shooting started so he did not see much else.  (*Id.* at 157).

## C.     THE INCIDENT AT DUXBERRY AVENUE AND ONTARIO STREET

After Officer Rosen made the radio call, he drove north on Gerbert Road and turned east on Duxberry Avenue to go toward Ontario Street in order to locate Green.  (Doc. 153, Bare Aff. ¶ 26; Doc. 162, Rosen Aff. ¶ 25; Doc. 162-7, Rosen Aff. Ex. 7).  The Officers then saw Green and Rutledge.  Green was in the middle of Duxberry Avenue, with his hands in his waistband area. (Doc. 153, Bare Aff. ¶ 27–28; Doc. 162, Rosen Aff. ¶ 26–27; Doc. 162-7, Rosen Aff. Ex. 7).

Rutledge testified that before the shots were fired, he did not specifically see Green pull a gun, but Green was yelling "Bro, bro, bro, bro, bro!" at the GMC while holding out his left arm in a manner that Rutledge knows to be typical of someone holding a gun.  (Doc. 148, Rutledge Dep. 175–90; Docs. 148-20–23, Rutledge Dep. Exs. T–W).  Another witness, Jherri Alfred saw Green with the gun.  (Doc. 142, Alfred Dep. at 135–41).

Recognizing that Green posed an imminent threat based on the fact that he had previously pulled a gun from the same location, Officer Rosen unholstered his pistol as he drove toward Green and Rutledge.  (Doc. 162, Rosen Aff. ¶ 29).  A number of things then happened nearly simultaneously.  As Officer Rosen was stopping the GMC approximately 5–7 feet from Green, Green was reaching into his waistband and pulled out the pistol from under his shirt.  (Doc. 153, Bare Aff. ¶ 30–31; Doc. 153-2, Bare Aff. Ex. 2; Doc. 162, Rosen Aff. ¶ 29–30; Doc. 162-8, Rosen Aff. Ex. 8).  Officer Rosen aimed his gun with his right hand through the front windshield of the GMC as he reached his left hand over his body to throw the GMC into park, and then reached his left hand back over to start opening the driver's side door to get out of the GMC, while repeatedly shouting "Police!" and "Don't move!"  (Doc. 162, Rosen Aff. ¶ 30).  Officer Bare drew his weapon

and started to exit the GMC from the rear passenger door while yelling "Police! Put your gun down!" or words to that effect, while using the fingertips of his right hand to lift and flash his badge on its lanyard toward Green. (Doc. 153, Bare Aff. ¶ 32). Green pointed his pistol directly at Officer Rosen and approached Rosen's position. Green was either firing or was about to fire his weapon at Rosen. (Doc. 153, Bare Aff. ¶ 33; Doc. 162, Rosen Aff. ¶ 31).[6] In response, Officer Rosen fired several shots at Green in rapid succession through the gap between the "A" pillar on the driver's side of the GMC and the open driver-side door as he fell back into his seat in an effort to avoid Green's gunfire. (*Id.*). Green fired at Officer Rosen, riddling the GMC with bullet holes and shooting out the front and back driver-side windows. (Doc. 153, Bare Aff. ¶ 34; Doc. 162, Rosen Aff. ¶ 32; Docs. 162-9–16, Rosen Aff. Exs. 9–16). When the shooting started, Rutledge stopped looking at what was happening and ran westbound on Duxberry Avenue to Green's aunt's house. (Doc. 148, Rutledge Dep. at 202–04). Rutledge said he heard about 17 gunshots and he could tell that the shots came from different calibers of guns because they sounded different. (*Id.* at 204).

Officer Rosen paused firing as Green was out of sight. (Doc. 162, Rosen Aff. ¶ 33). Officer Rosen did not know if he had struck Green or if Green was hidden behind Rosen's opened door. (*Id.*). Officer Bare moved quickly to his right and circled toward the front passenger side of the GMC as Green was circling around Officer Rosen's position. (Doc. 153, Bare Aff. ¶ 35; Doc. 153-3, Bare Aff. Ex. 3). Officer Rosen heard additional gunshots and moved out from behind the driver-side door to the north/northeast. (Doc. 162, Rosen Aff. ¶ 34). Green was moving

---

[6] Plaintiff argues that Green did not pull his gun first, nor did he fire his gun first. There are some witnesses who say Green did not have a gun, however that testimony is contradicted by the physical evidence and therefore not reliable. Further, there is no testimony that says with certainty that the Officers fired first, only speculation and conjecture that the witnesses believed that was what happened. In reality, everything happened very quickly and it may never be clear exactly what happened. Regardless, as discussed further in Section III, below, this dispute is not material.

north/northwest aiming his weapon and firing at Officer Rosen. *Id*. Officer Bare fired several shots as Green was pointing his weapon and firing at Officer Rosen. (Doc. 153, Bare Aff. ¶¶ 34–36). Green fell to the ground, dropped his gun, and the Officers stopped firing. (Doc. 153, Bare Aff. ¶ 36; Doc. 162, Rosen Aff. ¶ 34; Doc. 162-17, Rosen Aff. Ex. 17).

Rosen fired a total of fifteen shots in approximately three to five seconds. (Doc. 162, Rosen Aff. ¶ 35). Officer Bare fired a total of seven shots in approximately two seconds. (Doc. 153, Bare Aff. ¶ 37). Bare described this a "tense, uncertain, and rapidly evolving situation." "I fired my weapon at Green because I was in fear for my life and for the life of Officer Rosen. I believed that I had no other means to protect our lives." Rosen concurred. (Doc. 153, Bare Aff. ¶ 37; Doc. 162, Rosen Aff. ¶ 35). The Synched Video shows Green's gun lying next to him on the ground and forensic evidence shows he fired six shots from his .45 caliber semiautomatic pistol with a 10 round magazine. All six of Green's fired .45 caliber cartridge cases were located in the area toward the northwest corner of the intersection of Duxberry and Ontario, and the bullets were lodged in the GMC. (Doc. 159, Noedel Aff. ¶ 23, ¶ 44; Doc. 168, Synched Video).[7]

Officers Rosen and Bare advanced closer to Green, and Rosen stepped on Green's pistol to secure it. (Doc. 153, Bare Aff. ¶ 38; Doc. 162, Rosen Aff. ¶ 37). At 6:11:18 p.m., Officer Bare aired "Shots fired! Shots fired!" (Doc. 153, Bare Aff. ¶ 39; Doc. 168, Synched Video at 6:11:18). At 6:11:31 p.m., Officer Rosen aired "Duxberry and Ontario, shots fired!" (Doc. 162, Rosen Aff. ¶ 39; Doc. 168, Synched Video at 18:11:31). At 6:11:51 p.m. Officer Rosen aired "Start the medic, please!" (*Id*.). At 6:12:07 p.m. Officer Rosen aired "Duxberry and Ontario. Run cars into us." (*Id*.). At 6:12:37 p.m., less than 80 seconds after Officer Bare aired "Shots fired," CPD Officers Paul Lively and Brian Connelly arrived at the scene in Columbus Police Cruiser #23 and the

