```
 1           IN THE UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION

 3                       - - -

 4   Adrienne Hood,              :
                                 :
 5         Plaintiff,             :
                                 :
 6         vs.                    :    Case No. 2:17-CV-471
                                 :
 7   City of Columbus, et al.,   :
                                 :
 8         Defendants.            :

 9                       - - -

10            DEPOSITION OF TRACI M. SHAW

11                       - - -

12
                   Wednesday, September 12, 2018
13                 10:17 a.m.
                   City of Columbus Department of Law
14                 77 North Front Street
                   Columbus, Ohio  43215
15
                         - - -
16              SUSAN L. COOTS, RPR
           REGISTERED PROFESSIONAL REPORTER
17                       - - -

18

19

20

21

22          ANDERSON REPORTING SERVICES, INC.
                 1421 West Third Avenue
23                Columbus, Ohio  43212
                     (614) 326-0177
24                 FAX (614) 326-0214
```

Tracie M. Shaw
9/12/2018
52



```
19   Q.        Based on your training, education, and
20   experience, what is your understanding of an imminent
21   or immediate threat being likely to happen?
22   A.        It's likely to happen.
23   Q.        Can you give me some examples.
24   A.        Of an immediate threat?
```

```
1    Q.         Yes.
2    A.         Certainly.  Let's take an active shooter
3    scenario in a school, a student is hiding under her
4    desk, and there's an active shooter outside going
5    through the building shooting students.  She is in
6    danger and immediate threat -- of an immediate threat.
7    Q.         So there's an active shooter example.  Any
8    other examples?
9    A.         Yes.
```

```
 6   Q.        Are there other firearm examples?
 7   A.        I could give you millions of examples.
 8   Someone pointing a gun at you, a deadly weapon, a
 9   firearm.  That person would be an immediate threat.
10   Q.        Active shooter.  Someone pointing a gun.
11   Other firearms examples.
12   A.        Other firearms examples?
13   Q.        Uh-huh.
14   A.        Someone pointing a gun, someone shooting a
15   gun in the area that you're in; you're in an immediate
16   threat.
```

```
6   Q.         Do you expect all Columbus Division of
7   Police Officers to comply with that requirement that
8   the threat of serious bodily harm be imminent?
9   A.         Yes, sir.
```



23   Q.        All right.  Opinion 7.
24             "Rosen complied with National Law

1  Enforcement guidelines training and best practices
2  when he fired his weapon at Henry L. Green."
3          What facts and witnesses did you base that
4  opinion on?
5  A.      I based that on Officer Rosen and Officer
6  Bare's statements.  I also based it on the Columbus
7  Police Division Directive Use of Force Policy 201.
8          "If reasonable, sworn personnel should give
9  a verbal warning and intention to use deadly force,"
10 and they attempted to do that.
11         And, certainly, I use it on the action
12 versus reaction.  Action is always faster than
13 reaction.  Henry Green could have pulled out that gun
14 towards Rosen in 23/100 of a second.  So as soon as he
15 starts making that movement towards his waistband, in
16 my opinion, concerning the totality of the
17 circumstances, that that level of force is reasonable.
18 Q.      Any assumptions?
19 A.      My assumption that -- on this one, no, sir.
20 Q.      And looking at Opinion 8.  "Bare complied
21 with National Law Enforcement guidelines, training,
22 and best practices when he fired his weapon at Henry
23 L. Green, V."
24 A.      Yes, sir.