---

[7] *See* Doc. 162, Rosen Aff. ¶ 43; Doc. 162-18, Rosen Aff. Ex. 18; Doc. 168, Synched Video at 18:12:38.

remainder of the incident is captured on their cruiser video system. (Doc. 153, Bare Aff. ¶ 43; Doc. 162, Rosen Aff. ¶ 42; Doc. 155, Connelly Aff. ¶ 23; (Doc. 168, Synched Video). Other officers arrived and took control of the scene, including attending to Green. Rosen and Bare left the scene with Officer Support Team Members. (Doc. 153, Bare Aff. ¶ 45; Doc. 162, Rosen Aff. ¶ 45). This concluded Rosen and Bare's involvement in the incident. Green was shot eight times and the cause of death was a gunshot wound to the chest. (Doc. 164–4, Am. Autopsy Rep.).

The timing of the events has been determined based on the Officers' recollections in conjunction with the cruiser video and radio transmission evidence. The entire encounter, from the time the Officers saw Green on East 26th Avenue, until the conclusion of the shooting, spanned less than two minutes. From 6:10:20 p.m. to 6:10:43 p.m., Officer Rosen made his first radio call. Thirty-five seconds later, at 6:11:18 p.m., Officer Bare aired "Shots fired! Shots fired!"

There were other witnesses to the event and their accounts generally support the summary of events set forth above with some minor differences. Lavonna Williams was at her address at 2198 Ontario Street when she heard gunshots. She was playing outside with her niece. Looking toward the intersection of Duxberry and Ontario, she saw a man in front of the white vehicle shooting his gun into the vehicle. (Doc. 150, Williams Dep. at 28, 30, 47, 51–53, 61–62, 123–24; Docs. 150-5–6, Williams Dep. Exs. E–F). Williams also said that the man shooting at the vehicle was white. (*Id*. at 97). Additionally, Shantel Anderson was at her home at 1210 Duxberry Avenue, which is slightly to the east of the intersection of Duxberry and Ontario. (Doc. 143, Anderson Dep. at 11, 21; Doc. 143–1, Anderson Dep. Ex. A). Anderson says she saw the GMC drive slowly eastbound on Duxberry Avenue and come to a stop near Green at Duxberry and Ontario. (*Id*. at 50, 53, 57). She states further that the driver of the GMC "[r]olled down the window a little bit" and "said some words" [but] "I don't know what the words was to Mr. Henry Green." (*Id*. at 57).

At that point, according to Anderson, "[w]hatever words they exchanged" Green lifted his shirt "to show what he had." (*Id*. at 57). "And after that, I don't know what the words was, but Mr. Henry start[ed] shooting. I guess he felt offended." (*Id*. at 57–59). Anderson saw Green continue shooting as he walked toward the GMC. (*Id*. at 71–72). According to Anderson, Green shot out one of the vehicle's windows while the officer tried to shield himself behind the door of the vehicle. (*Id*. at 47–48, 61, 63). Anderson then saw the officers shooting back. (*Id*. at 45–46).

Plaintiff also relies on a number of other witnesses and their testimony is summarized below. Jamar Jordan was standing in front of his home located at the corner of Duxberry and Ontario, he watched Green and Rutledge cross Duxberry and stated: "They were greeting me. They was coming up crossing the middle of the street;" "They were never stationary." (Doc. 186, Jordan Dep. 53, 81–82). Jordan then described that the Officers vehicle was speeding down Duxberry toward Green and Rutledge. (*Id*. at 66). When the vehicle was approaching, Jordan testified that Green did not have a gun out but the officer driving the vehicle did have his gun out. (*Id*. at 64, 67, 74, 206). Jordan did confirm that Green had a gun, but "[a]fter the two shots, Bub pulled out his gun." (*Id*. at 38–40, 78).[8] Jordan describes that Green shot at the vehicle before he took a knee then fell to the ground. The police did not shoot after Green fell, "[w]hen he was laying on his back, no, he wasn't shot no more." (*Id*. at 78, 111, 120–21).

Harold Newsome and Ericka Hickman were visiting Shantel Anderson's house at 1210 Duxberry and witnessed the incident. Newsome was inside his vehicle and Hickman was outside. The two were talking and watching their kids play nearby. Hickman recalls seeing Henry Green and the guy he was with walk right in front of the vehicle. (Doc. 187, Hickman Dep. at 49). Green stopped in the middle of the street looked like he was cussing them out. She stated, "I thought it

---

[8] Henry Green's nickname was Bubby.

was like some gang-related stuff, like they were about to start fighting." (*Id*. at 49). Newsome and Hickman recall the person inside the vehicle saying something to Green, but did not know what was said. (Doc. 188, Newsome Dep. at 53; Doc. 187 Hickman Dep. at 53). Hickman recalls at some point the people in the SUV yelling get down. (Doc. 187, Hickman Dep. at 56). Both Newsome and Hickman say they witnessed the shots coming from the white SUV, but they did not actually see the guns. They also specifically state that Green never had a gun. (Doc. 188, Newsome Dep. at 40–42; Doc. 187, Hickman Dep. at 68–69). Newsome continued that "[a]fter they got out of the car, he was laying on the ground, they kept shooting him." (*Id*. at 72).

There were several other witnesses Shawnta Willis, Antoine Moss, Jr., Arman Green, Edward Jackson, and Courtney Carter who all described hearing multiple gun shots but did not see the initial encounter because they were not looking in the direction of the incident or had an obstructed view. Most just saw the end of the incident when Green fell to the ground. (Doc. 193, Willis Dep. at 54–56, 62, 69–71; Doc. 191, Moss Dep. at 32–36; Doc. 192, Green Dep. at 11–14, 18–20, 24–33; Doc. 190, Jackson Dep. at 33–44; 62–73; Doc. 189, Carter Dep. at 33–34, 46, 53–75).

Plaintiff also relies on expert testimony to bolster her arguments and attempt to create a genuine issue of material fact. However, expert opinions that conclude that the officers acted unreasonably and state that Green was the subject of excessive force are legal conclusions that need not be considered by this Court on summary judgment. *See Carpenter v. City of Franklin*, No. 1:05-cv-323, 2006 WL 3791931 at *13 (S.D. Ohio Dec. 22, 2006) (finding that the expert opinion "fail[ed] to meet the requirement for a factual basis and that the finding of a 'proper' use of force is a conclusory assertion about an ultimate legal issue"). Further, an expert that testifies as to a legal conclusion, such as it was objectively unreasonable for an officer to shoot a suspect,

11

"expresses a legal conclusion, going beyond 'stating opinions that suggest the answer to the ultimate issue.'" *DeMerrell v. City of Cheboygan*, 206 F. App'x 418, 426 (6th Cir. 2006) (citing *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994)). Notwithstanding the foregoing, the expert opinions do not shed any additional light on the undisputed facts in this case and thus, do not help to create a genuine issue of material fact.