1  Q.          What did you base that on?  What facts and
2  witnesses?
3  A.          On Bare's statement that he observed Henry
4  Green firing shots at Officer Rosen, and he had a duty
5  to protect Officer Rosen's life.  And, certainly,
6  Henry Green was a deadly threat to him as well because
7  he could have easily have turned that weapon.  So I
8  showed some action versus reaction on how quickly
9  someone can move a firearm across their body.  12/100s
10 of a second.  That 12/100s of a second is what Henry
11 Green could have turned the gun towards Officer Bare,
12 so he was in danger of serious physical harm.
13 Q.          And any assumptions in forming this opinion?
14 A.          No, sir.
15 Q.          And Opinion 9.  "It is my opinion that
16 holding Green at gunpoint until backup arrived would
17 comply with National Law Enforcement guidelines,
18 training, and best practice."  What facts and
19 witnesses did you base that opinion on?
20 A.          On that is our OPOTA curriculum.  That's
21 what I base that on.
22 Q.          Did you base it on any witness statement?
23 bare and Rosen's witness statements?
24 A.          Yes.  Well, that's what they did, so,

1  obviously, I used their statements.  I'm sorry.  I
2  didn't mean to say "obviously."
3           Rosen and Bare, I use their statements.
4  That's what they did.  Then I also used the -- I
5  looked at the video.  And when I believe it was
6  Cruiser No. 23 pulled up, that's what they -- that's
7  what the officers were doing.
8  Q.       Any assumptions in forming this opinion?
9  A.       Yes.  I assumed that Henry Green had dropped
10 the gun at that point in order to be holding them --
11 no longer firing at him.
12 Q.       Any other assumptions?
13 A.       No, sir.
14 Q.       And then Opinion 10.  "It is my opinion that
15 handcuffing Green and rendering aid to him complied
16 with National Law Enforcement guidelines, training,
17 and best practices."
18 A.       Uh-huh.
19 Q.       Can you give me any facts and witnesses that
20 you relied on?
21 A.       So that's the best -- they did handcuff
22 Green.  Responding officers did handcuff Green.  That
23 was seen on video.  As far as rendering aid, that was
24 also seen on video.  Of course, once the scene is

1  safe, we need to -- "safe" meaning that the threat has
2  been stopped, from that point, you need to get medical
3  aid, render aid started for the suspect or officers.

6   Q.          And you state here in the second paragraph,
7   the second-to-last sentence on Page 10, you state
8   that, "Studies have shown that glass and car doors do
9   not provide ballistic protection cover from bullets
10  and can easily be penetrated."
11  A.          Yes, sir.
12  Q.          What studies are you referring to?
13  A.          There are numerous studies.  The one that I
14  actually saw, we took a CPD cruiser door and fired all
15  kinds of rounds at it.  And then we took dowel rods
16  and we labeled them and we shot a 357 through the car
17  door and labeled it, and then a shotgun through there,
18  a 9-millimeter, and we labeled them, and then put
19  dowel rods through that so you could see that they
20  went -- they penetrated that door.  So there are
21  numerous studies about that.  However, I have
22  personally seen that door that was used, and we have
23  that at the academy and we use that in training.
24  Q.          Now, I know that you were asked to assume

```
1   and write this report based on the belief that
2   everything that Officer Bare and Rosen said was true?
3   A.        True.  Uh-huh.
```

[redacted]

```
11  Q.        Now, regarding your opinions in your report,
12  these ten opinions here, are you 100 percent certain
13  about each of your opinions based on the facts as you
14  believe them?
15  A.        Within a reasonable degree of law
16  enforcement certainty, yes, sir.
17  Q.        Have you made any credibility determinations
18  as a part of your analysis in this matter?
19  A.        No, sir.
```

[redacted]

```
20   Q.        So in this case, at what point would you
21   think that actively resisting factor would have come
22   into play?
23   A.        I don't know that -- I think he was actively
24   trying to kill Officer Rosen.  I don't think he was
```

```
1   actively resisting arrest.
2   Q.      So you don't think it's a factor here?
3   A.      I don't, sir.
4   Q.      And then whether the suspect is attempting
5   to evade arrest by flight.  My assumption is that the
6   same thing applies; he's not evading arrest by flight
7   in this scenario?
8   A.      Uh-huh.
9   Q.      Based on your understanding of the facts, he
10  attempted to kill Officer Rosen?
11  A.      Yes, sir.
```