Plaintiff Adrienne Hood, as administrator of the Estate of Henry Green V, initiated this case on June 1, 2017, against Defendants the City of Columbus, Officers Jason Bare and Zachary Rosen, Columbus Chief of Police Kim Jacobs, Columbus Police Commander Gary Cameron, and Columbus Police Sergeant Eric Pilya. In Count I, Plaintiff brings a wrongful death and survival action pursuant to 42 U.S.C. § 1983 and Ohio Revised Code § 2125.01. In Count II, Plaintiff asserts excessive force and unreasonable seizure in violation of 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution. In Count III, Plaintiff asserts racial discrimination in violation of 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment. In Count IV, Plaintiff alleges state law claims of assault and battery. In the final claim, Count V, Plaintiff brings a *Monell* Claim against the City of Columbus.

## II.     STANDARD OF REVIEW

Defendants have filed their motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 716–17 (6th Cir. 2012). The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient evidence," in favor of the nonmoving

12

party; evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment. *Id.* at 249–50.

The party seeking summary judgment shoulders the initial burden of presenting the Court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial burden is satisfied, the burden then shifts to the non-moving party to set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (after burden shifts, nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury").

In considering the factual allegations and evidence presented in a motion for summary judgment, the Court "views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). But self-serving affidavits alone are not enough to create an issue of fact sufficient to survive summary judgment. *Johnson v. Washington Cty. Career Ctr.*, 982 F. Supp. 2d 779, 788 (S.D. Ohio 2013) (Marbley, J.). "The mere existence of a scintilla of evidence to support [the non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Anderson,* 477 U.S. at 251.

## III.     DISCUSSION

Defendants move for summary judgment on all of Plaintiff's claims against them based on qualified immunity and generally that they are entitled to judgment in their favor. Plaintiff has responded in opposition on most of the claims but has chosen not to respond to Defendants'

13

arguments in connection with the Section 1983 Fourteenth Amendment Equal Protection Clause claim against the Defendants. (Doc. 202 at 4).[9] The Court will first evaluate whether Defendants are entitled to qualified immunity and then move to the remaining arguments.

## A.    Qualified Immunity

Defendants Bare and Rosen assert that they are entitled to qualified immunity on Plaintiff's Section 1983 claims against them.  They assert that they did not violate any of Plaintiff's constitutionally protected rights and are therefore entitled to summary judgment on the issue of qualified immunity.  Plaintiff asserts, however, that the defense of qualified immunity does not protect the Defendants from liability.

Under the doctrine of qualified immunity, government officials performing discretionary functions are immune from suit unless the plaintiff shows the official violated "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Conn v. Gabbert*, 525 U.S. 286, 290 (1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The central purpose of affording public officials qualified immunity from suit is to protect them 'from undue interference with their duties and from potentially disabling threats of liability.'" *Elder v. Holloway*, 510 U.S. 510, 514 (1994) (quoting *Harlow*, 457 U.S. at 806).  "Qualified immunity provides police officers 'breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law.'"  *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (quoting *Stanton v. Sims*, 571 U.S. 3, 6 (2013)). Qualified immunity will apply "if officers of reasonable competence could disagree on the issue." *Id*.

---

[9] The Court need not address the merits of this claim as it is deemed abandoned.  *See Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (plaintiff deemed to abandon claim by failing to address the claim in response to a motion for summary judgment).  Judgment is therefore granted in Defendants' favor on this claim.

The Sixth Circuit "has consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right." *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008) (citing *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 842 (6th Cir. 2002)) (emphasis in original). "[C]ategorical references to 'Defendants'" do not meet this standard. *Marcilis v. Twp. of Redford*, 693 F.3d 589, 596–97 (6th Cir. 2012). Nor do allegations that an individual defendant "was present and perhaps involved in [the plaintiff's] restraint," without allegations as to the unconstitutionality of the individual defendant's actions. *Lanman*, 529 F.3d at 684.

The Court must apply a two-step test to determine whether qualified immunity protects a government official. *Conn*, 526 U.S. at 290; *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1358 (6th Cir. 1996). The first step is to determine whether a violation of a clearly established constitutional right has occurred. *Conn*, 526 U.S. at 290; *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996). If a constitutional violation is found, the second step is to determine whether an objectively reasonable public official in the circumstances would have recognized that his conduct violated the clearly established constitutional right. *Conn*, 526 U.S. at 290; *Buchanan*, 99 F.3d at 1358; *Dickerson*, 101 F.3d at 1158.

To be clearly established at the time of the conduct in question, the constitutional right must have been recognized by the United States Supreme Court, the United States Court of Appeals for the Sixth Circuit, this Court or other courts within the Sixth Circuit, or, in some cases, courts of other circuits. *Sheets v. Moore*, 97 F.3d 164, 166 (6th Cir. 1996); *Dickerson*, 101 F.3d at 1158. "The contours of the right must be sufficiently clear that a reasonable person would understand that what he is doing violates that right." *Sheets*, 97 F.3d at 166. "This is not to say

that an official action is protected by qualified immunity unless the very action has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

### 1. Constitutional Violation Inquiry

Plaintiff bears the burden of establishing a constitutional violation. Plaintiff alleges that Green had a constitutional right, secured by the Fourth Amendment, not to be subjected to excessive force and wrongful death. Defendants counter that they are entitled to qualified immunity because Green posed a threat of death or serious physical injury to the Officers at the time that deadly force was used. And Plaintiff asserts that there are genuine issues of material fact preventing summary judgment and specifically that Green did not pose any threat to the officers justifying deadly force.

### a. Excessive Force and Wrongful Death

Claims regarding police officers' use of excessive force in the course of an arrest or other seizure are governed by the Fourth Amendment. *See Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). The Fourth Amendment requires that an officer's use of force be objectively reasonable, and courts must balance the consequences to the individual against the government's interests in effecting the seizure. *See Graham*, 490 U.S. at 396. Determining reasonableness "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is activity resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Garner*, 471 U.S. at 8–9). "This is an objective test, to be 'judged from the perspective of a reasonable officer on the scene, rather than with the

16

20/20 vision of hindsight.'"  *Withers v. City of Cleveland*, 640 F. App'x 416, 419 (6th Cir. 2016) (quoting *Graham*, 490 U.S. at 396).

"This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002).  "Further, 'the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'"  *Sigley v. City of Parma Heights*, 437 F.3d 527, 534 (6th Cir. 2006) (quoting *Graham*, 490 U.S. at 396–97).

An officer's use of deadly force is reasonable only if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others[.]" *Tenn. v. Garner*, 471 U.S. 1, 8 (1985); *see also Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 487 (6th Cir. 2007) ("[A]n officer may use deadly force whenever he or she, in the face of a rapidly unfolding situation, has probable cause to believe that a suspect poses a serious physical threat either to the police or members of the public.").  To determine whether a suspect presents an imminent danger to officer or the public at the time the officers use deadly force requires an analysis of both the moments before the shots were fired and the prior interactions between the suspect and the officers.  *See Latits v. Phillips*, 878 F.3d 541, 548 (6th Cir. 2017).

In the case at bar, Defendants argue that each of the factors set forth in *Graham* support the Officers' use of deadly force.  The Officers were patrolling in an area with a long history of violent crimes, including a drive-by shooting of a gang member the day before this incident.  When the Officers first encountered Green and Rutledge at the intersection of 26th and Ontario, Rutledge testified that they did not know who was in the GMC and that Green was saying "What the fuck?"

17

to the vehicle after nearly being hit by it.  (Doc. 148, Rutledge Dep. at 130–31).  According to the Officers, Green lifted his shirt, displayed a black pistol in his front waistband, and started pulling his pistol out.  (Doc. 153, Bare Aff. ¶ 20; Doc. 162, Rosen Aff. ¶ 20).  Officer Rosen drove past Green and saw Green in his driver side view mirror aiming the pistol at the GMC.  (*Id.*).  Officer Bare heard Officer Rosen yell, "He just pulled a gun on us! He just pulled a gun on us!"  (Doc. 152, Bare Aff. ¶ 21).  Rutledge could not confirm that Green pulled a gun at this time because he said he was on his phone.  (Doc. 148, Rutledge Dep. at 135).  Officer Rosen then radioed in the following: "6410. Duxberry, Ontario. Two male blacks walking northbound. Red tanktop, black shorts, short hair on one.  Just pulled a 33 on us" which indicated a gun.  (Doc. 168, Synched Video, submitted in support of Rosen Aff. ¶ 22).  The Officers at this point considered Green to be a danger to others.  (Doc. 153, Bare Aff. ¶ 25; Doc. 162, Rosen Aff. ¶ 24).

Plaintiff argues that Rutledge's testimony creates a genuine issue of material fact as to whether Green pulled a gun on the Officer.  Rutledge testified that "[Green] could have pulled a gun on the car" and "we were close enough to each other to like if he did pull a gun out on the car, I would have seen it in time.  I would have seen it.  There's no way—he's not—you're not fast enough to pull a gun out on a car and put it back in your pocket."  But Rutledge also testified that at the same time, "I was focused on my phone."  (Doc. 148, Rutledge Dep. at 132–34).

Relying on *Byrd-Givens v. Asch*, No. 2:16-cv-410 (S.D. Ohio Apr. 9, 2018), Defendants counter that Rutledge can neither confirm, nor deny that Green pulled a gun on the GMC at East 26th Avenue and Ontario Street because he was admittedly focused on his phone.  The facts in *Byrd-Givens* are similar to the case at bar in that the Officers' testimony in *Byrd-Givens* that the suspect was running at them with a knife was supported by Officer Asch's radio call to the Police Department in real time.  The plaintiff in that case attempted to rebut that argument with testimony

from Alford that the suspect's hands could have been empty. The Court held that "[t]his argument thus does nothing more than 'identify a metaphysical doubt or hypothetical plausibility'" about whether Givens was holding a knife when he was shot "based on lack of evidence." (*Id*. at 15–16, citing *Chappell v. City of Cleveland*, 585 F.3d 912 (6th Cir. 2009)). To withstand summary judgment, however, this Court in *Byrd-Givens* held that "Plaintiff is obliged to come forward with specific facts, based on discovery and disclosure materials on file, and any affidavits, showing that there is a genuine issue for trial. *Id*. Plaintiff in this case does not dispute that Green was in fact armed throughout this encounter. And none of Plaintiff's arguments or testimony presented creates a genuine dispute of material fact about whether Green pulled a gun on the Officers. At most, like in *Byrd-Givens*, Rutledge's testimony identifies a metaphysical doubt or hypothetical plausibility.

Based on the above, when the Officers encountered Green again, they knew he was armed and were justified in believing he posed a danger to others. "When a person aims a weapon in a police officer's direction, that officer has an objectively reasonable basis for believing that the person poses a significant risk of serious injury or death." *Greathouse v. Couch*, 433 F. App'x 370, 373 (6th Cir. 2011). Moreover, a "police officer need not wait for a suspect to open fire on him, much less wait for the suspect to actually hit him, before the officer may fire back." *Id*. "Whether [a suspect] shot first or did not fire the gun at all is immaterial to whether the officers' actions were reasonable under the circumstances. The issue is whether [the suspect] threatened the officers with the gun at close range such that they were justified in using deadly force in self-defense." *Estate of Sowards v. City of Trenton*, 125 F. App'x 31, 34, 38–39 (6th Cir. 2005) (citing *Boyd v. Baeppler*, 215 F.3d 594, 598, 604 (6th Cir. 2000) ("That the defendants did not see or hear Boyd fire the weapon does not affect whether the police officers,

acting reasonably under the circumstances known to them, acted in defense of their own safety and the safety of [others] through the use of deadly force.")).

The Court finds that the appropriate method to analyze the severity of the risk posed by Green is to consider the information available to the reasonable officer at the time of the shooting. *Goodrich v. Everett*, 193 F. App'x 551, 555 (6th Cir. 2006). The Officers were pursuing Green because he pulled a gun on them. Even construing the fact that Plaintiff argues that Green did not know the people in the GMC were officers in his favor, he still pulled a gun and pointed it at an individual.[10] The Officers did not have to wait for Green to fire his weapon at the second encounter with him. *See Thornton v. City of Columbus*, 727 F. App'x 829, 838 (6th Cir. 2018) (citing *Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001) ("[A]n officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action."). The Court agrees that at the time the Officers encountered Green, based on the information they had at the time, it was reasonable for them to believe that Green posed an immediate threat to the safety of the officers and others. Therefore, this factor weighs in favor of the use of force.

As to the second *Graham* factor—actively resisting arrest or attempting to evade arrest— Defendants maintain that Green refused to comply with the Officers' commands. Plaintiff counters that the Officers did not even try to arrest Green, therefore he did not resist or flee. When the Officers encountered Green at Duxbury and Ontario, Rosen and Bare drew their

---

[10] The Sixth Circuit in *Chappell* also considered the issue of whether a suspect knew detectives entering his house were police officers. In *Chappell*, just like in the present case, there are witnesses who did not hear the officers identify themselves, however, that does not refute the officers' testimony that they made such announcements, it only establishes that they did not hear them. According to the Sixth Circuit, this "discrepancy doesn't actually raise a genuine dispute of fact." 585 F.3d at 914. The Sixth Circuit further held that "even if a genuine fact dispute were deemed presented, it is not material, because the events before the shooting are not a factor in determining whether the detectives had probable cause to use deadly force once they entered the bedroom." *Id.*

weapons and shouted "Police" and "Don't Move" and "Put your gun down" or words to that effect. (Doc. 162, Rosen Aff. ¶ 30; Doc. 185, Rosen Dep. at 180; Doc. 153, Bare Aff. ¶ 32; Doc. 184, Bare Dep. at 218–19, 288–89). There were no other witnesses close enough to confirm or deny what the officers said, but there were witnesses (Alfred, Anderson, Newsome, and Hickman) who confirmed that the officers said words to Green. (Doc. 143, Anderson Dep. at 57; Doc. 188, Newsome Dep. at 53; Doc. 187, Hickman Dep. at 53). The witnesses also testified that they did not know that the individuals in the GMC were officers. (*Id*.).

There is no dispute that the Officers and Green fired upon each other. The Officers described that Green pulled and pointed his gun at the Officers and opened fire. (Doc. 153, Bare Aff. ¶ 31, 33; Doc. 162, Rosen Aff. 30, 31). Plaintiff, however, contends that the Officers fired at Green first and then he returned fire. All witnesses agree that the entire incident happened very quickly.[11] After Green pulled his weapon on the Officers, they pursued him as armed and dangerous and acted reasonably when drawing their guns when encountering Green. With their guns already drawn and Green in close proximity, it would have been both impractical and unwise for the Officers to have holstered their weapons to attempt to use another method to detain Green, such as pepper spray or a nightstick.

The timing of the encounter—as well as who actually shot first—is disputed; however, those specific details are not material enough to defeat summary judgment. Defendants argue, and the Court agrees, that Plaintiff's reference to select portions of the testimony of some of the witnesses is insufficient to create a genuine issue of material fact as to the Officers' reasonable belief that Green posed a threat of serious physical harm to the Officers or others when they used

---

[11] The fact that a situation "unfolds quickly" is not alone sufficient to justify the application of deadly force, but it is a factor that weighs in favor of a finding of reasonableness when it accompanies a credible threat to the safety of an officer or the public. *See Mullins*, 805 F.3d at 766–67.

deadly force. The differences in what the witnesses observed and testified to appears to be based on their vantage point. For example, Newsome and Hickman insist that Green never had a gun at all, however the physical evidence clearly contradicts that testimony, nor does Plaintiff contest this fact. Rather, it appears that these witnesses, as well as many others, including Rutledge, were not watching exactly what was unfolding when the shooting began, most testified that they took cover or ran upon hearing the gunfire. Accordingly, the fact that Green did not comply with the Officers' instructions to put the gun down and continued to brandish it, and had displayed hostility toward the Officers, including yelling profanities, constitutes resisting arrest. In that moment, the Officers' use of deadly force against Green did not violate the Fourth Amendment.

Even if this Court found that Green was not resisting or evading arrest, such that the third factor does not weigh in favor of the officers, the outcome would not change. When the suspect poses an immediate threat as already found, such circumstances still justify entry of summary judgment for the Officers on an excessive force claim. *See Davidson v. City of Opelika*, 675 F. App'x 955, 959 (11th Cir. 2017) (where a reasonable officer would have believed that suspect was pointing a gun at him, suspect objectively posed a grave and immediate threat that rendered the use of deadly force not excessive). Simply put, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, use of deadly force does not violate the Constitution." *Penley v. Eslinger*, 605 F.3d 843, 851 (11th Cir. 2010). Indeed, in *Mitchell v. Schlabach*, 864 F.3d 416, 422 (6th Cir. 2017), the Sixth Circuit noted that:

> While it is beyond question that '[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead,' it is also clear that Mitchell was something more than a 'nondangerous suspect.' [*Garner*] at 11. As discussed above, the available evidence readily establishes that Schlabach reasonably believed that he was in danger of serious physical harm when he shot Mitchell. We therefore will not 'second-guess[] [Schlabach's] assessment, made on the scene, of

> the danger presented by' Mitchell's approach. *Ryburn v. Huff*, 565 U.S. 469, 477,
> 132 S. Ct. 987, 181 L. Ed. 2d 966 (2012) (per curiam). Accordingly, we find that
> the seriousness-of-the-threat factor also weighs in favor of a finding of
> reasonableness here.

*Mitchell*, 864 F.3d at 422.

### b.       Segmented Analysis

Plaintiff contends that the proper analysis for consideration of all the events constituting

excessive force is a segmented approach that requires a reevaluation of the reasonableness of the

force used as the circumstances change. (Doc. 202, Pl.'s Resp. at 55–56; citing *Dickerson,* 101

F.3d 1151). The Sixth Circuit employs a segmented approach to excessive force claims where the

reasonableness of each shooting is analyzed independently of the other shootings. *Greathouse v.*

*Couch*, 433 F. App'x 370, 372 (6th Cir. 2011). The Sixth Circuit has warned that "'[w]hen an

officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at

any time thereafter with impunity.'" *Dickerson*, 101 F.3d at 1162 n.9 (quoting *Ellis v. Wynalda*,

999 F.2d 243, 247 (7th Cir. 1993)).

In *Dickerson*, the court "segmented the claims . . . to consider first, the reasonableness of

the officers' actions in entering Dickerson's home without following the knock and announce rule

and then, second, their use of deadly force against Dickerson. . . . We limited the second inquiry

to the 'moments preceding the shooting' and did not allow consideration of the officer's entry into

Dickerson's home to weigh in this determination." *Id*. While the Court does not disagree that the

Sixth Circuit often employs a segmented approach to these cases, it is also necessary for the Court

view the officers' actions within the context of the totality of events. Given that the ultimate

question is whether the officers' actions were reasonable, the use of force "analysis must consider

all of the knowledge possessed by [the officer] at the moment he determined to employ . . . force.

We cannot simply take a snapshot of the moment and consider it in isolation from other

information." *Bouggess v. Mattingly*, 426 F. Supp. 2d 601, 607 (W.D. Ky. 2006) (citing *Garner*, 471 U.S. at 1).

Specifically, Plaintiff directs the Court's focus on the segment of the encounter when the Officers approached Green in plain clothes. Plaintiff relies on *Dugan v. Starrett*, 2014 U.S. Dist. LEXIS 23600, (S.D. Ohio 2014) (Frost, J.) to assert that Green did not know the Officers in this case were Officers because like those in *Dugan*, they were wearing civilian clothes and driving an unmarked vehicle. However, unlike *Dugan*, Green is not here to testify as to what he believed at the time. There is no evidence of what Green knew, however, the testimony, viewed objectively, strongly indicated that Green's intentions during this encounter were not innocent and compliant, but defiant and hostile. Ultimately, of course, the objective reasonableness of the officers' conduct must be measured in light of what they actually observed in the circumstances confronting them, not in light of speculation that may arise with the benefit of hindsight. And as discussed above, the Officers in this case had already determined that Green posed a threat of serious physical harm to both the Officers and the public and needed to be apprehended.

Plaintiff also argues that the Officers' shots must be segmented, specifically as Plaintiff was falling to the ground. However, Plaintiff has failed to provide any evidence that the Officers' shots at Green were separated by "a significant gap in time that they must be viewed as distinct incidents requiring individualized analysis." *Stevens-Rucker v. City of Columbus*, 739 F. App'x 834, 844 (6th Cir. 2018). Rather, the undisputed evidence establishes that this entire incident happened very quickly—lasting less than two minutes, with both Officers firing all of their shots in a five-second window. Like the incident in *Stevens-Rucker*, the "shots were fired in such rapid succession that they constituted a single event." *Id.*[12]

---

[12] *See also Mullins*, 805 F.3d at 766, in which the officer maintained that the "confrontation unfolded in such rapid succession that he did not have a chance to realize that a potentially dangerous situation had

Therefore, based on the aforementioned standards and detailed discussion, the Court concludes that Officers Rosen and Bare's use of deadly force on Green was objectively reasonable and does not amount to excessive force in violation of the Fourth Amendment.  The facts as told by both parties and confirmed with the video/audio evidence, establish that the Officers believed they were approaching an armed and dangerous suspect who had just threatened them with a gun.

      **c.**      **Equal Protection**

Plaintiff originally filed a claim under Section 1983 for violation of the Fourteenth Amendment Equal Protection Clause against the Defendants.  However, in Plaintiff's Response in Opposition to Defendants Bare and Rosen's Motion for Summary Judgment, Plaintiff states: "Plaintiff has chosen not to respond to Defendants' arguments in connection with her Section 1983 Fourteenth Amendment Equal Protection Clause claim against the Defendants."  (Doc. 202, Pl.'s Resp. at 4).  The Court therefore deems this claim abandoned.  *See Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (plaintiff deemed to abandon claim by failing to address the claim in response to a motion for summary judgment).  Judgment is therefore granted in Defendants' favor on this claim.

      **2.**      **Clearly Established Inquiry**

If the Court were to have found that the Defendants violated any of Plaintiff's constitutional rights, then the next step would be to ask whether the right was "clearly established" in a particularized sense, such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

---

evolved into a safe one."  The Sixth Circuit ultimately concluded that the officer "was faced with a rapidly escalating situation, and his decision to use deadly force in the face of a severe threat to himself and the public was reasonable."  *Id.*

There is no question that a reasonable officer in the same situation as any of the Defendant Officers in this case, would have known that there is a clearly established constitutional right to be free from excessive force and/or deadly force. Thus, a reasonable officer would not have used deadly force against Green unless he or she had probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others. Having found that Officers Rosen and Bare had probable cause to believe Green posed a threat of serious physical harm, namely because he pulled a gun on the Officers, then there was no violation of Plaintiff's clearly established constitutional rights.

Even if the Officers' use of deadly force on Green was objectively unreasonable and, therefore, constituted excessive force, Defendants would nonetheless be entitled to qualified immunity because Plaintiff has failed to prove that the Officers' actions violated a clearly established constitutional right at the time of the use of deadly force. Generally speaking, the Fourth Amendment right to be free from excessive force in the context of a seizure is clearly established. *See Saucier,* 533 U.S. at 201–02; *Adams v. Metiva,* 31 F.3d 375, 386–87 (6th Cir. 1994); *Belford v. City of Akron,* No. 5:05cv2650, 2006 U.S. Dist. LEXIS 57704, 2006 WL 2381507, at *5 (N.D. Ohio Aug. 16, 2006). However, the Supreme Court has held that for the purposes of qualified immunity, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier,* 533 U.S. at 202 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, (1987)). In other words, this inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 201. At the time of this incident, "the law was clearly established that officers could not use deadly force unless they had probable cause to

26

believe that an individual posed a serious risk of harm to officers or others." *Lopez v. City of Cleveland*, 625 F. App'x 742, 744 (6th Cir. 2015).

Plaintiff generally asserts that Green had the right not to be shot if he did not pose an immediate threat to the safety of the officers or others. (Doc. 202, Pl.'s Resp. at 59). Defendants, however, counter that Green posed an immediate threat to the safety of the Officers and others. This determination comes down to whether a reasonable officer would believe that Green was an immediate threat to others in the area.

In this case, Plaintiff cites no controlling Fourth Amendment case that declares materially similar conduct by law enforcement unconstitutional, nor has this Court found any case law holding that an officer violates the Fourth Amendment by shooting an armed and dangerous suspect who had already showed he was armed by pulling a gun on the officer and who was not complying with the officer's orders. Plaintiff generally relies on the Supreme Court's decision in *Tennessee v. Garner*, as well as *Dickerson*, *Bouggess*, and *Estate of Kirby* in asserting that the law was clearly established. The Court will address each of these cases, however, these cases are not sufficiently "particularized" to the facts of this case to place the supposed unconstitutionality of the Officers' actions "beyond debate" because they all involved situations in which the victim did not pose a threat to the shooting officer's safety.

The decision in *Tennessee v. Garner* indisputably enshrines the rule that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." 471 U.S. at 11. However, that case involved facts much different than the facts of this case. *Garner* centered upon a police officer's decision to shoot an unarmed criminal suspect as he was attempting to flee from the scene of a robbery on foot. *Id*. at 3–4. The police officer testified that he shot the suspect because he was convinced that the suspect would have eluded capture otherwise. *Id*. at 4 n.3.

Based on those facts, the Supreme Court determined that the police officer had violated the suspect's clearly established constitutional right to be free from excessive force because the suspect was unarmed and did not pose a danger to the officer or the public. *Id*. at 11. In this case, if Green were unarmed and had turned away from the GMC and fled, then *Garner* would be on point. However, Green was not attempting to flee when he was shot, rather, he was confronting the Officers, failing to obey their commands, and he had a gun.

Plaintiff also relies on *Dickerson*, 101 F.3d 1151, as authority for the idea that Green did not pose a threat to the Officers' safety because he was walking with his hands by his sides when he was shot. In *Dickerson*, the Sixth Circuit considered an officer's appeal from the lower court's denial of summary judgment on the basis of qualified immunity in a case involving a police shooting. *Id*. at 1154. The evidence in that case suggested that two police officers had been dispatched after neighbors reported that Dickerson was drunk and had fired nine shots inside his home. *Id*. at 1154. After the officers entered the home, Dickerson closed the cylinder on a revolver, screamed, and ran toward the front door. *Id*. One of the officers took cover inside the home while the other retreated outside. *Id*. Both officers then shot the suspect. *Id*. at 1155. A witness across the street testified that she saw the suspect walk slowly toward the front door with his hands by his sides and that she then heard a gunshot. *Id*. at 1154-55. She was unable to remember anything beyond that point because she was hit by a stray bullet. *Id*. at 1155. The police provided conflicting testimony, stating that Dickerson exited the home with his handgun pointed at the officer who fled the home and that the officer fired in order to neutralize the threat to his safety. *Id*. The Sixth Circuit ultimately held that it lacked jurisdiction over the appeal due to the conflicting testimony about the facts of the shooting, but also suggested in dicta that the shooting would have violated Dickerson's clearly established rights if it was true that he walked slowly

28

toward the door with his hands at his sides when he was shot. *Id*. at 1164-65. That dicta does not support the Plaintiff's claim here because it assumed a set of facts in which the victim could not have been reasonably perceived as an immediate threat to the officers' safety. Here, the evidence establishes that Green was a serious threat to the Officers and general public. Accordingly, *Dickerson's* discussion of a situation in which the suspect does not pose a threat to the shooting officer's safety is not relevant to our analysis in this case.

Next, Plaintiff relies on *Bouggess v. Mattingly*, 482 F.3d 886 (6th Cir. 2007) for two purposes. First, Plaintiff claims *Bouggess* supports the argument that it was clearly established that Green should not have been shot merely because he had a gun in his waistband but had not pulled it. Second, Plaintiff relies on *Bouggess* to counter Defendants' argument that it is consequential that the incident occurred in a dangerous neighborhood. In *Bouggess*, a crack dealer, Newby, struggled with Officer Mattingly and was resisting arrest. When Newby fled from Mattingly, Mattingly shot him in the back and killed him. *Id*. at 888–89. Like the above cases, the *Bouggess* court held that a suspect fleeing on foot, without more, cannot justify the use of deadly force. The court refused to rely on the police officer's contention that crack dealers are dangerous as justification for the use of deadly force. However, the present case differs because when the officer in *Bougess* called in the report of theft, he did not believe that Newby was armed, nor did he radio in that Newby was armed and dangerous. Again, a case in which the court determined that the suspect did not pose a threat to the officer's safety is not instructive here. Further, merely because Bouggess was a crack dealer in a dangerous neighborhood, was not sufficient to justify the use of deadly force. But again, *Bouggess* is distinguishable from the case at bar because a dangerous neighborhood was not the only evidence Officers Rosen and Bare were relying on when pursuing Green.

Finally, Plaintiff relies on *Estate of Kirby v. Duva*, 530 F.3d 475 (6th Cir. 2008), to argue that the Officers in this case cannot rely on Green's reputation to justify the use of deadly force. In *Estate of Kirby*, officers shot and killed a suspect inside his vehicle when they claimed he was driving at them and they feared for their safety. The evidence, however, showed that Kirby was not driving recklessly and there was no danger to the officers. The fact that Kirby, a known drug dealer, had a reputation for paranoia and violence was not sufficient to establish that he posed a threat to the officers at the time of the shooting. The Officers in this case made no claims regarding their knowledge of Green's reputation. Rather, they merely relied on his actions of pulling a gun on them minutes before the second encounter with him. *Kirby* is also not relevant to the case at bar.

The aforementioned cases relied on by Plaintiff establish that it is settled law that a suspect has a right not to be shot when he does not pose a risk of danger to the police or the public. However, the relevant case law shows that there is no bright-line rule to determine whether force is excessive when the suspect does pose a risk of danger to the police or the public. The Supreme Court has cautioned that an officer's actions may fall "in the 'hazy border between excessive and acceptable force.'" *Brosseau v. Haugen*, 543 U.S. 194, 200-01 (2004) (quoting *Saucier*, 533 U.S. at 206). Therefore, to officers approaching an armed and dangerous suspect that had previously pulled a gun on them, it would not be "clear to a reasonable officer that his conduct was unlawful in the situation he confronted," and thus, that the right was not clearly established. *Saucier*, 533 U.S. at 202. Accordingly, for the aforementioned reasons, Officers Rosen and Bare did not violate any of Green's "clearly established" rights and are therefore entitled to qualified immunity on Plaintiff's excessive force and wrongful death claims.

### 3. Objectively Reasonable Officer test

Even if the Court were to have found that the Officers violated Green's clearly established constitutional rights, Plaintiff cannot establish that an objectively reasonable officer faced with the same circumstances as the Officers in this case would have recognized that the conduct violated a clearly established constitutional right. The final test for qualified immunity is whether an objectively reasonable officer under the circumstances would have known that the officers' conduct violated the constitution in light of the preexisting law.

Considering the circumstances in this case—that Green pulled a gun on the Officers and was therefore considered armed and dangerous, and that Green failed to comply with the Officers' instructions—then an objective officer faced with the same circumstances, would recognize that it was reasonable to determine that Green posed a threat to the officer and others and it was reasonable to use deadly force in the rapidly escalating encounter. Accordingly, the use of deadly force in this case was not a violation of Green's clearly established constitutional rights. Officers Rosen and Bare are therefore entitled to qualified immunity on Plaintiff's claim of excessive force in this case.

### B. *Monell* Liability

Plaintiff seeks to hold the City of Columbus, Chief Jacobs, Commander Cameron, and Sergeant Pilya liable, in their official capacities, under a theory that the policy and customs implemented by the City and the Police Department resulted in a deprivation of Green's constitutional rights. Specifically, Plaintiff alleges that:

> Defendant City of Columbus and its decision-makers, with deliberate indifference, gross negligence and reckless disregard to the safety, security and constitutional and statutory rights of Henry Green V, maintained, enforced, tolerated, permitted, acquiesced in, and applied policies, practices or customs and usages by and applied policies, practices, or customs and usages of, among other things: (1) Training and authorizing Columbus Division of Police Officers to act recklessly and aggressively with regard to the use of force on citizens; (2) Hiring, retaining and assigning

officers with demonstrably unreasonable decision-making patterns and patterns of misconduct; (3) Subjecting citizens to the unreasonable use of force and unreasonable seizure; (4) Allowing officers to violate the constitutional rights of citizens and take other unlawful action against citizens; (5) Failing to adequately train officers regarding the use of force and the use of lethal force; (6) Failing to adequately train officers on plainclothes tactics and negligently assigning officers to plainclothes duty; (7) Failing to adequately supervise officers, permitting unlawful conduct to occur; (8) Failing to adequately discipline officers regarding their unlawful conduct; (9) Failing to perform drug and alcohol tests on officers after their involvement in police shootings; (10) Authorizing the Summer Strike Force/Community Safety Initiative to continue on for years while negligently assigning, supervising and retaining officers working in the program; (11) Setting numbers-based goals for the Summer Strike Force/Community Safety Initiative which led to unconstitutional and unlawful conduct while pursuing those goals; (12) Failing to adequately investigate police-involved shootings, both ratifying and authorizing future behavior; (13) Condoning and encouraging officers in the belief that they can violate the constitutional rights of individuals, such as Henry Green V, and that such conduct will not adversely affect their opportunities for promotion and other employment benefits.

(Doc. 219, Pl.'s Resp. at 2–3; Doc. 1, Compl. ¶ 176). Additionally, Plaintiff alleges:

Defendants' conduct as alleged constitutes a pattern of constitutional violations based either on a deliberate plan by defendants or on defendants' deliberate indifference, gross negligence, or reckless disregard to safety, security, and rights of plaintiff and the Decedent. Plaintiff alleges that (1) Defendant City of Columbus has a policy, practice and custom of allowing officers to violate the constitutional rights of citizens, and failing to adequately train, supervise and discipline officers who participate in such unlawful conduct; (2) Defendant City of Columbus authorized Community Safety Initiative/Summer Strike Force, and as a matter of policy, Defendants authorized overly aggressive and unlawful conduct, and inadequately supervised, trained and disciplined officers in such a way that it reflects deliberate indifference to the constitutional rights of those likely to be implicated when officers of the Columbus Division of Police come into contact with community residents and others; (3) Defendant Sergeant Eric Pilya, as Team Leader for the Critical Incident Response Team, had both actual and constructive knowledge of the actions of both Officers Bare and Rosen, as well as actual and constructive knowledge of the actions of the actions of the detectives responsible for investigating police-involved shootings, and he along with chain of command authorized and encouraged the pattern and practice of failing to adequately investigate officer-involved shootings; (4) Commander Gary Cameron, as 2016 Community Safety Initiative Director, and as a matter of policy and practice negligently assigned, trained, supervised and retained officers working in the program. Commander Cameron had both actual and constructive knowledge of the actions of both Officers Bare and Rosen, as well as actual and constructive knowledge of the actions of the chain of command in failing to train, supervise and

discipline Officers Bare, Rosen and other officers working the Community Safety Initiative throughout the years; and (5) Chief Kim Jacobs, as chief law enforcement officer for the City of Columbus, Ohio, serves as the ultimate policymaker for the Columbus Division of Police, and had both actual and constructive knowledge of the actions of both Officers Bare and Rosen, as well as actual and constructive knowledge of the actions of the chain of command in failing to train, supervise and discipline Officers Bare, Rosen and others like them.

Defendants move for summary judgment on Plaintiff's municipal liability claims under *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978). The *Monell* decision made clear that local government units could be held liable for § 1983 claims, but that "§ 1983 did not support *respondeat superior* liability, reasoning that 'Congress did not intend municipalities [and other local government units] to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort.'" *Moldowan v. City of Warren*, 578 F.3d 351, 394 (6th Cir. 2009) (quoting *Monell*, 436 U.S. at 691). A plaintiff can identify one of four methods "[t]o show the existence of a municipal policy or custom leading to the alleged violation:" "(1) the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance of acquiescence of federal violations." *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015), *cert. denied*, 136 S. Ct. 1381 (2016) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).

"A city's custom or policy can be unconstitutional in two ways: 1) facially unconstitutional as written or articulated, or 2) facially constitutional but consistently implemented to result in constitutional violations with explicit or implicit ratification by city policymakers." *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (citing *Monell*, 436 U.S. at 692–94). "In other words, the risk of a constitutional violation arising as a result of the inadequacies in the municipal

policy must be 'plainly obvious.'" *Id.* (citing *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 412 (1997)).

Plaintiff must "identify the policy, connect the policy to the [county] itself and show that the particular injury was incurred because of the execution of that policy." *Searcy v. City of Dayton*, 38 F.3d 282, 287 (6th Cir. 1994). Plaintiff must show that there is a direct causal link between the city's policy and the alleged constitutional violation. *See City of Canton v. Harris*, 489 U.S. 378, 389 (1989). The "constitutional violation of a municipal official is a prerequisite to municipal liability." *Pollard v. City of Columbus*, 780 F.3d 395, 404 (6th Cir. 2015) (citing *Weeks v. Portage Cty. Exec. Officers*, 235 F.3d 275, 279 (6th Cir. 2000)). This Court has determined in the preceding sections that Defendants did not violate Green's constitutional rights by the use of deadly force employed against him. Therefore, Defendants are also entitled to summary judgment on Plaintiff's claims of municipal liability.

## C.      State Law Claims

Plaintiff also asserts state law claims against Defendants for wrongful death, assault, and battery. Plaintiff only asserts federal subject matter jurisdiction in this case based on his 42 U.S.C. § 1983 claims. Having granted summary judgment to Defendants on Plaintiff's federal claims against them, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. It is well-settled that a district court may decline to exercise supplemental jurisdiction over state law claims once it has dismissed all claims over which it possessed original jurisdiction. *Saglioccolo v. Eagle Ins. Co.*, 112 F.3d 226, 233 (6th Cir. 1997). Indeed, the Sixth Circuit has recognized that if all federal claims are dismissed before trial, remaining state claims generally should be dismissed. *Id.*; *Taylor v. First of Am. Bank-Wayne*, 973 F.2d 1284, 1287 (6th

Cir. 1992).  Therefore, pursuant to 28 U.S.C. § 1367(c)(3) and (d), the Court will dismiss Plaintiff's state law claims against all Defendants without prejudice.

## IV.    CONCLUSION

For the foregoing reasons, Defendants City of Columbus Motion for Summary Judgment is **GRANTED**; Officers Bare and Rosen's Motion for Summary Judgment is **GRANTED**; and Police Chief Kim Jacobs, Columbus Police Commander Gary Cameron, and Columbus Police Sergeant Eric Pilya's Motion for Summary Judgment is **GRANTED**.

The Clerk shall remove Documents 171, 172, and 173 from the Court's pending motions list and enter final judgment in favor of Defendants.

**IT IS SO ORDERED.**

*/s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**